OFFICE OF THE COUNTY COUNSEL
COUNTY OF SANTA CLARA
TONY LOPRESTI, State Bar #289269
KAVITA NARAYAN, State Bar #264191
MEREDITH A. JOHNSON, State Bar #291018
RAPHAEL N. RAJENDRA, State Bar #255096
LAURA S. TRICE, State Bar #284837
HANNAH M. GODBEY, State Bar #334475
TAYRYN A. EDWARDS, State Bar #344959
70 West Hedding Street, East Wing, Ninth Floor
San José, California  95110-1770
Telephone: (408) 299-5900
Facsimile:  (408) 292-7240
E-Mail:     Tony.LoPresti@cco.sccgov.org
            Kavita.Narayan@cco.sccgov.org
            Meredith.Johnson@cco.sccgov.org
            Raphael.Rajendra@cco.sccgov.org
            Laura.Trice@cco.sccgov.org
            Hannah.Godbey@cco.sccgov.org
            Tayryn.Edwards@cco.sccgov.org

Attorneys for Plaintiff
COUNTY OF SANTA CLARA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
San Jose Division

| County of Santa Clara, | No. |
| Plaintiff, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| v. | |
| **Donald J. Trump**, as President of the United States; **Department of Justice**; **James McHenry**, in his official capacity as Acting Attorney General of the United States; **Department of State**; **Marco Rubio**, in his official capacity as Secretary of State; **Department of Homeland Security**; **Kristi Noem**, in her official capacity as Secretary of Homeland Security; **U.S. Citizenship and Immigration Services**; **Jennifer B. Higgins**, in her official capacity as Acting Director of U.S. Citizenship and Immigration Services; **Department of Health & Human Services**; **Dorothy Fink**, in her official capacity as Acting United States Secretary of Health and Human Services; **Centers for Medicare & Medicaid Services**; **Jeff Wu**, in his official capacity as Acting Administrator of the Centers for Medicare & Medicaid Services; **United States Social Security Administration**; **Michelle King**, in her | |

official capacity as Acting Commissioner for Social Security; **Department of Housing and Urban Development**; **Matthew Ammon**, in his official capacity as Acting Secretary of Housing and Urban Development; **Department of Agriculture**; **Gary Washington**, in his official capacity as Acting Secretary of Agriculture; and the **United States of America**,

Defendants.

# INTRODUCTION

1.      Just hours into his term, President Trump issued an executive order that will, if implemented, deprive membership in this Nation's democracy to vast numbers of people born in the United States and subject to its laws, and therefore guaranteed citizenship by the Constitution itself. The executive order would bar full participation in American society in *precisely* the ways that the Nation permanently rejected when it ratified the Fourteenth Amendment 157 years ago.  Like the Civil War in whose shadow it was drafted, enacted, and ratified, the Fourteenth Amendment repudiates the view that people born in the United States could be denied citizenship based on the status of their parents and ancestors.  Instead, it fulsomely embraces and adopts *jus soli*—"right of the soil"—as the law of the land.

2.      By its very terms, the Fourteenth Amendment guarantees citizenship to every person who is born in the United States and subject to American law, regardless of their parentage.  The very first sentence of the Fourteenth Amendment, known as the Citizenship Clause, provides: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside."  More than 125 years ago, the Supreme Court articulated and applied the obvious meaning of the Fourteenth Amendment's language in a case that originated in the Northern District of California, *United States v. Wong Kim Ark*, 169 U.S. 649 (1898).  And echoing the Fourteenth Amendment, Congress made clear in the Immigration and Nationality Act that "person[s] born in the United States, and subject to the jurisdiction thereof" "shall be nationals and citizens of the United States at birth."  8 U.S.C. § 1401.  Each of these sources individually, and all of them collectively, underscore that birthright citizenship has been an

Complaint for Declaratory and Injunctive Relief

obvious, fundamental, and constitutionally inflexible aspect of American law for over a century and a half. Indeed, the entire architecture of modern American law and life is built upon the bedrock of the Constitution's guarantee of birthright citizenship to all individuals born in the United States and subject to its jurisdiction, regardless of the parents to whom those individuals are born.

3. On January 20, 2025, President Trump issued an executive order entitled "Protecting the Meaning and Value of American Citizenship." Exec. Order No. 14,160 of January 20, 2025, 90 Fed. Reg. 8,449 (Jan. 29, 2025) ("Order"). The Order directs the entire executive branch to ignore this constitutional and statutory guarantee and instead recognize the citizenship of a child born on American soil only if that child's biological mother or father is a U.S. citizen or lawful permanent resident when the child is born.

4. If the Order is implemented or enforced, it will cause the government to deny the benefits, privileges, and vital protections of United States citizenship to hundreds of thousands, if not millions, of people who are born each year and entitled to citizenship under the Fourteenth Amendment—a deprivation that will follow them through their entire lives. This includes thousands of individuals served by Plaintiff County of Santa Clara ("Santa Clara"). It includes children born to parents who lack lawful immigration status as well as children born to parents in a wide range of lawful but temporary immigration statuses. Among the people whom the Order would prevent from raising their U.S.-born children as U.S. citizens are asylees and refugees enjoying hard-earned safety in our country and awaiting their Green Cards, professionals from other nations who lend their skills to Santa Clara's workforce and myriad businesses within Santa Clara County under H-1B visas, students on visas attending the multiple universities in Santa Clara County, and undocumented persons who live in and contribute to the Santa Clara County community. These families are neighbors, coworkers, and friends—all of them valued parts of the communities whose health and welfare governments, especially local governments, are responsible for protecting.

5. The Order's harms are not simply theoretical or far-off. The Order is already ripping at the fabric of society in ways that local governments like Santa Clara—as the level of government closest to the people—are uniquely exposed to, especially well-positioned to see, and directly responsible for mending. The Order is already harming Santa Clara by forcing it to incur financial

Complaint for Declaratory and Injunctive Relief

costs and workload burdens to respond to the chaos the Order is sowing, and to anticipate and plan for the Order's long-term impacts.  And if the Order goes into effect, Santa Clara will suffer concrete financial and other losses due to the Order's predictable effects on public engagement with County programs and services.  Santa Clara will continue to be harmed by the Order and Defendants' actions to implement and enforce it unless and until it is permanently enjoined.  Like counties across California and local governments across much of the nation, Santa Clara operates the social safety net of programs and services that enable its residents to live lives of dignity.  Among Santa Clara's core responsibilities under state law is the duty to relieve and support the most vulnerable among us. As a result of the Order, Santa Clara is already, and will continue to be, hampered in its fulfillment of that core function.

6.      This Court should declare that the Order is unconstitutional and unlawful and enjoin and vacate any action to implement it.

**JURISDICTION AND VENUE**

7.      This Court has jurisdiction under 28 U.S.C. § 1331 because this is a civil action arising under the Constitution and other laws of the United States.  This Court also has jurisdiction under 28 U.S.C. § 1346(a)(2) because this is a civil action against the United States founded upon the Constitution and an Act of Congress.

8.      In addition to its other remedial authorities, this Court has authority to issue declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02.

9.      Venue properly lies within the Northern District of California under 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1) because Santa Clara is in this judicial district, no real property is involved in this action, and a substantial part of the events or omissions giving rise to this action occurred in this District.

**DIVISIONAL ASSIGNMENT**

10.      Assignment to the San Jose Division is proper under Civil L.R. 3-2(c) because the San Jose Division is the Division serving Santa Clara County, which is where a substantial part of the events or omissions giving rise to the claims asserted below occurred, and is therefore where this action arises.

Complaint for Declaratory and Injunctive Relief

**PARTIES**

11.     Plaintiff County of Santa Clara ("Santa Clara") is a charter county and political subdivision of the State of California.

12.     Santa Clara is home to one of the largest and most diverse populations in the country. It has almost two million residents and is more populous than 12 U.S. states.  The government of the County of Santa Clara alone employs more than 23,000 people.

13.     More than 40 percent of Santa Clara's residents are foreign-born.  That is the highest percentage of any county in California and one of the highest percentages of any county in the United States.  Santa Clara's foreign-born population exceeds 750,000 people and comprises people with a range of immigration statuses:  naturalized citizens; lawful permanent residents; individuals in a wide variety of lawful but temporary statuses, including but not limited to refugees, asylees, students studying at universities who hold student visas, and victims of human trafficking or other crimes who have assisted law enforcement and hold T or U visas; and people without lawful immigration status.  As the heart of Silicon Valley, Santa Clara also has many residents who are experts in computer and other technology industries who hold H-1B and related visas.

14.     More than 60 percent of children in Santa Clara County have at least one foreign-born parent.  That is by far the highest percentage in California and one of the highest percentages of any county in the United States.

15.     Santa Clara is aggrieved and has standing to bring this suit because Defendants' refusal to issue or accept evidence that children born in the United States and residing and receiving services in Santa Clara County are citizens of the United States, or to otherwise acknowledge their United States citizenship has injured, is injuring, and will continue to injure Santa Clara unless and until implementation and enforcement of the Order is permanently enjoined.

16.     Defendant Donald J. Trump is the President of the United States.  He issued the Order.  He is sued in his official capacity.

17.     Defendants Department of Justice, Department of State, Department of Homeland Security, U.S. Citizenship and Immigration Services, Department of Health & Human Services, Centers for Medicare & Medicaid Services, United States Social Security Administration,

Department of Housing and Urban Development, and Department of Agriculture (collectively, the "Department and Agency Defendants") are each a department, agency, or office of the United States. Each of the Department and Agency Defendants is responsible for generating, processing, issuing, accepting, and/or acknowledging information and documents that recognize that individuals born in the United States are citizens by virtue of their place of birth. Each of the Department and Agency Defendants is responsible for doing so in a variety of ways, including in connection with contracts, programs, or other activities that affect Santa Clara and residents in Santa Clara County.

18.    Defendant James McHenry is the Acting Attorney General of the United States. He is sued in his official capacity, in which capacity he is responsible for overseeing and administering all duties and programs of Defendant Department of Justice.

19.    Defendant Marco Rubio is the Secretary of State. He is sued in his official capacity, in which capacity he is responsible for overseeing and administering all duties and programs of Defendant Department of State.

20.    Defendant Kristi Noem is the Secretary of Homeland Security. She is sued in her official capacity, in which capacity she is responsible for overseeing and administering all duties and programs of Defendant Department of Homeland Security.

21.    Defendant Jennifer B. Higgins is the Acting Director of U.S. Citizenship and Immigration Services. She is sued in her official capacity, in which capacity she is responsible for overseeing and administering all duties and programs of Defendant U.S. Citizenship and Immigration Services.

22.    Defendant Dorothy Fink is the Acting United States Secretary of Health and Human Services. She is sued in her official capacity, in which capacity she is responsible for overseeing and administering all duties and programs of Defendant Department of Health & Human Services.

23.    Defendant Jeff Wu is the Acting Administrator of the Centers for Medicare & Medicaid Services. He is sued in his official capacity, in which capacity he is responsible for overseeing and administering all duties and programs of Defendant Centers for Medicare & Medicaid Services.

24.    Defendant Michelle King is the Acting Commissioner for Social Security. She is

Complaint for Declaratory and Injunctive Relief

1  sued in her official capacity, in which capacity she is responsible for overseeing and administering

2  all duties and programs of Defendant United States Social Security Administration.

3      25.    Defendant Matthew Ammon is the Acting Secretary of Housing and Urban

4  Development.  He is sued in his official capacity, in which capacity he is responsible for overseeing

5  and administering all duties and programs of Defendant Department of Housing and Urban

6  Development.

7      26.    Defendant Gary Washington is the Acting Secretary of Agriculture.  He is sued in his

8  official capacity, in which capacity he is responsible for overseeing and administering all duties and

9  programs of Defendant Department of Agriculture.

10     27.    Defendants James McHenry, Marco Rubio, Kristi Noem, Jennifer B. Higgins,

11 Dorothy Fink, Jeff Wu, Michelle King, Matthew Ammon, and Gary Washington (together, the

12 "Implementing Official Defendants") are officials within the government through whom the

13 Department and Agency Defendants will implement the Order.

14     28.    Defendant United States of America includes all government agencies and

15 departments responsible for the implementation, execution, and enforcement of the Order.

16                              **ALLEGATIONS**

17 **A.    The President Has No Authority to Deny or Refuse to Recognize Birthright Citizenship**

18     29.    Birthright citizenship has its roots in the English common law principle of *jus soli*,

19 meaning "right of the soil"—the rule that citizenship status is vested at birth, based on the child's

20 physical place of birth.  *See Calvin v. Smith*, 77 Eng. Rep. 377 (K.B. 1608) (*Calvin's Case*).

21     30.    The Fourteenth Amendment's Citizenship Clause enshrines this principle in the

22 Constitution.  Under the Fourteenth Amendment's Citizenship Clause, "[a]ll persons born or

23 naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United

24 States and of the State wherein they reside."  U.S. Const. amend. XIV, § 1, cl. 1.

25     31.    This sweeping grant of birthright citizenship to American-born children was no

26 accident.  To the contrary, it is widely understood that the Citizenship Clause—and, more

27 specifically, its inclusion of *all* persons—was meant to repudiate the notorious pre-Civil War

28 decision *Dred Scott v. Sandford*, 60 U.S. 393 (1857), in which the Supreme Court denied citizenship

1    to African Americans born on U.S. soil based on their race, the enslavement of their parents and

2    ancestors, and their forcible historical exclusion from the body politic.  Legislative debates

3    surrounding the ratification of the Fourteenth Amendment show that the enacting Congress

4    understood and intended that the Amendment's Citizenship Clause would apply to *all persons* born

5    on American soil—including, as one Senator crudely put it, children of "Gypsy" settlers or other

6    foreigners.  Cong. Globe, 39th Cong., 1st Sess. 2890 (1866); Cong. Globe, 39th Cong., 1st Sess.

7    498; *Wong Kim Ark*, 169 U.S. at 698-99 (detailing legislative debates over the 1866 Civil Rights

8    Act).

9        32.    The Supreme Court reaffirmed the scope of the Fourteenth Amendment's protection

10   thirty years later in *Wong Kim Ark*, which clarified the meaning of the phrase "subject to the

11   jurisdiction thereof."  The Court concluded that Wong Kim Ark—who was born in the United States

12   to parents who were "subjects of the Emperor of China"—was a U.S. citizen.  The Court held that

13   "[e]very citizen or subject of another country, while domiciled here, is within the allegiance and the

14   protection, and consequently subject to the jurisdiction, of the United States."  169 U.S. at 693.

15       33.    The Supreme Court has subsequently treated as constitutionally settled that anyone

16   "born in the United States, [i]s a citizen of this country," without regard to whether their biological

17   parents immigrated unlawfully or held any lawful immigration status.  *See, e.g.*, *INS v. Rios-Pineda*,

18   471 U.S. 444, 446 (1985) (unanimous decision).

19       34.    Executive branch interpretations of the Fourteenth Amendment show the same

20   understanding: birthright citizenship in this nation extends to all persons who are not immune to the

21   laws of the United States.  Legislation Denying Citizenship at Birth to Certain Children Born in the

22   United States, 19 Op. O.L.C. 340 (1995) (proposed legislation to deny birthright citizen to children

23   born to certain classes of noncitizens is "unquestionably unconstitutional" and "unconstitutional on

24   its face"); *see also* Citizenship of Children Born in the United States of Alien Parents, 10 Op. Att'y

25   Gen. 328, 328-29 (1862) (analyzing pre-Fourteenth Amendment common law); Citizenship, 10 Op.

26   Att'y Gen. 382, 396-97 (1862) (same).

27       35.    The only limitation on the Citizenship Clause's guarantee of citizenship to everyone

28   born on American soil is that the guarantee does not extend to those who are not "subject to the

jurisdiction" of the United States—that is, not subject to the laws of the country.  This is a narrow exclusion that focuses, perhaps most prominently, on the children of agents of foreign sovereigns, who enjoy diplomatic immunity under American laws dating to the Founding Era with roots in English law predating the Founding by a century.  *See* Crimes Act of 1790, § 25, 1 Stat. 112, 117-18.

36.    Since its enactment in 1952, the Immigration and Nationality Act has also confirmed the plain constitutional guarantee of birthright citizenship.  *See* Pub. L. No. 82-414, § 301, 66 Stat. 163, 235.  Section 301(a) of the Act provides that any "person born in the United States, and subject to the jurisdiction thereof" is a "citizen[] of the United States at birth."  8 U.S.C. § 1401(a).  Section 301(a) echoes the language of the Citizenship Clause, and thus incorporates the meaning of that Clause set forth in *Wong Kim Ark* and its progeny.

37.    The President cannot override the constitutional and statutory guarantee of birthright citizenship by executive action.  A President has no power to act except that conferred by Congress or by the Constitution.  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952).  And the President also has no power under the Constitution to enact, amend, or repeal statutes—much less the Constitution itself.  *Clinton v. City of New York*, 524 U.S. 417, 438 (1998).

38.    Nonetheless, the Order purports, by unilateral presidential decree, to withhold the evidence, documents, privileges, and benefits of citizenship "to persons: (1) when that person's mother was unlawfully present in the United States and the person's father was not a United States citizen or lawful permanent resident at the time of said person's birth, or (2) when that person's mother's presence in the United States was lawful but temporary, and the person's father was not a United States citizen or lawful permanent resident at the time of said person's birth."  Order § 2(a).

39.    The Order seeks to effectuate this constitutional deprivation by establishing a new "policy" under which no federal agency "shall issue documents recognizing United States citizenship, or accept documents . . . purporting to recognize United States citizenship" for these children born after 30 days from the date of the Order.  Order § 2(a), (b).  The Order directs "[t]he heads of all executive departments and agencies [to] issue public guidance within 30 days of the date of this order regarding this order's implementation with respect to their operations and activities," Order § 3(b), and also specifically instructs the Secretary of State, the Attorney General, the

9

1    Secretary of Homeland Security, and the Commissioner of Social Security to ensure that their

2    respective departments and agencies' regulations, policies, and personnel carry out the Order, Order

3    § 3(a).

4         40.    The Order not only rests on unconstitutional footing, it also violates the President's

5    constitutional responsibility to "take Care that the Laws be faithfully executed," U.S. Const. art. II,

6    § 3, because it goes out of its way to instruct federal agencies and officials to *refuse* to faithfully

7    execute a wide range of laws that all rest on the bedrock constitutional foundation of birthright

8    citizenship.

9         41.    Indeed, birthright citizenship is so fundamental that an extraordinarily wide swath of

10   American law treats a birth certificate showing that a person was born in the United States, standing

11   alone, as adequate proof of United States citizenship.  Examples exist throughout the United States

12   Code, the Code of Federal Regulations, and agencies' forms, guidance, and processes where the

13   government has presupposed the Citizenship Clause's meaning and faithfully applied its full scope.

14        42.    For instance, Defendant Department of State issues passports to United States

15   citizens, 22 U.S.C. § 211a, which it recognizes as "among the most visible and important public

16   services carried out by the department."  Dep't of State, 8 Foreign Affairs Manual (FAM) § 101.1-

17   1(f).  In carrying out this "important public service[]," the Department of State relies on birth

18   certificates as "primary evidence" sufficient on their own to establish the citizenship of persons born

19   in the United States.  22 C.F.R. § 51.42(a).[1]  Its guidance documents explain that this practice is

20   based on the Fourteenth Amendment's guarantee of birthright citizenship.  The Foreign Affairs

21   Manual, for example, states that "[a]ll children born in and subject, at the time of birth, to the

22   jurisdiction of the United States acquire U.S. citizenship at birth even if their parents were in the

23   United States illegally at the time of birth," and emphasizes that a child's "[a]cquisition of U.S.

24   citizenship" under the Fourteenth Amendment "generally is not affected by the fact that the parents

25   may be in the United States temporarily or illegally."  8 FAM § 301.1-1(d), (d)(2)(a).

26

27   _____

28   [1] Even if "secondary evidence" is required, that evidence consists of further proof of birth on U.S.
     soil.  *See* 22 C.F.R. § 51.42(b).

43.    In a similar vein, Defendant Social Security Administration, which is responsible for issuing social security numbers to U.S. citizens, has long hewed to the practice that "[g]enerally, an applicant for an original or replacement social security number card may prove that he or she is a U.S. citizen by birth by submitting a birth certificate or other evidence . . . that shows a U.S. place of birth."  Its public-facing information sheets and guidance documents likewise treat birth in the United States as evidence of a person's citizenship and entitlement to a social security number. Perhaps most prominently, the Social Security Administration's Application for a Social Security Card states that an applicant can provide the required "Evidence of U.S. Citizenship" by "provid[ing] your U.S. birth certificate."  Social Security Administration, Form SS-5, https://www.ssa.gov/forms/ss-5.pdf (last accessed Jan. 30, 2025), archived at https://perma.cc/35CW-U5VF.

44.    Likewise, Defendant Department of Homeland Security, acting through Defendant U.S. Citizenship & Immigration Services, has issued guidance for employers seeking to verify that their employees are authorized to work in the United States, as required by the Immigration and Nationality Act.  *See* 8 U.S.C. § 1324a.  That guidance, like the regulations and other materials issued by other Defendant agencies and departments, recognizes that a birth certificate showing a U.S. place of birth is evidence of the person's authorization to work because it evidences U.S. citizenship.  *See* 8 C.F.R. § 274a(b)(1)(v)(C)(3); *see also* USCIS, *Instructions for Form I-9, Employment Eligibility Verification*, https://www.uscis.gov/sites/default/files/document/forms/i-9instr.pdf (last accessed Jan. 30, 2025), archived at https://perma.cc/EE8Q-73EZ.  Congress has directed Defendants Department of Health & Human Services and, through it, Defendant Centers for Medicare & Medicaid Services, to treat a birth certificate showing that a person was born within the United States as appropriate evidence of the person's citizenship.  42 U.S.C. § 1396b(x)(1), (x)(3)(A)(ii), (x)(3)(C)(i).

45.    The Order would dismantle this system.  It flies in the face of the Fourteenth Amendment's plain text as well as the longstanding, uninterrupted, and ubiquitous application of the constitutional guarantee of citizenship to all born in the United States and subject to its jurisdiction. / / /

Complaint for Declaratory and Injunctive Relief

**B.      The Order Injures Plaintiff County of Santa Clara**

46.      Santa Clara is and will continue to be irreparably harmed by the Order.  Even setting aside the harm Santa Clara's residents will suffer as a result of the Order, Defendants' actions have already caused, and will continue to cause, Plaintiff to face administrative burdens associated with the administration of programs and the change in the meaning and significance of birth certificates showing birth in the United States, and it will also result in lost revenues and increase the financial burdens Plaintiff bears in providing healthcare and social services to its residents.  These injuries flow directly from the Order as well as the predictable actions residents have taken and will take in response to the Order.

**i.      Impacts on the County of Santa Clara Health System**

47.      Santa Clara's County Health System is the second-largest county-owned health and hospital system in California, and one of the largest public health systems in the nation.  It is the only public safety-net healthcare provider in Santa Clara County.  The County Health System includes three acute-cate hospitals and a network of primary and specialty care clinics that together comprise Santa Clara Valley Healthcare (SCVH); and the Behavioral Health Services Department, Public Health Department, Emergency Medical Services Agency, Custody Health Services Department, and Valley Health Plan, which offers a range of health plans to county residents.

48.      In 2024, SCVH delivered approximately 4,310 babies, handled 189,000 Emergency Department and urgent care visits, provided 234,000 days of acute inpatient hospital care, and had 785,000 visits to its outpatient clinics.

49.      As a safety-net public healthcare system, SCVH provides hospital and clinic services regardless of patients' ability to pay and disproportionately serves patients who rely on government-sponsored health coverage.  In Fiscal Year 2024 (July 1, 2023 to June 30, 2024), approximately 64 percent of SCVH's patient services revenues derived from Medi-Cal—California's Medicaid program—and another 19 percent derived from Medicare.

50.      Medi-Cal consists of two components: (1) federally funded Medi-Cal, which is available to people who meet federal Medicaid eligibility requirements and which is jointly funded by the State and federal governments, and (2) "State-Only" Medi-Cal, which is available to certain

1   populations that do not meet federal Medicaid eligibility requirements and operates without federal

2   funding.  U.S. citizens and certain limited categories of lawfully present non-citizens are eligible for

3   federally funded Medi-Cal if they meet other eligibility requirements (e.g., income limits).

4   However, most non-citizens—including undocumented immigrants, H-1B visa holders, and many

5   other lawfully present non-citizens—are eligible only for State-Only Medi-Cal.

6        51.     Currently, all babies born at SCVH are U.S. citizens eligible for federally funded

7   Medi-Cal, if they satisfy other eligibility requirements.  But the Order purports to create a new class

8   of U.S.-born non-citizen children who would not be eligible for federally funded Medi-Cal.  For

9   SCVH—which in 2024 delivered nearly 1,500 babies to mothers enrolled in State-Only Medi-Cal

10  due to their immigration status—Defendants' refusal to recognize the citizenship of this population

11  would have significant impacts.  The adverse financial impacts would be wide-ranging.

12       52.     First, under the Order, SCVH would lose substantial revenues from critical federally

13  funded Medi-Cal programs.  For example, in Fiscal Year 2024, SCVH recognized over $240 million

14  in supplemental revenues from the Enhanced Payment Program and the Voluntary Rate Range

15  Program, two Medicaid programs that allow public healthcare providers like SCVH to maximize

16  federal reimbursement and earn supplemental payments.  These programs are essential to the

17  financial health of SCVH, but they apply only to services provided to patients enrolled in federally

18  funded Medi-Cal.  Because the Order, if implemented, would necessarily and immediately reduce

19  the number of children who are permitted to enroll in federally funded Medi-Cal, it would

20  necessarily and immediately reduce SCVH's revenues from these programs.  SCVH would also see

21  reduced revenues from other Medicaid programs and funding streams that do not apply to, or pay

22  lower rates for, services provided to patients who are not eligible for federally funded Medi-Cal.

23       53.     Second, immediately upon issuance, the Order began impacting SCVH patients in

24  entirely predictable ways that, if allowed to continue, will result in further loss of revenue.  In just

25  the first few days since the Order issued, staff already report that pregnant patients have expressed

26  anxiety about the consequences of the Order for their babies and fear of delivering at the hospital.

27       54.     The fears expressed by patients at SCVH align with expert predictions that any effort

28  to eliminate birthright citizenship would cause immigrants to distrust healthcare systems and avoid

1    medical care.  *See, e.g.*, Drishti Pillai, Akash Pillai, and Samantha Artiga, *Children of Immigrants:*

2    *Key Facts on Health Coverage and Care*, Kaiser Family Foundation (Jan. 15, 2025),

3    https://www.kff.org/racial-equity-and-health-policy/issue-brief/children-of-immigrants-key-facts-on-

4    health-coverage-and-care, archived at https://perma.cc/RA4E-5DTZ (ending birthright citizenship

5    would "increase fears and confusion" related to seeking health care services, leading to "reluctance

6    among parents to enroll [their families] in programs for which they are eligible, including health

7    coverage").  Indeed, like Santa Clara, other jurisdictions have seen the Order produce a chilling

8    effect that deters immigrant communities from seeking healthcare and other social services

9    throughout the country.

10         55.     In SCVH's experience, too, patient fear of this nature results in higher levels of

11   appointment cancellations, no-shows, and failure to follow up with necessary care, which in turn

12   results in not only harm to patients but also financial loss to SCVH.  In addition to the loss of

13   revenue for services not provided, increased cancellations and no-shows also jeopardize other

14   important revenue streams.  For example, in 2025, SCVH stands to earn up to $175 million in

15   revenues from the State Quality Incentive Pool program if it meets 40 quality measures, including

16   measures that take into account patient attendance at prenatal, postpartum, and pediatric

17   appointments.  Historically, SCVH has met some of these stringent measures by small margins, and

18   even a small uptick in cancelled appointments or no-shows could prevent SCVH from meeting some

19   of those measures, amounting to a loss of approximately $4.4 million per measure missed.

20         56.     Third, based on its long experience administering healthcare programs, Santa Clara

21   fully expects that the fear instilled by the Order will reduce Medi-Cal enrollment and deter patients

22   from seeking care, resulting in devastating impacts on SCVH and the patients it serves.  Based on its

23   experience, SCVH expects that parents of children subject to the Order will be less likely to enroll

24   those children in State-Only Medi-Cal, resulting in both decreased revenues and increased costs for

25   SCVH.  With lower Medi-Cal enrollment, SCVH will not only lose reimbursement for what would

26   otherwise be Medi-Cal-covered services, but it will also face reduced capitation and supplemental

27   payments from programs like the Enhanced Payment Program and Quality Incentive Pool program,

28   which depend in part on the size of the Medi-Cal population SCVH serves.  And children who are

1  not enrolled in Medi-Cal will be uninsured, resulting in higher costs to SCVH for uncompensated

2  care (i.e., care not covered by an insurance program).  Based on its experience, SCVH also expects

3  that parents of children subject to the Order will be less likely to seek routine and preventive medical

4  care and even in-hospital births, resulting in increased costs to SCVH when families instead present

5  without health coverage at the Emergency Department with emergent, advanced, or complicated

6  conditions that could have been managed more cost-effectively—and more safely—with preventive

7  care.  Santa Clara already invests hundreds of millions of dollars from its General Fund each year to

8  cover uncompensated care provided by SCVH, and that investment would have to increase

9  significantly under the Order.

10      57.    Another part of Santa Clara's Health System, the Public Health Department, is

11  responsible for promoting and protecting the health of Santa Clara County's entire population at a

12  community level.  The Public Health Department works to prevent disease and injury (for example,

13  through communicable disease prevention and sexual health programs); promote healthy lifestyles

14  (for example, by providing public education about childhood obesity and supporting tobacco and

15  violence prevention initiatives); create healthy environments free from health hazards and pollutants;

16  and collect, curate, and use data to inform decision-making.  None of Santa Clara County's 15 cities

17  has its own public health department, and therefore all Santa Clara County residents rely on the

18  Public Health Department to perform essential public health functions.

19      58.    A key function of the Public Health Department is to support maternal, child, and

20  family health.  To that end, the Public Health Department's Maternal Child and Family Health

21  Branch offers services and programs to support vulnerable children and families in Santa Clara

22  County.  This includes administering the Women, Infants and Children nutrition program (WIC), a

23  federal program that provides monthly assistance to buy healthy foods, breastfeeding support, health

24  information, and other services to pregnant and breastfeeding people, infants, and children;

25  California Children's Services, a program for children and youth with certain serious medical

26  conditions; and other programs to improve the health of vulnerable children and families.

27      59.    In the days since the Order was issued, Public Health Department staff have reported

28  an increase in fear expressed by participants in the WIC and California Children's Services

1   programs.  Other jurisdictions have also reported similar disturbances related to connecting

2   community members with WIC services.  These early expressions of fear and anxiety, just days after

3   the Order issued and before it has taken effect, are consistent with the Public Health Department's

4   expectation that the Order will deter pregnant and parenting community members who fear their

5   children are or will be subject to the Order from accessing the Department's programs.  When

6   families avoid these programs because of the fear instilled by the Order, they lose access to

7   nutritious foods and postpartum support, which are critical to the health of both mothers and

8   children.  By reducing uptake of these programs, the Order will harm Santa Clara financially

9   because its safety-net Health System will be forced to absorb the increased costs of caring for a

10  population in poorer health, physically and mentally.

11       60.    The Public Health Department is also responsible for the prevention and control of

12  infectious disease.  As part of this work, the Public Health Department seeks to ensure that children

13  in Santa Clara County receive required vaccinations, which are essential not only to health of

14  individual children but to the population overall.  For example, the Public Health Department runs a

15  vaccination clinic, funded in part with Santa Clara funds, for children who need to get vaccinated

16  quickly in order to register for school and have no other means of obtaining required vaccinations in

17  time.  And after the COVID-19 pandemic, when many children ceased attending regular doctor's

18  visits and therefore fell behind in vaccinations, the Public Health Department undertook an extensive

19  public awareness campaign to educate families on the importance of vaccinations and reduce

20  barriers to vaccine uptake.  If allowed to take effect, the Order will deter community members who

21  fear their children are or will be subject to the Order from seeking routine prenatal and pediatric

22  care, resulting in decreased vaccination rates among children and increasing the risk of spread of

23  preventable childhood diseases, such as measles and whooping cough.  To protect the health of all

24  Santa Clara County residents, the Public Health Department will be required to expend additional

25  resources through means such as expanding the existing vaccination clinic, developing public

26  outreach and education campaigns, and/or tracking and controlling outbreaks of disease.

27       **ii.    Harm to Santa Clara Agencies That Provide Public Benefits and Supports**

28       61.    As a California county, one of Santa Clara's most important functions is the provision

1  and administration of public benefits and supports to vulnerable residents.  If implemented, the

2  Order will harm Santa Clara's ability to perform this function, reduce federal funds available to

3  support Santa Clara County residents, and force Santa Clara to increase expenditures of its own

4  funds to meet the needs of its residents and the community as a whole.

5  62.  Many of these benefits and services are provided by Santa Clara's Social Services

6  Agency.  Within the Social Services Agency, the Department of Employment and Benefits Services

7  (DEBS) is responsible for ensuring that low-income individuals and families receive essential health,

8  nutrition, financial, and employment services.  Among other things, DEBS administers and helps

9  residents enroll in public benefits including health coverage, food assistance, financial assistance,

10  and employment services.  Nearly 25 percent of all Santa Clara County residents receive one or

11  more benefits from DEBS.

12  63.  Many of the public benefits that DEBS administers are federally funded and, under

13  federal eligibility rules, are available only to U.S. citizens and residents within limited categories of

14  lawful immigration status.  For example, CalFresh, California's implementation of the federal

15  Supplemental Nutrition Assistance Program, provides food assistance to low-income people, and

16  CalWORKs, California's implementation of the federal Temporary Assistance for Needy Families

17  program, provides cash aid and services for low-income families.  These commonly used public

18  benefits provide critical support for children in low-income families, but they are not available to

19  undocumented immigrants and many people with lawful but temporary immigration statuses (such

20  as H-1B visa-holders).

21  64.  Under the Fourteenth Amendment, children born in Santa Clara County (or elsewhere

22  in the United States) are U.S. citizens who are eligible for CalFresh, CalWORKs, and other federally

23  funded benefits programs, assuming they meet income and other eligibility requirements.  But the

24  Order would cease to recognize or respect the citizenship of many children born in Santa Clara

25  County going forward, which will strip them of their eligibility for important public programs and

26  deprive Santa Clara of an essential source of funds to support the health and welfare of children in its

27  communities.

28  65.  Santa Clara also receives significant funding through the federal Title IV-E program,

which is named for Part E of Title IV of the Social Security Act and provides federal funding to support local and state governments' child welfare services—most notably foster care, adoption assistance, and guardianship assistance. Santa Clara performs Title IV-E-funded work through several departments, including its Social Services Agency and Probation Department. Each year Santa Clara receives tens of millions of dollars in federal Title IV-E funds for the work these two departments do to support vulnerable young people in need of child welfare services.

66.    Title IV-E funding is available only to support youth who meet eligibility criteria, including U.S. citizenship or lawful immigration status (in addition to other criteria). If the Order is not enjoined, Santa Clara expects that Defendant Department of Health & Human Services will cut a significant portion of this major federal funding source that Santa Clara uses to support and protect children.

67.    The loss of federal CalFresh, CalWORKs, and other public benefit program funding will have adverse financial impacts on Santa Clara and put pressure on other Santa Clara programs to make up for lost public benefit support. For example, Santa Clara's Office of Supportive Housing operates programs for people experiencing or at risk of homelessness. Many of its programs are funded in part by Santa Clara's General Fund. Under the Order, as families lose access to CalFresh and CalWORKs benefits, many will be forced to divert income that otherwise would have covered rent to buy food and necessities for their children. The Order will place these families at greater risk of homelessness and push some into shelters, safe-parking programs (for people living in their vehicles), and other Office of Supportive Housing programs for homelessness prevention and temporary housing assistance that are supported by local funds. These individuals and families will also predictably seek and be eligible for other forms of public assistance at a higher rate, such as in-kind food assistance and free diaper programs, which Santa Clara supports out of its General Fund. To address these impacts, Santa Clara will be forced to spend more of its own funds—either to expand existing programs, or to create new programs to fill the gap where CalFresh, CalWORKs, and other federally funded benefits programs are no longer available.

**iii.    Other Operational and Administrative Costs and Burdens Imposed by the Order**

68.    Santa Clara has also already incurred, and will continue to incur, substantial

1  administrative costs and burdens because of the Order.  This is because citizenship and immigration

2  status are relevant to a vast array of the programs and services through which Santa Clara serves its

3  residents and obtains funding to do so.  Santa Clara will need to develop processes and guidance,

4  hire and train workers, and process the paperwork necessary to account for the major change the

5  Order makes to those programs and services.  Already, residents are turning to their local

6  governments to understand how the Order affects the governmental programs and services they use.

7       69.     For instance, the Order imposes enormous uncertainty and administrative burdens on

8  DEBS and other Santa Clara agencies that are responsible for enrolling people in public benefits

9  programs and verifying their eligibility.  Like myriad other federal, state, and local programs, Santa

10  Clara's eligibility assessment procedures treat proof of birth within the United States as proof of an

11  individual's citizenship—and, therefore, conclusive evidence that the applicant meets the

12  citizenship/immigration status requirement for benefits such as CalWORKs and CalFresh.  The

13  Order purports to invalidate that assumption, leaving agencies like DEBS without any understanding

14  of how to perform basic eligibility determinations going forward.  If the Order takes effect, DEBS

15  will have to await guidance from the State and then expend significant resources to revise its rules

16  and policies, develop trainings on new and more complicated procedures for verifying eligibility,

17  and conduct trainings to ensure its eligibility workers can follow the new procedures and

18  requirements.  In the interim, DEBS staff have been forced to spend a great deal of resources

19  analyzing the Order and its effects on the programs DEBS administers, answering questions from

20  staff, and fielding calls from community members about the impact of the Order.  Indeed, in just the

21  first week after the Order issued, approximately 11 DEBS staff members spent 15-20 percent of their

22  time on work related to the Order.  That burden will only increase if the Order is allowed to take

23  effect.

24       70.     Santa Clara also faces burdens as an employer as a result of the Order's upending of

25  the foundations of birthright citizenship.  Santa Clara employs staff across the County organization

26  who are residing in the United States in lawful but temporary immigration status and working for

27  Santa Clara under a work visa.  A child born to these employees will lose U.S. citizenship under the

28  Order unless the other biological parent of that child is a citizen or lawful permanent resident.

1      71.    Santa Clara expects to lose dedicated employees as a result of the chaos and

2  uncertainty the Order imposes on their family situations.  The loss will create a burden on Santa

3  Clara to recruit and train new staff members in the critical roles currently occupied by employees

4  with lawful but temporary immigration status.  Bringing on new staff to replace an experienced

5  departing employee inevitably causes disruption and loss of value to Santa Clara and to the public it

6  serves.

7      72.    Even if these employees remain in Santa Clara's employment, as Santa Clara hopes

8  they will, the Order will impose burdens on them and on Santa Clara itself.

9      73.    First, many of the Santa Clara employees who hold lawful but temporary immigration

10  status serve in critical roles in the County Health System.  Others are direct-service providers in

11  Santa Clara's Social Services Agency such as social workers, eligibility workers, and employment

12  counselors.  These employees may well be in the position of supporting anxious patients and clients

13  facing uncertainty about their children's immigration status while the employees themselves grapple

14  with that anxiety in their own lives.

15      74.    Second, in targeting these employees, the Order imposes both immediate and long-

16  term administrative burdens on Santa Clara as an employer.  Under the Internal Revenue Code, it

17  appears these employees would no longer be able to seek the federal Child Tax Credit for any child

18  who does not have lawful immigration status with a Social Security number valid for employment in

19  the United States.  In addition to the immediate economic burden on these employees and their

20  families due to the loss of this important tax credit, Santa Clara is directly burdened by this change

21  because it must act quickly to identify the affected employees, alert payroll staff, and adjust its

22  payroll practices and systems so that these employees no longer have taxes withheld from their

23  paychecks to account for the impact of the Child Tax Credit.  Moreover, when the children of these

24  employees reach employment age, their lack of lawful work authorization would prevent Santa Clara

25  from employing them.  For years, Santa Clara has been sought out as an employer by multiple

26  generations of families dedicated to public service.  The Order disrupts this valuable employment

27  pipeline.  *See* Drishti Pillai, Akash Pillai, and Samantha Artiga, *The Role of Adult Children of*

28  *Immigrants in the U.S. Health Care Workforce*, Kaiser Family Foundation (Mar. 13, 2024),

Complaint for Declaratory and Injunctive Relief

1  https://www.kff.org/racial-equity-and-health-policy/issue-brief/the-role-of-adult-children-of-

2  immigrants-in-the-u-s-health-care-workforce, archived at https://perma.cc/TQ2Q-LAAR (ending

3  birthright citizenship would exacerbate workforce shortages in the healthcare industry in light of the

4  fact that both immigrant adults and the adult children of immigrants comprise a disproportionate

5  share of the health industry workforce).

6  **FIRST CAUSE OF ACTION**

7  **The Order Violates the Fourteenth Amendment**

8  ***Against all Defendants***

9      75.    Plaintiff realleges and incorporates by reference the allegations of the preceding

10  paragraphs.

11      76.    The Order violates the Fourteenth Amendment's guarantee of citizenship to "[a]ll

12  persons born or naturalized in the United States, and subject to the jurisdiction thereof."  U.S. Const.

13  amend. XIV, § 1.

14      77.    Section 2 of the Order asserts that the "policy" of the federal government is to refuse

15  to recognize the citizenship of certain children who are born on United States soil and subject to the

16  United States' jurisdiction, based solely on their parentage.  Specifically, it asserts that Defendants

17  will not issue or accept "documents recognizing United States citizenship" of a person born after 30

18  days from the date of the Order "(1) when that person's mother was unlawfully present in the United

19  States and the person's father was not a United States citizen or lawful permanent resident at the

20  time of said person's birth, or (2) when that person's mother's presence in the United States was

21  lawful but temporary, and the person's father was not a United States citizen or lawful permanent

22  resident at the time of said person's birth."  Order § 2(a), (b).

23      78.    Section 3 of the Order requires all Defendants to "issue public guidance within 30

24  days of the date" the Order issued and also specifically requires the Secretary of State, the Attorney

25  General, the Secretary of Homeland Security, and the Commissioner of Social Security to "take all

26  appropriate measures to ensure that the regulations and policies of their respective departments and

27  agencies are consistent with" the Order and that all personnel of their respective departments and

28  / / /

agencies carry out the Order's policy of refusing to recognize the citizenship of certain United States citizens.

79.     The Order violates the Fourteenth Amendment's guarantee of citizenship to all individuals born in the United States and subject to the jurisdiction thereof, and deprives many such citizens of their rights, privileges, immunities, and benefits.

80.     The President has no authority to override or ignore the Fourteenth Amendment's Citizenship Clause or otherwise amend the Constitution, *see* U.S. Const. art. V, and Defendants lack authority to deny or deprive anyone their right to birthright citizenship; to refuse to recognize such citizenship; or to deprive those citizens of the rights, benefits, entitlements, and privileges attendant to their citizenship.

81.     Defendants' violations have caused harm and will continue to cause harm to Santa Clara for which no remedy other than an injunction is adequate.

## SECOND CAUSE OF ACTION

**The Order Violates the Constitutional Separation of Powers**

**(U.S. Const. art. I, § 1; U.S. Const. art. I, § 8, cl. 4; U.S. Const. art. II, § 3)**

*Against all Defendants*

82.     Plaintiff realleges and incorporates by reference the allegations of the preceding paragraphs.

83.     The United States Constitution states that "[a]ll legislative Powers herein granted shall be vested in [the] Congress of the United States." U.S. Const. art. I, § 1. One of the "legislative Powers" "vested" in Congress is the power "To establish an uniform Rule of Naturalization." U.S. Const. art. I, § 8, cl. 4. The Constitution does not vest any legislative power in the President. Rather, the Constitution directs that the President "shall take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3.

84.     Section 301(a) of the Immigration and Nationality Act echoes the Fourteenth Amendment and directs that all "person[s] born in the United States, and subject to the jurisdiction thereof," "shall be nationals and citizens of the United States at birth." 8 U.S.C. § 1401(a).

85.     The President has no power under the Constitution to override or amend the

Complaint for Declaratory and Injunctive Relief

Immigration and Nationality Act's statutory guarantee of birthright citizenship, to impose additional conditions or limits on birthright citizenship, or to refuse to acknowledge that any "person born in the United States, and subject to the jurisdiction thereof," is a "citizen[] of the United States at birth."

86.     Neither the Immigration and Nationality Act nor any other Act of Congress purports to authorize the President to establish criteria that limit or condition when citizenship is conferred by birthright on an individual born within the United States.

87.     The President has no constitutional, statutory, or other authority to issue, impose, implement, or enforce the limitations and requirements set forth in Section 2 of the Order.  Even if the Order did not directly contravene the Fourteenth Amendment, the Order would nonetheless purport to exercise legislative authority that the President does not possess and thereby usurp Congress's power, and in doing so violate the Constitution's separation of powers.

88.     Defendants' violations have caused harm and will continue to cause harm to Santa Clara for which no remedy other than an injunction is adequate.

## THIRD CAUSE OF ACTION

### The Order Violates the Immigration and Nationality Act

#### *Against all Defendants*

89.     Plaintiff realleges and incorporates by reference the allegations of the preceding paragraphs.

90.     Section 301(a) of the Immigration and Nationality Act echoes the Fourteenth Amendment and directs that all "person[s] born in the United States, and subject to the jurisdiction thereof" "shall be nationals and citizens of the United States at birth."  8 U.S.C. § 1401(a).

91.     Nothing in the Immigration and Nationality Act or any other Act of Congress grants or purports to grant the President or any department or agency of the United States the power to impose criteria or limits on birthright citizenship not found in a statute adopted by Congress.

92.     The Order contravenes the Immigration and Nationality Act by refusing to acknowledge, and directing Defendants to refuse to acknowledge, the citizenship of several specified

/ / /

groups of "person[s] born in the United States, and subject to the jurisdiction thereof," contrary to statutory mandate.

93.    The President has no authority to override Section 301(a)'s statutory guarantee of citizenship, and Defendants therefore lack authority to unilaterally strip individuals of their right to citizenship under Section 301(a), to refuse to acknowledge their citizenship, or, therefore, to carry out the Order's policy or instructions.

94.    Defendants' violations have caused harm and will continue to cause harm to Santa Clara for which no remedy other than an injunction is adequate.

**FOURTH CAUSE OF ACTION**

**The Order Directs Federal Agencies to Take Actions that Violate**

**the Administrative Procedure Act**

***Against all Defendants except Defendant Trump***

95.    Plaintiff realleges and incorporates by reference the allegations of the preceding paragraphs.

96.    The Order directs that "[t]he heads of all executive departments and agencies shall issue public guidance within 30 days of the date of this order regarding this order's implementation with respect to their operations and activities." Order § 3(b). The Order also directs Defendants Secretary of State, Attorney General, Secretary of Homeland Security, and Commissioner of Social Security to "take all appropriate measures to ensure that the regulations and policies of their respective departments and agencies are consistent with this order." Order § 3(a). The Order requires federal departments, agencies, and officials to implement the Order's "Policy" within 30 days, which necessarily requires Defendants to override, supersede, disregard, or violate existing and applicable guidance, regulations, policies, forms, and procedures.

97.    The Order permits and directs Defendants to take actions that violate the Administrative Procedure Act, 5 U.S.C. § 706(2)(B), because they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity, including rights protected by the Fourteenth Amendment; in excess of

/ / /

1    statutory jurisdiction, authority, or limitations, or short of statutory right; and without observance of

2    procedure required by law.

3         98.    Defendants' violations have caused harm and will continue to cause harm to Santa

4    Clara for which no remedies other than an injunction and vacatur are appropriate remedies.

5                                        **PRAYER**

6    WHEREFORE Plaintiff requests that the Court grant the following relief:

7         1.    Declare that the Order is unconstitutional and unlawful in its entirety;

8         2.    Temporarily restrain, and preliminarily and permanently enjoin, Defendants from

9    implementing or enforcing the Order;

10        3.    Declare that any actions taken or to be taken by Defendants to implement or enforce

11   the Order violate the Administrative Procedure Act;

12        4.    Vacate any actions taken by Defendants to implement or enforce the Order;

13        5.    Order Defendants to pay Plaintiff reasonable attorneys' fees, other expenses, and

14   costs; and

15        6.    Grant any other and further relief that this Court may deem just and proper.

16

17   Dated:  January 30, 2025                    Respectfully submitted,

18

19                                    By:  /s/ Tony LoPresti
                                          TONY LOPRESTI
20                                        COUNTY COUNSEL

21                                        KAVITA NARAYAN
                                          MEREDITH A. JOHNSON
22                                        RAPHAEL N. RAJENDRA
                                          LAURA S. TRICE
23                                        HANNAH M. GODBEY
                                          TAYRYN A. EDWARDS
24
                                          Attorneys for Plaintiff
25                                        COUNTY OF SANTA CLARA

26

27

28

Complaint for Declaratory and Injunctive Relief