OFFICE OF THE COUNTY COUNSEL
COUNTY OF SANTA CLARA
TONY LOPRESTI, State Bar #289269
KAVITA NARAYAN, State Bar #264191
MEREDITH A. JOHNSON, State Bar #291018
RAPHAEL N. RAJENDRA, State Bar #255096
LAURA S. TRICE, State Bar #284837
HANNAH M. GODBEY, State Bar #334475
TAYRYN A. EDWARDS, State Bar #344959
70 West Hedding Street, East Wing, Ninth Floor
San José, California  95110-1770
Telephone: (408) 299-5900
Facsimile:  (408) 292-7240
E-Mail:      Tony.LoPresti@cco.sccgov.org
                 Kavita.Narayan@cco.sccgov.org
                 Meredith.Johnson@cco.sccgov.org
                 Raphael.Rajendra@cco.sccgov.org
                 Laura.Trice@cco.sccgov.org
                 Hannah.Godbey@cco.sccgov.org
                 Tayryn.Edwards@cco.sccgov.org

Attorneys for Plaintiff
COUNTY OF SANTA CLARA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Jose Division

| | |
|---|---|
| **County of Santa Clara**,<br><br>  Plaintiff,<br><br>  v.<br><br>**Donald J. Trump**, et al.,<br><br>  Defendants. | No. 5:25-cv-00981-EKL<br><br>**COUNTY OF SANTA CLARA'S MOTION FOR A PRELIMINARY INJUNCTION AND MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Hearing Date:  March 12, 2025<br>Time:              10:00 am<br>Judge:            Hon. Eumi K. Lee<br>Place:             San José Courthouse<br>                       Courtroom 7<br><br>Trial Date:      Not set |

1

**TABLE OF CONTENTS**

2    TABLE OF CONTENTS ............................................................................................... ii

3    TABLE OF AUTHORITIES .......................................................................................... iii

4    NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION................. 1

     INTRODUCTION AND BACKGROUND ....................................................................... 1

5    STANDARD OF REVIEW ............................................................................................. 3

6    ARGUMENT ................................................................................................................. 3

7        I.    Santa Clara is Likely to Succeed on the Merits of Its Claims.......................... 3

8              A.    The Order Violates the Citizenship Clause of the Fourteenth
                    Amendment ............................................................................................. 3

9              B.    The Order Violates Section 301 of the Immigration and Nationality Act.. 9

10             C.    The Order Violates the Separation of Powers Doctrine ...........................10

11       II.   The Order Causes Imminent and Irreparable Harm to Santa Clara ............11

12             A.    The Order Has Inflicted and Will Continue to Inflict
                    Economic Injuries on Santa Clara ...........................................................12

13                  1.    Loss of Federal Funding and Increased Costs to the Health
                          System ..........................................................................................12
14

15                  2.    Costs Stemming from Reduced Availability of Federal Benefits
                          and Increased Dependence on Santa Clara-Funded Programs ......14

16                  3.    Administrative, Operational, and Compliance Costs....................15

                    4.    Employer Costs...........................................................................17
17
               B.    The Order Undermines Santa Clara's Interest in the Wellbeing of its
18                  Community..............................................................................................17

19      III.   The Balance of Equities and the Public Interest Strongly Favor Santa Clara19

20             A.    The Public Interests in Vindicating Constitutional Rights and Ensuring
                    Presidential Power is Lawfully Exercised Weigh Strongly in Favor of
21                  Granting Relief. ......................................................................................20

22             B.    The Public Interests in Promoting Community Health and
                    Avoiding Preventable Human Suffering Weigh
23                  Strongly in Favor of Granting Relief........................................................21

24             C.    The Public Interest in a Prosperous Economy Weighs
                    in Favor of Granting Relief .....................................................................22
25
               D.    The Public Interest in Preventing the Creation of an Underclass Weighs in
26                  Favor of Granting Relief .........................................................................22

27      IV.    Santa Clara has Standing to Bring this Action ...............................................23

     CONCLUSION..............................................................................................................24
28

1

# TABLE OF AUTHORITIES

2

## <u>CASES</u>

3

4    *Afroyim v. Rusk,*
    387 U.S. 253 (1967) ......................................................................................... 7

5    *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,*
    458 U.S. 592 (1982) ...................................................................................... 17, 19

6

7    *Ariz. Dream Act Coal. v. Brewer,*
    757 F.3d 1053 (9th Cir. 2014) ............................................................................ 20

8    *Baird v. Bonta,*
    81 F.4th 1036 (9th Cir. 2023) .............................................................................. 20

9    *California v. Azar,*
10        911 F.3d 558  (9th Cir. 2018) .................................................................. 12, 21, 24

11    *Calvin v. Smith,*
    77 Eng. Rep. 377 (K.B. 1608) ............................................................................. 3

12

13    *Citizenship,*
    10 Op. Att'y Gen. 382 (1862) .............................................................................. 8

14    *City & Cnty. of San Francisco v. USCIS,*
    408 F. Supp. 3d 1057 (N.D. Cal. 2019) ...............................12, 13, 15, 16, 19, 21

15

16    *City of Davis v. Coleman,*
    521 F.2d 661 (9th Cir. 1975) ......................................................................... 18, 19

17    *City of Sausalito v. O'Neill,*
    386 F.3d 1186 (9th Cir. 2004) ...................................................................17, 19, 22

18

19    *Clinton v. City of New York,*
    524 U.S. 417 (1998) .......................................................................................... 11

20    *Cole v. Oroville Union High School Dist.,*
    228 F.3d 1092 (9th Cir. 2000) ............................................................................ 23

21

22    *County of Santa Clara v. Trump,*
    250 F. Supp. 3d 497 (N.D. Cal. 2017) ................................................................ 19

23    *Dep't of Commerce v. New York,*
    558 U.S. 752 (2019) .................................................................................. 13, 15, 24

24

25    *Dred Scott v. Sandford,*
    60 U.S. 393 (1857) ............................................................................................. 5

26    *East Bay Sanctuary Covenant v. Biden,*
    993 F.3d 640 (9th Cir. 2021) .............................................................................. 12

27

28    *East Bay Sanctuary Covenant v. Trump,*
    993 F.3d 640 (9th Cir. 2021) .............................................................................. 21

*Elk v. Wilkins*,
    112 U.S. 94 (1884)............................................................................................... 7

*Gardner v. Ward*,
    2 Mass. 244 (1805) ............................................................................................ 5

*Golden Gate Restaurant Ass'n v. City & Cnty. of San Francisco*,
    512 F.3d 1112 (9th Cir. 2008)...................................................................20, 21, 22

*Harris v. Bd. of Supervisors, L.A. Cnty.*,
    366 F.3d 754 (9th Cir. 2004) .............................................................................21

*Hawaii v. Trump*,
    859 F.3d 741(9th Cir. 2017).........................................................................17, 21

*Hecht v. Malley*,
    265 U.S. 144 (1924)........................................................................................... 9

*Inglis v. Trustees of Sailor's Snug Harbor*,
    28 U.S. (3 Pet.) 99 (1830) ..............................................................................4, 8

*INS v. Rios-Pineda*,
    471 U.S. 444  (1985)......................................................................................... 6

*Knauer v. United States*,
    328 U.S. 654 (1946)...........................................................................................23

*Lopez v. Heckler*,
    713 F.2d 1432 (9th Cir. 1983) ...........................................................................21

*Lynch v. Clarke*,
    1 Sand. Ch. 583 (N.Y. Ch. 1844) ...................................................................... 5

*M.R. v. Dreyfus*,
    697 F.3d 706 (9th Cir. 2012)..............................................................................21

*Massachusetts v. Mellon*,
    262 U.S. 447 (1923)...........................................................................................17

*Nat'l Ass'n of Mfrs. v. DHS*,
    491 F. Supp. 3d 549 (N.D. Cal. 2020) ...............................................................17

*Nat'l Urban League v. Ross*,
    508 F. Supp. 3d 663 (N.D. Cal. 2020) ...............................................................13

*New York v. Scalia*,
    464 F. Supp. 3d 528 (S.D.N.Y. 2020)................................................................16

*Nken v. Holder*,
    556 U.S. 418 (2009)...........................................................................................20

*Organized Village of Kake v. U.S. Dep't of Agric.*,
    795 F.3d 956  (9th Cir. 2015)............................................................................13

*Plyler v. Doe*,
    457 U.S. 202  (1982).....................................................................................6, 23

*Preminger v. Principi,*
    422 F.3d 815 (9th Cir. 2005)................................................................20

*Regents of the Univ. of Cal. v. Am. Broad. Cos., Inc.,*
    747 F.2d 511 (9th Cir. 1984)................................................................17

*Rent-A-Cnt., Inc. v. Canyon Television & Appliance Rental, Inc.,*
    944 F.2d 597 (9th Cir. 1991)................................................................17

*Roman v. Wolf,*
    977 F.3d 9351 (9th Cir. 2020)..........................................................3, 20

*Schneiderman v. United States,*
    320 U.S. 118 (1943)..............................................................................23

*Shapiro v. United States,*
    335 U.S. 1 (1948)....................................................................................9

*Shell Offshore, Inc. v. Greenpeace, Inc.,*
    709 F.3d 1281 (9th Cir. 2013)..............................................................23

*Slaughter-House Cases,*
    83 U.S. 36 (1872)...............................................................................6, 9

*Tennessee v. Dep't of Educ.,*
    104 F.4th 577 (6th Cir. 2024)................................................................16

*Texas v. EPA,*
    829 F.3d 405 (5th Cir. 2016)................................................................16

*Texas v. Garland,*
    719 F. Supp. 3d 521 (N.D. Tex. 2024) ................................................16

*Trop v. Dulles,*
    356 U.S. 86 (1958)................................................................................23

*Trump v. United States,*
    603 U.S. 593 (2024)..............................................................................10

*United States v. Bevans,*
    16 U.S. 336 (1818)..................................................................................7

*United States v. Student Challenging Regulatory Agency Procedures,*
    412 U.S. 669 (1973)..............................................................................12

*United States v. Wong Kim Ark,*
    169 U.S. 649 (1898)........................................................................6, 7, 8

*Washington v. Trump,*
    --- F. Supp. 3d ---, 2025 WL 272198, at *2 (W.D. Wash. Jan. 23, 2025) . 2, 13, 15, 16, 23

*Weber v. Aetna Cas. & Sur. Co.,*
    406 U.S. 164 (1972)..............................................................................23

*West Virginia v. EPA,*
    597 U.S. 697 (2022)..............................................................................10

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Human Servs.*,
    485 F. Supp. 3d 1  (D.D.C 2020) ...................................................................16

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ........................................................................... 3, 19, 20

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ...................................................................................10

*Zepeda v. INS*,
    753 F.2d 719 (9th Cir. 1983) .......................................................................20

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. XIV, § 1 ............................................................................. 3

U.S. Const. art. I, § 1 ......................................................................................11

U.S. Const. art. I, § 8, cl. 4 .............................................................................11

## STATUTES

42 U.S.C. § 1395dd ........................................................................................14

8 U.S.C. § 1401(a) ........................................................................................... 9

Cal. Health & Safety Code § 1317 ..................................................................14

## OTHER AUTHORITIES

*Citizenship of Children Born in the United States of Alien Parents*,
    10 Op. Att'y Gen. 328 (1862) ....................................................................... 8

Cong. Globe,
    39th Cong., 1st Sess. 2890-97 (1866) ........................................................... 8

Cong. Globe,
    39th Cong., 1st Sess. 498, 573, 574 (1866) ................................................... 8

Executive Order No. 14,159 of January 20, 2025,
    90 Fed. Reg. 8,443 (Jan. 29, 2025) .............................................................. 9

Executive Order No. 14,160 of January 20, 2025,
    90 Fed. Reg. 8,449 (Jan. 29, 2025) ...........................................................1, 2

*Legislation Denying Citizenship at Birth to Certain Children Born in the United States:
    Statement Before the Subcomms. on Immigr. and Claims and on the Const. of the H.
    Comm. on the Judiciary*, 104th Cong. (1995) ..............................................10

Polly J. Price, *Natural Law and Birthright Citizenship in Calvin's Case (1608)*, 9 Yale J. L. &
    Humanities 73 (1997) ................................................................................. 3

1

## **COURT RULES**

2

Civil Local Rule 65-2 .................................................................................................. 1

Civil Local Rule 7-2 .................................................................................................... 1

Federal Rule of Civil Procedure 65 .............................................................................. 1

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiff County of Santa Clara's Motion for Preliminary Injunction          Case No. 5:25cv981-EKL

**NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION**

PLEASE TAKE NOTICE that on March 12, 2025, or as soon thereafter as it may be heard before Judge Lee, Plaintiff County of Santa Clara will move and hereby does move, pursuant to Rule 65 of the Federal Rules of Civil Procedure and Civil Local Rules 7-2 and 65-2, for a preliminary injunction prohibiting Defendants from implementing or enforcing Executive Order No. 14,160 of January 20, 2025, 90 Fed. Reg. 8,449 (Jan. 29, 2025) ("Order"), which is entitled "Protecting the Meaning and Value of American Citizenship."  The Order directs Defendants to develop and issue implementing guidance "within 30 days," and directs Defendants to refuse to issue or acknowledge documentation of citizenship to persons born on or after February 20, 2025.  The Order is already causing Plaintiff to suffer irreparable harm, and implementation of the Order will cause Plaintiff to suffer further irreparable harm.  This Motion is based on this Notice; the following Points and Authorities; the accompanying Declarations; this Court's file; and any other matters properly before the Court.

**INTRODUCTION AND BACKGROUND**

A few hours after taking office, President Trump issued an Executive Order that purports to deny citizenship to children born in the United States.  The Order plainly violates the Fourteenth Amendment of the United States Constitution and Acts of Congress and contradicts clear United States Supreme Court precedent.  If left to go into effect, the Order will immediately and irrevocably turn upside down the lives of the people who live in Santa Clara County—including many of its roughly 750,000 foreign-born residents—and Plaintiff County of Santa Clara ("Santa Clara") will suffer both immediate and long-term harm to its ability to provide the community with core safety-net services such as healthcare and public benefits.  Accordingly, the Order should be enjoined while the merits of the case are under consideration.

In clear violation of federal law, the Order asserts a policy under which federal departments and agencies may not "issue documents recognizing United States citizenship, or accept documents . . . purporting to recognize United States citizenship" to babies born in the United States "(1) when that person's mother was unlawfully present in the United States and the person's father was not a United States citizen or lawful permanent resident at the time of said person's birth, or (2) when that

1   person's mother's presence in the United States was lawful but temporary, and the person's father

2   was not a United States citizen or lawful permanent resident at the time of said person's birth."

3   Order § 2a.[1]  The United States District Court for the Western District of Washington has already

4   granted a 14-day temporary restraining order, set to expire on February 6, 2025, that prevents

5   enforcement of the Order, recognizing the "strong likelihood" that the Order violates the Fourteenth

6   Amendment and the Immigration and Nationality Act.  *See Washington v. Trump*, --- F. Supp. 3d ---,

7   2025 WL 272198, at *2 (W.D. Wash. Jan. 23, 2025).  And on February 5, 2025, the United States

8   District Court for the District of Maryland issued a nationwide preliminary injunction preventing

9   enforcement of the Order.  *See Casa, Inc. v. Trump*, No. 8:25-cv-00201-DLB (D. Md. Feb. 5, 2025)

10  (written order not yet issued).  Santa Clara is similarly likely to succeed on the merits of its claims.

11          Santa Clara seeks injunctive relief because of the immediate and irreparable harm that it is

12  facing and will continue to face if the Order is allowed to go into effect.  As the only public safety-

13  net healthcare provider in the Santa Clara County region, Santa Clara provides a wide range of

14  health services to community members regardless of income or ability to pay.  To fulfill its core duty

15  as a county, Santa Clara also administers public benefits that provide critical food assistance and

16  financial support, among other things.  Its ability to provide and administer these services—many of

17  which are federally funded and have immigration-related eligibility criteria—will be obstructed if

18  the Order goes into effect, to the detriment of both Santa Clara and its residents.

19          This Court should grant Santa Clara's request for a preliminary injunction.  The balance of

20  the equities, including the public interest in vindicating constitutional rights and avoiding

21  preventable human suffering, weighs strongly in favor of preserving the status quo by enjoining the

22  Order pending the Court's determination on the merits in order to protect Santa Clara and its

23  residents from needless harm and disruption.

24  / /

25

26

27  _____

28  [1] The Order further directs "[t]he heads of all executive departments and agencies [to] issue public guidance within 30 days of the date of this order regarding this order's implementation with respect to their operations and activities," Order § 3(b), and instructs the Secretary of State, Attorney General, Secretary of Homeland Security, and Commissioner of Social Security to ensure their regulations, policies, and personnel conform to the Order, Order § 3(a).

# STANDARD OF REVIEW

To obtain a preliminary injunction, the movant must establish: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of relief; (3) that the balance of equities tips in the movant's favor; and (4) that granting relief is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). When a government entity is a party to a case in which a preliminary injunction is sought, as here, the final two factors—the balance of equities and the public interest—merge. *See, e.g.*, *Roman v. Wolf*, 977 F.3d 935, 940-41 (9th Cir. 2020).

# ARGUMENT

## I.    Santa Clara is Likely to Succeed on the Merits of Its Claims

Santa Clara seeks an injunction preliminarily enjoining the Order and its implementation and enforcement on the grounds that the Order violates the Citizenship Clause of the Fourteenth Amendment, the constitutional Separation of Powers, and the Immigration and Nationality Act.[2]

### A.    The Order Violates the Citizenship Clause of the Fourteenth Amendment

The Order plainly violates the Fourteenth Amendment, which states that "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S. Const. amend. XIV, § 1. The constitutional text means what it plainly says: citizenship extends by birth to every child who is both born within the geographic confines of the United States and subject to the jurisdiction of the United States.

The Fourteenth Amendment elevated to constitutional text, and codified to constitutional practice, the preexisting and longstanding rule in the United States of birthright citizenship. This practice was and remains based on the common law rule of *jus soli*—the right of the soil, the principle that a person is a citizen of the country in which they were born—whose origins extend at least as far back as the seventeenth Century. *See Calvin v. Smith*, 77 Eng. Rep. 377 (K.B. 1608); *see generally* Polly J. Price, *Natural Law and Birthright Citizenship in Calvin's Case (1608)*, 9 Yale J. L. & Humanities 73, 138-40 (1997).

In fact, cases dating back to the pre-Civil War era establish conclusively that American

---

[2] Plaintiff also pleads a claim under the Administrative Procedure Act, *see* Compl. ¶¶ 95-98, but does not rely on that claim in this motion.

Plaintiff County of Santa Clara's Motion for Preliminary Injunction                                    Case No. 5:25cv981-EKL

1   citizenship has always vested at birth to anyone born in this country.  By 1830 it was clear to Justice

2   Story that "[n]othing is better settled at the common law than the doctrine that the children even of

3   aliens born in a country, while the parents are resident there under the protection of the government,

4   and owing a temporary allegiance thereto, are subjects by birth."  *Inglis v. Trustees of Sailor's Snug*

5   *Harbor*, 28 U.S. (3 Pet.) 99, 164 (1830) (Story, J., dissenting).  Citizenship attached simply by virtue

6   of the place of birth.  A child's citizenship did not depend on the status of their parents, or the extent

7   to which they or their parents intended to remain in the United States, and instead only on the

8   sovereign power which exercised political control over the place of birth at the time of the child's

9   birth.  *Id.* at 155.  Indeed, Justice Story explained, the citizenship of a child born in New York

10  around the time of the Founding would turn on which sovereign power held control of the place at

11  the time of the child's birth—and *not* on the status or allegiances of the child's parents.  The identity

12  of the sovereign who controlled New York at the time of birth, *standing alone*, determined the

13  citizenship of the child.  If the child was born before the Declaration of Independence, or during the

14  seven years "when the British took possession of New York," then the child "was born a British

15  subject."  *Id.* at 170.  Justice Story even addressed the two-month period after the Declaration of

16  Independence and before the British invaded, during which New York threw off British control.

17  American citizenship in that instance was equally clear: "if he was born after the 4th of July 1776,

18  and before the 15th of September 1776, he was born an American citizen; and that *it makes no*

19  *difference in this respect*, whether or not parents had at the time of his birth, elected to become

20  citizens of the state of New York."  *Id.* (emphasis added).

21        Other cases accord with Justice Story's view.  A frequently cited antebellum case, *Lynch v.*

22  *Clarke*, held conclusively:

23        The Constitution of the United States, as well as those of all the thirteen old states,
          pre-supposed the existence of the common law, and was founded upon its principles,
24        so far as they were applicable to our situation and form of government. . . .

25        The law on this subject, which prevailed in all the states, became the governing
          principle or common law of the United States, when the union of the states was
26        consummated, and their separate legislation on the point was terminated.

27        It is therefore the law of the United States, that children born here, are citizens,
          *without any regard to the political condition or allegiance of their parents*.
28

4

1  *Lynch v. Clarke*, 1 Sand. Ch. 583, 583-84 (N.Y. Ch. 1844) (emphasis added); *accord Gardner v.*

2  *Ward*, 2 Mass. 244 (1805) ("[b]y this circumstance of his birth," a person "born within the

3  jurisdiction of the common law, is a citizen of the country wherein he is born . . . [t]he place of birth

4  is coëxtensive with the dominions of the sovereignty").

5       *Dred Scott v. Sandford*, 60 U.S. 393 (1857), marked the Supreme Court's stark departure

6  from this constitutional rule.  In the last gasp of the slavery era in the United States, *Dred Scott*

7  abandoned *jus soli*, and instead embraced the view that American citizenship—and more precisely,

8  its absence—traveled by bloodline and race from parent to child, excluding from citizenship in

9  perpetuity those who were born on American soil to ancestors considered to be politically inferior

10 and beneath membership in the nation.  The decision cast aside the common law principle of

11 birthright citizenship, holding instead that no African American could ever be an American citizen,

12 even if a free person and born in the United States, because of their ancestry.  Contrary to the

13 prevailing rule that the parent's status has no bearing on the American-born child's claim to

14 birthright citizenship, *Dred Scott* held that at the "Founding" people "who were at the time of the

15 adoption of the Constitution recognized as citizens in the several States, became also citizens of this

16 new political body; but none other; it was formed by them, and for them and their posterity, but for

17 no one else." *Id.* at 406.  From this premise, *Dred Scott* held, African Americans lay outside the

18 "one political family" that the Court surmised was established at the Founding, so they and their

19 descendants could *never* become citizens: "neither the class of persons who had been imported as

20 slaves, nor their descendants, whether they had become free or not, were then acknowledged as a

21 part of the people, nor intended to be included in the general words used in" the Declaration of

22 Independence. *Id.* at 406-07.

23       *Dred Scott* presaged the Civil War, in whose bloody shadow the 39th Congress enacted the

24 Fourteenth Amendment, and the States then ratified it.  The very first sentence of the Fourteenth

25 Amendment, now known as the Citizenship Clause, "overturn[ed] the *Dred Scott* decision" and

26 reestablished birthright citizenship as the law of the land—not just for the descendants of enslaved

27 persons excluded by the racist political preferences of the day, but, *categorically*, for "*all persons*

28 born within the United States and subject to its jurisdiction." *Slaughter-House Cases*, 83 U.S. 36, 73

1  (1872) (emphasis in original).

2      *United States v. Wong Kim Ark*, decided in 1898, reaffirmed the breadth of the Citizenship

3  Clause—including its grant of birthright citizenship to children whose parents are not, and may

4  never become, citizens.  In that case, the court considered the citizenship of Wong Kim Ark, who

5  was born in San Francisco to parents who, at the time of his birth, resided in San Francisco, "[were]

6  subjects of the Emperor of China," and had no pathway to naturalized American citizenship for

7  themselves.  *United States v. Wong Kim Ark*, 169 U.S. 649, 652-53 (1898).  After extensively

8  surveying case law from before and after the adoption of the Fourteenth Amendment, the Court held

9  that "[e]very citizen or subject of another country, while domiciled here, is within the allegiance and

10  the protection, and consequently subject to the jurisdiction, of the United States."  *Id.* at 693.  The

11  decision thus rejects the proposition, offered by the dissent in that case, that the Citizenship Clause

12  does not reach children born within the United States to parents who "seem in the United States to

13  have remained pilgrims and sojourners" and who "have never been allowed by our laws to acquire

14  our nationality, and, except in sporadic instances, do not appear ever to have desired to do so."  *Id.*

15  at 725-26, 731-32 (Fuller, C.J., dissenting).

16      In the 127 years since *Wong Kim Ark*, the Supreme Court has taken it as constitutionally

17  settled that the Citizenship Clause entitles all children born in the United States to American

18  citizenship, regardless of their parentage, excepting only narrow categories long recognized by the

19  common law at the time the Fourteenth Amendment was ratified and not at issue here.  *See INS v.*

20  *Rios-Pineda*, 471 U.S. 444, 446 (1985) (recognizing unanimously that a person born in the United

21  States was a citizen of the United States even though both of his parents entered into the country

22  unlawfully); *see also Plyler v. Doe*, 457 U.S. 202, 215, 243 (1982) (all nine justices in majority and

23  dissent agreeing to majority's analysis that "anyone, citizen or stranger," even without lawful

24  immigration status, is "within its jurisdiction" under the Equal Protection Clause because "the simple

25  fact of his presence within [a] State's territorial perimeter" means "he is subject to the full range of

26  obligations imposed by the State's civil and criminal laws").

27      The Court had made especially clear that the Fourteenth Amendment's broad and clear grant

28  of birthright citizenship is impervious to revisions from the President or Congress in response to

1  changing political winds: "Whatever considerations, in the absence of a controlling provision of the

2  constitution, might influence the legislative or the executive branch of the government to decline to

3  admit persons of the Chinese race to the status of citizens of the United States," the Court said,

4  "there are none that can constrain or permit the judiciary to refuse to give full effect to the

5  peremptory and explicit language of the fourteenth amendment, which declares and ordains that 'all

6  persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens

7  of the United States.'" *Wong Kim Ark*, 169 U.S. at 694.  As the Court explained in *Afroyim v. Rusk*,

8  the Fourteenth Amendment was intended "to provide an insuperable obstacle against every

9  governmental effort" to re-define the nation's foundational citizenship right, and noted that "it seems

10  undeniable from the language [the drafters] used that they wanted to put citizenship beyond the

11  power of any governmental unit to destroy." 387 U.S. 253, 263 (1967).

12      The preceding cases also explain, contextualize, and give meaning to the Citizenship

13  Clause's phrase "subject to the jurisdiction thereof."  This phrase echoes the common law's

14  emphasis on the sovereignty and political control of the place of birth, and thus also neatly and fully

15  explains those narrow classes of persons who are widely understood *not* to be covered by the

16  Citizenship Clause despite being born within the geographical confines of the United States.  The

17  Citizenship Clause "affirms the ancient and fundamental rule of citizenship by birth within the

18  territory," and also embraces "the exceptions or qualifications (as old as the rule itself)."  *Wong Kim*

19  *Ark*, 169 U.S. at 693.  The starting principle is that "a foreign sovereign himself . . . is not amenable

20  to the civil or criminal jurisdiction of the country."  *United States v. Bevans*, 16 U.S. 336, 348-49

21  (1818).  A diplomat, as "the delegate of his sovereign," is universally considered "exempt from the

22  local jurisdiction of the country where he resides," and "[b]y a fiction of law, founded on this

23  principle, he retains his national character unmixed and his residence is considered as a continued

24  residence in his own country."  *Id.* at 349.  In analogous fashion, Congress's recognition of an Indian

25  tribe's tribal sovereignty has routinely been understood to exempt that tribe from some *but not all* of

26  American "civil or criminal jurisdiction."  *Wong Kim Ark*, 169 U.S. at 681; *Elk v. Wilkins*, 112 U.S.

27  94, 100 (1884) (citing cases).  This is why the phrase "subject to the jurisdiction thereof" does not

28  exclude *all* Indians born in the United States from the Citizenship Clause's reach, but, like the Civil

Rights Act of 1866, very narrowly excludes only those who are not taxed because they are considered citizens of their tribe, not the United States. *Wong Kim Ark*, 169 U.S. at 688-81, 688.

These exceptions "illustrate and confirm the general doctrine," *Inglis*, 28 U.S. (3 Pet.) at 155, embodied in the Citizenship Clause's requirement that persons be "subject to the jurisdiction" of the United States to obtain citizenship at birth. That phrase exempts from birthright citizenship *only* those who are exempt from the reach of American law. *Wong Kim Ark*, 169 U.S. at 693. This is why it was relevant to the Supreme Court's analysis that Wong Kim Ark's parents were "not employed in any *diplomatic or official capacity* under the emperor of China," but it did not otherwise matter to the child's citizenship that his parents were "*subjects* of the Emperor of China." *Wong Kim Ark*, 169 U.S. at 653-54 (emphases added).

Ratification debates further illustrate the breadth of the birthright citizenship guarantee. Discussions over the Fourteenth Amendment show that the enacting Congress understood that the Fourteenth Amendment would apply to *all* persons—including, as one Senator crudely put it, children of "Gypsy" settlers or foreigners. Cong. Globe, 39th Cong., 1st Sess. 2890-97 (1866); Cong. Globe, 39th Cong., 1st Sess. 498, 573, 574; *see also Wong Kim Ark*, 169 U.S. at 697-99 (describing 39th Congress's debates over 1866 Civil Rights Act and Citizenship Clause).

Additionally, longstanding Executive Guidance—even predating the Fourteenth Amendment—has viewed birthright citizenship as a wide-ranging guarantee that did not depend on the child's lineage. *See Citizenship of Children Born in the United States of Alien Parents*, 10 Op. Att'y Gen. 328, 328-29 (1862) (analyzing pre-Fourteenth Amendment common law and finding it "quite clear . . . that children born in the United States of alien parents, who have never been naturalized, are native-born citizens of the United States, and, of course, do not require the formality of naturalization to entitle them to the rights and privileges of such citizenship"); *Citizenship*, 10 Op. Att'y Gen. 382, 396-97 (1862) (same).

It can hardly be disputed that the people the Order seeks to exclude from the Citizenship Clause's guarantee are subject to American law, inasmuch as they and their parents may be held liable for violating those laws. Indeed, the proposition that, *unlike* with foreign diplomats, the Executive Branch may enforce United States law against people without lawful status or with lawful

1   but temporary status—by, for example, deporting them, revoking their visas or otherwise

2   terminating their lawful status, or subjecting them to criminal prosecution—is the underlying

3   presupposition of several executive actions taken in the first weeks of President Trump's term.  *See,*

4   *e.g.*, Executive Order No. 14,159 of January 20, 2025, at §§ 2, 9, 90 Fed. Reg. 8,443, 8,443, 8,445

5   (Jan. 29, 2025).  By that very same token, the Citizenship Clause itself directly forecloses the

6   Executive Branch's claim that children of people in these statuses may be denied birthright

7   citizenship.  By "interpolat[ing] a limitation" on the Citizenship Clause's guarantee "that is neither

8   expressed nor implied," *Slaughter-House Cases*, 83 U.S. at 129, the Order thus violates the

9   Fourteenth Amendment on its face.

10          **B.      The Order Violates Section 301 of the Immigration and Nationality Act**

11          Even if the Fourteenth Amendment itself did not conclusively establish the Order's illegality,

12   the Order would nonetheless be unlawful because it contravenes the Immigration and Nationality

13   Act (INA).  From its original adoption in 1952 to today, Section 301(a) of the INA has echoed the

14   language of the Citizenship Clause.  It provides that "person[s] born in the United States, and subject

15   to the jurisdiction thereof" "shall be nationals and citizens of the United States at birth."  8 U.S.C.

16   § 1401(a).  By the time Congress enacted the INA in 1952, the Citizenship Clause, as definitively

17   construed in *Wong Kim Ark*, was widely and universally understood to embrace all children who

18   were born within the physical territory of the United States and not immune from generally

19   applicable American law.  That meaning thus imbues the INA.  *See generally Shapiro v. United*

20   *States*, 335 U.S. 1, 16 (1948); *see also Hecht v. Malley*, 265 U.S. 144, 153 (1924) (Congress "must

21   be considered to have adopted also the construction given by this Court to such language, and made

22   it a part of the enactment.").

23          What is more, Congress has repeatedly considered *and rejected* legislation that would rewrite

24   Section 301(a) to strip birthright citizenship from children who are not born to citizens or lawful

25   permanent residents—precisely what the Order now attempts to do by executive fiat.  *See, e.g.*,

26   H.R. 1363, 104th Cong. (1995), the "Citizenship Reform Act of 1995."  Congress's decision to

27   refuse such an amendment may well be based on the more than a century of consistent instruction

28   that the Citizenship Clause forecloses that statutory option.  In 1995—and not for the first time—the

1   Office of Legal Counsel for the U.S. Department of Justice explained that a proposal to deny

2   birthright citizenship to children born to undocumented parents would be "unquestionably

3   unconstitutional." *Legislation Denying Citizenship at Birth to Certain Children Born in the United*

4   *States: Statement Before the Subcomms. on Immigr. and Claims and on the Const. of the H. Comm.*

5   *on the Judiciary*, 104th Cong. (1995) (statement of Walter Dellinger, Former Assistant Att'y Gen. of

6   the United States).  Importantly, the very attempt to enact such an amendment reflects Congress's

7   understanding that Section 301(a) does not embrace President Trump's proposed limitations on

8   birthright citizenship.

9           Even if Section 301(a) could be construed to leave any ambiguity about the meaning of the

10  phrase "subject to the jurisdiction thereof," there is no basis for any argument that in 1952 Congress

11  intended that such an ambiguity serve as a delegation of broad authority to the President to define

12  the parameters of a statute, let alone a constitutional right.  It is difficult to imagine any question of

13  greater "economic and political significance" than the scope of a provision that describes what group

14  of people constitutes the American polity and may participate in its sovereignty.  *See, e.g.*, *West*

15  *Virginia v. EPA*, 597 U.S. 697, 721 (2022) (statutory ambiguities should not lightly be construed to

16  delegate decisionmaking authority on major questions of economic or political importance).  Given

17  these stakes, it is untenable to read the INA as granting the President the authority to resolve or

18  disturb the statutory meaning.

19                  **C.      The Order Violates the Separation of Powers Doctrine**

20          For much the same reason as the Order violates the INA, the Order also violates the

21  Constitution's Separation of Powers.  Even if the Citizenship Clause's meaning did not entirely

22  foreclose the limitations the Order seeks to impose, the power to establish those limitations would be

23  a legislative power, which the Constitution has vested solely in Congress, and not the Executive

24  Branch.

25          The President derives power only from Congress or the Constitution.  *Youngstown Sheet &*

26  *Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952); *Trump v. United States*, 603 U.S. 593, 607 (2024).  A

27  President thus has little, if any, power to act in ways that go against the expressed or implied will of

28  Congress.  *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring).  And no provision of the

1    Constitution authorizes the President to enact, amend, or repeal statutes, much less the Constitution.

2    *Clinton v. City of New York*, 524 U.S. 417, 438 (1998).  The Naturalization Clause supplies the only

3    basis under the Constitution for any branch of government to define who is entitled to American

4    citizenship, and that clause vests power exclusively in Congress.  *See* U.S. Const. art. I, § 8, cl. 4

5    ("The Congress shall have Power . . . To establish an uniform Rule of Naturalization"); U.S. Const.

6    art. I, § 1 ("All legislative Powers herein granted shall be vested in [the] Congress").  The Order's

7    attempt to define the parameters of citizenship asserts a power the President simply does not have.

8            In sum, the Order is plainly unconstitutional and unlawful on multiple grounds, and Santa

9    Clara is overwhelmingly likely to succeed on the merits of its claims.

10   **II.      The Order Causes Imminent and Irreparable Harm to Santa Clara**

11           Santa Clara is suffering and will continue to suffer irreparable economic injuries and injuries

12   to its interests in community health and wellbeing unless and until the Order is enjoined.  The Order

13   rips at the fabric of society in ways that Santa Clara—as the level of government closest to the

14   people—is uniquely exposed to and directly responsible for mending.  Indeed, Santa Clara's core

15   responsibility under state law is to support society's most vulnerable people.  To that end, Santa

16   Clara operates the social safety net of programs and services that enables its residents to lead

17   dignified lives.  If the Order goes into effect, Santa Clara will suffer concrete monetary injuries due

18   to a loss of federal funding for those programs, increased health care costs due to reduced uptake of

19   preventative care, and increased reliance on locally funded programs and services.  Additionally, the

20   shock waves the Order has sent through the community are already undermining Santa Clara's

21   provision of services by forcing Santa Clara to incur significant financial and administrative burdens

22   in responding to the chaos the Order is sowing, and in anticipating and planning for the Order's

23   immediate and long-term impacts.  Each moment a Santa Clara employee spends—or will spend, if

24   the Order is not enjoined—analyzing the language of the Order; answering questions about the

25   Order; preparing to alter or altering procedures to comply with the Order's unconstitutional

26   commands; developing, facilitating, and attending trainings related to the Order; or undertaking

27   other tasks necessitated by the Order's unlawful attempt to dispose of a bedrock constitutional

28   principle that is woven into the fabric of countless local, state, and federal laws, is a moment that

1  employee cannot spend serving Santa Clara residents.

2      In addition, the mission and core governmental interest of Santa Clara is to achieve a healthy,

3  safe, and prosperous community for all—including for community members who have been

4  historically targeted by exclusionary governmental policies and practices.  The Order undercuts that

5  mission by undermining public health, including by relegating valued members of the community

6  into an underclass position, and by destabilizing the local economy.

7      **A.    The Order Has Inflicted and Will Continue to Inflict Economic Injuries on
          Santa Clara**

8

9      The Order imposes a significant and immediate financial burden on Santa Clara as a social

10  safety net provider, healthcare provider, and employer.  Economic losses that are not recoverable

11  qualify as irreparable injuries regardless of their magnitude.  *California v. Azar*, 911 F.3d 558, 581

12  (9th Cir. 2018); *City & Cnty. of San Francisco v. USCIS*, 408 F. Supp. 3d 1057, 1123 (N.D. Cal.

13  2019) (there is no need to "establish a particular quantum of harm" to satisfy the irreparable injury

14  requirement); *see also United States v. Student Challenging Regulatory Agency Procedures*,

15  412 U.S. 669, 689 n.14 (1973) ("We have allowed important interests to be vindicated by plaintiffs

16  with no more at stake in the outcome of an action than" a $5 fine or a $1.50 poll tax for purposes of

17  standing).  Economic losses stemming from an executive order are not recoverable from the federal

18  government in light of the government's sovereign immunity.  *Azar*, 911 F.3d at 581 (citing 5 U.S.C.

19  § 702); *East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021).  The Order

20  inflicts four types of economic injuries on Santa Clara: (1) loss of federal funding and increased

21  costs for the County Health System; (2) costs stemming from reduced availability of federal benefits

22  and increased reliance on Santa Clara-funded benefit programs; (3) administrative, operational, and

23  compliance costs; and (4) financial burdens related to Santa Clara's status as an employer of

24  approximately 23,000 people.

25      **1.    Loss of Federal Funding and Increased Costs to the Health System**

26      If the Order goes into effect, Santa Clara will suffer a financial injury through the loss of

27  critical federal funding used to support its public safety-net Health System—the second largest

28  county-run health system in California.  Precedent establishes that loss of federal funding is an

1   imminent and irreparable harm. *San Francisco*, 408 F. Supp. 3d at 1121-23 (the loss of "federal

2   Medicaid reimbursement" funds qualifies as an imminent and irreparable harm regardless of whether

3   a county treats the affected Medicaid enrollees or turns them away); *Washington v. Trump*, --- F.

4   Supp. 3d ---, 2025 WL 272198, at *1 ("Plaintiff States face irreparable injury as a result of the

5   signing and implementation" of the birthright citizenship executive order, as they will "lose federal

6   funding"); *see also, e.g.*, *Dep't of Commerce v. New York*, 558 U.S. 752, 766-67 (2019) ("loss of

7   federal funds" is a "concrete and imminent injury"); *Organized Village of Kake v. U.S. Dep't of

8   Agric.*, 795 F.3d 956, 965 (9th Cir. 2015) ("loss of funds . . . satisfied Article III's standing

9   requirement"); *Nat'l Urban League v. Ross*, 508 F. Supp. 3d 663, 688-89 (N.D. Cal. 2020) (same).

10          An immediate effect of the Order will be a loss of revenue due to an increase in non-citizen

11  children who do not qualify for federally funded Medi-Cal (California's implementation of

12  Medicaid).  Decl. of Paul E. Lorenz ("Lorenz Decl.") ¶¶ 15-19; *see also id.* ¶¶ 9-10 (explaining

13  eligibility criteria).  Because a new and significant population of U.S.-born, non-citizen children

14  served by Santa Clara will no longer be eligible for federally funded Medi-Cal, Santa Clara will

15  receive reduced revenues from programs such as the Enhanced Payment Program (EPP) and the

16  Voluntary Rate Range Program, both of which are available only in connection with services

17  provided to enrollees in federally funded Medi-Cal. *Id.* ¶¶ 16-21.  Santa Clara currently receives

18  hundreds of millions of dollars from these programs annually, and reductions in these funding

19  streams will cause significant financial harm and uncertainty. *Id.* ¶¶ 20-21.  Importantly, as a Medi-

20  Cal provider, Santa Clara does not have the option of choosing the patients it serves, making the loss

21  of these revenues unavoidable. *Id.* ¶ 23.

22          Santa Clara's Health System also stands to lose millions of dollars in other revenue streams

23  as a result of the Order's chilling effects.  Already, patients have expressed fear of the consequences

24  of the Order for their children and reluctance to have in-hospital births. *Id.* ¶ 25; *see also* Decl. of

25  Greta S. Hansen ("Hansen Decl.") ¶¶ 24, 26.  Health System experts anticipate an increase in

26  appointment cancellations, no-shows, and failure to schedule follow-up care by patients deterred by

27  the Order.  Lorenz Decl. ¶ 25; *see also* Hansen Decl. ¶¶ 24, 26.  This will inevitably result in lost

28  revenue for services that should have been provided but were not.  Lorenz Decl. ¶ 27.  In addition,

1    Santa Clara will face a significant risk of reduced payments from supplemental Medi-Cal revenue

2    streams, such as the Quality Incentive Pool (QIP) program.  *Id.* ¶ 28.  QIP payments are tied to

3    satisfaction of demanding quality measures, and even a small uptick in cancellations or no shows

4    could result in significant loss of funds—approximately $4.4 million per measure missed.  *Id.*

5        Health experts within and outside of Santa Clara further expect that the Order will reduce

6    Medi-Cal enrollment, resulting in lost Medi-Cal revenue and increased costs of uncompensated care.

7    *Id.* ¶ 30.  When patients decline to enroll in Medi-Cal, Santa Clara loses the reimbursement that

8    Medi-Cal otherwise would have paid for the patient's care, instead incurring costs that, in many

9    cases, will be entirely uncompensated.  *Id.* ¶ 32.  Such a drop-off in enrollment further reduces

10   payments from programs like EPP and QIP, because those payments depend in part on the size of the

11   Medi-Cal population Santa Clara serves.  *Id.*  Therefore, as the Order reduces Medi-Cal enrollment,

12   it will reduce Santa Clara's revenues and increase costs associated with uncompensated care, forcing

13   Santa Clara to contribute more of its own funds to cover the costs of necessary care.  *Id.*; *see also id.*

14   ¶ 12 (describing County contributions for uncompensated care).

15       Finally, the Order will reduce uptake of prenatal care, postpartum care, vaccinations, and

16   other pediatric preventive services, ultimately resulting in increased costs for Santa Clara.  *Id.* ¶¶ 33-

17   34.  Because routine preventive care results in reduced hospitalizations and emergency department

18   use, a drop-off in preventative care will result in increased costs for Santa Clara, which is legally

19   required to provide emergency services and treatment to any person presenting with an emergency

20   medical condition without regard to citizenship, insurance status, or ability to pay.  *Id.* ¶ 34; Cal.

21   Health & Safety Code § 1317; 42 U.S.C. § 1395dd.  Reduced vaccination rates also require Santa

22   Clara's Public Health Department to expend additional resources on vaccination clinics, awareness

23   campaigns, and disease control.  Hansen Decl. ¶ 26.

24              **2.    Costs Stemming from Reduced Availability of Federal Benefits and
                        Increased Dependence on Santa Clara-Funded Programs**

25

26       If the Order is implemented, Santa Clara will need to address the loss of federal funding

27   streams that support its social safety net programs by spending more of its own funds.  The burden

28   of increased dependence on locally funded social safety net programs following a withdrawal of

14

1  federal funding is an irreparable harm.  *City & Cnty. of San Francisco v. USCIS*, 981 F.3d 742, 762

2  (9th Cir. 2020) (dependence on local benefit programs caused by a loss of access to federal benefits

3  programs "constitute[s] an irreparable injury because of the unavailability of monetary damages"

4  due to sovereign immunity); *see also Dep't of Commerce*, 588 U.S. at 766-67; *Washington v. Trump*,

5  --- F. Supp. 3d ---, 2025 WL 272198, at *1 ("incur[ring] substantial costs to provide essential and

6  legally required medical care and social services to resident children subject to" the Order is an

7  imminent and irreparable harm).

8  If allowed to take effect, the Order will immediately result in a loss of federal public benefits

9  and funding streams that would otherwise be available, through Santa Clara, to U.S.-born children in

10  need of financial assistance.  For example, CalFresh and CalWORKs are federally funded benefits

11  that provide essential nutrition and financial assistance, and federal Title IV-E funding provides

12  important support for Santa Clara's foster care system.  Decl. of Eilona Betkolia-Gevargiz

13  ("Betkolia Decl.") ¶¶ 8-9, 11; Hansen Decl. ¶ 15.  If the Order takes effect, many U.S.-born children

14  will no longer qualify for these programs, depriving them of critical public supports and reducing

15  federal funding for Santa Clara's foster care program.  Betkolia Decl. ¶¶ 11-14; Hansen Decl. ¶ 16.

16  When families impacted by the Order lose access to these benefits, they will turn to Santa

17  Clara-funded programs for support.  Hansen Decl. ¶ 17.  More families will be forced into Santa

18  Clara-funded shelters and emergency homelessness prevention programs.  *Id.* ¶ 18.  More families

19  will seek County-funded in-kind food aid and free diapers.  *Id.* ¶ 19.  And Santa Clara will have to

20  spend more of its own funds to make up for lost federal safety-net funding—by expanding existing

21  programs or creating new programs to fill the gap where CalFresh, CalWORKs, and other federally

22  funded benefits programs are no longer available.  *Id.* ¶ 20.

23  ### 3.    Administrative, Operational, and Compliance Costs

24  The Order burdens Santa Clara with administrative, operational, and compliance costs that

25  Santa Clara would not otherwise incur.  "Governmental compliance costs caused by changes in

26  federal policy"—including hours spent answering questions about a new federal rule, analyzing the

27  outcome of the rule on services, training staff regarding the rule, adjusting procedures related to

28  future enrollment in public benefit programs, and undertaking community outreach and education

1    efforts—are "irreparable injuries."  *San Francisco*, 408 F. Supp. 3d at 1123-25; *Washington v.*

2    *Trump*, --- F. Supp. 3d ---, 2025 WL 272198, at *1 (the administrative burdens stemming from

3    compliance with the birthright citizenship executive order are irreparable injuries); *see also, e.g.*,

4    *Tennessee v. Dep't of Educ.*, 104 F.4th 577, 613 (6th Cir. 2024) (compliance costs that are

5    unrecoverable due to the federal government's sovereign immunity are "irreparable"); *Texas v. EPA*,

6    829 F.3d 405, 433-34 (5th Cir. 2016) (same); *Texas v. Garland*, 719 F. Supp. 3d 521, 553-54 (N.D.

7    Tex. 2024) (costs related to rule familiarization, legal research, updating policies and handbooks,

8    and amending training materials are "prototypical" examples of "pocketbook injuries"); *Whitman-*

9    *Walker Clinic, Inc. v. U.S. Dep't of Health & Human Servs.*, 485 F. Supp. 3d 1, 55-58 (D.D.C 2020)

10   ("operational costs" related to complying with new federal rules, including addressing "confusion

11   and panic" and "educating" clients, staff, and outside providers and organizations are injuries that

12   "clear[] the irreparable-harm threshold"); *New York v. Scalia*, 464 F. Supp. 3d 528, 544-45

13   (S.D.N.Y. 2020) (administrative costs such as "educating the public about a new" federal rule,

14   "designating staff time" to understanding and enforcing the rule, and "either retracting or issuing

15   new or revised guidance" are "cognizable injuries").

16            This case is a textbook example of such an injury.  In the weeks since the Order was issued,

17   Santa Clara's Department of Employment and Benefits Services (DEBS) has already spent

18   significant staff time analyzing and addressing questions about the Order, including fielding

19   questions from community members.  Betkolia Decl. ¶¶ 15-16.  And this administrative burden will

20   only increase:  If the Order goes into effect, DEBS staff will be unable to follow existing procedures

21   for evaluating eligibility for and enrolling residents in public benefits programs—which currently

22   treat proof of birth within the United States as proof of citizenship—and will be forced to expend

23   significant resources revising its policies and procedures, updating informational materials, engaging

24   in outreach efforts, and retraining over 1,000 DEBS staff, as well as the staff of over 60 community-

25   based organizations, among other tasks.  *Id.* ¶¶ 17-19.  This process would consume over 1,000

26   hours of staff time, at a minimum, making it a paradigmatic example of a pocketbook injury

27   sufficient to establish irreparable harm.  *Id.* ¶ 20; *Garland*, 719 F. Supp. 3d at 554.

28   / /

1          **4.     Employer Costs**

2          The Order also burdens Santa Clara in its capacity as an employer.  It is well established that

3     undermining an employer's ability to retain qualified staff constitutes an irreparable harm, both

4     through the loss of talent and because of costs associated with recruiting and training new hires.

5     *Nat'l Ass'n of Mfrs. v. DHS*, 491 F. Supp. 3d 549, 569-70 (N.D. Cal. 2020); *Luokung Tech. Corp. v.*

6     *Dep't of Def.*, 538 F. Supp. 3d 174, 194 (D.D.C. 2021); *see also Hawaii v. Trump*, 859 F.3d 741,

7     782-83 (9th Cir. 2017) ("constraints to recruiting and attracting" new employees cause irreparable

8     harm), *vacated on other grounds sub nom. Trump v. Hawaii*, 583 U.S. 941 (2017); *Rent-A-Cnt., Inc.*

9     *v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) (same); *Regents of*

10    *the Univ. of Cal. v. Am. Broad. Cos., Inc.*, 747 F.2d 511, 520 (9th Cir. 1984) (same).  Santa Clara

11    employs staff in numerous roles throughout the organization who are residing in the United States in

12    a lawful but temporary immigration status.  Hansen Decl. ¶ 28.  Santa Clara expects to lose

13    dedicated employees as a result of the uncertainty the Order imposes on their family situations.  *Id.*

14    ¶¶ 29-30.  That loss will create a burden on Santa Clara to recruit and train new staff members,

15    inevitably causing disruption and harm to Santa Clara.  *Id.* ¶ 30; *see also id.* ¶¶ 31-33.

16        **B.     The Order Undermines Santa Clara's Interest in the Wellbeing of its**
17            **Community**

18         The Order also undermines Santa Clara's interest in the wellbeing of its community.

19    Although a state or local government entity may not sue the federal government in a traditional

20    *parens patriae* posture to directly assert the interests of the entity's residents, *see Massachusetts v.*

21    *Mellon*, 262 U.S. 447, 485-86 (1923), a governmental entity like Santa Clara can sue the federal

22    government to vindicate its *own* interests, including those, like community health and wellness, that

23    are grounded in the entity's unique status as an institution of government.  *City of Sausalito v.*

24    *O'Neill*, 386 F.3d 1186, 1197-99 (9th Cir. 2004) (the interests a local government entity "may sue to

25    protect are as varied as [the entity's] responsibilities, powers, and assets," ranging from protecting

26    natural resources and public safety, to creating and enforcing health regulations, to safeguarding

27    revenue collection and taxation powers); *see also, e.g.*, *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex*

28    *rel. Barez*, 458 U.S. 592, 607-09 (1982) (Puerto Rico had an interest in "the health and well-being of

1    its residents" that included promoting economic wellness and "securing residents from the harmful

2    effects of discrimination"); *City of Davis v. Coleman*, 521 F.2d 661, 671-75 (9th Cir. 1975) (Davis

3    had an interest in enforcing a "controlled growth" plan that preserved a ratio of residential properties

4    to "academic and cultural amenities").  The Order undermines Santa Clara's interest in the wellbeing

5    of its community by damaging public health and weakening the local economy—which, in turn,

6    impose economic harms on Santa Clara in its role as the social safety net provider.

7          First, the Order would act as a blight on the physical and mental wellbeing of the community

8    Santa Clara is charged with serving and protecting.  As explained, patients have already expressed

9    fear about the consequences of the Order for their unborn children as well as reluctance to give birth

10   at County hospitals, which could lead to increased risk of complications requiring emergency

11   treatment.  Lorenz Decl. ¶ 25.  Health System experts attest that such fear is likely to result in an

12   increase in appointment cancellations, no-shows, and failure to schedule follow-up care,

13   undermining health gains that would be achieved through a preventative care model and leading to

14   worsened health outcomes for both mothers and children.  *Id.* ¶¶ 25-26, 34.  Additionally, because

15   robust access to prenatal care is associated with increased vaccination rates, these reductions in

16   service—even if they last for only a short while—would have irreversible consequences for

17   community health, including by increasing the risk of spreading communicable disease.  Hansen

18   Decl. ¶ 26.  Decreased access to nutritious foods and cash assistance will also undermine the

19   wellbeing of the community, forcing residents into Santa Clara-funded homeless shelters or onto the

20   streets.  *Id.* ¶ 18; Betkolia Decl. ¶ 14.  And the harm to community members from being denied the

21   opportunity to participate fully in the community, both socially and economically, also injures Santa

22   Clara's interest in community wellbeing.  *See* Hansen Decl. ¶¶ 37-38.  When residents are able to

23   openly and lawfully work and contribute to civic life without fear, communities are safer and

24   healthier, economies are more robust, and Santa Clara is required to spend less on safety-net health

25   and welfare services.  *Id.*  In turn, when residents cannot become full, contributing, lawfully

26   employed members of society, the harms inure to the public as a whole.  Each of these injuries—

27   which flow directly from the Order or predictable responses to the Order—undermine Santa Clara's

28   / /

1    interest, as the social safety net provider, in safeguarding community wellbeing. *See, e.g.*, *Snapp*,

2    458 U.S. at 607-09; *San Francisco*, 981 F.3d at 754, 762; *City of Sausalito*, 386 F.3d at 1197.

3         Second, Santa Clara's economy will suffer injury as a result of the Order. Immigrant

4    community members fill a vital role in the local economy. In 2021 alone, immigrant households in

5    Santa Clara County paid $6.7 billion in state and local taxes and $4.2 billion in rent, and contributed

6    $255 billion to Santa Clara's gross domestic product. Hansen Decl. ¶ 35. Additionally, as the heart

7    of Silicon Valley, Santa Clara is home to many of the world's largest technology companies. Those

8    companies depend upon highly skilled immigrants, many of whom are temporary H-1B visa holders,

9    to meet needs in areas such as computer science and engineering. Hansen Decl. ¶ 36. The local

10   economy thus relies on H-1B workers and other workers with temporary but lawful status—a key

11   group whose children the Order targets for deprivation of citizenship. The Order is likely to deter

12   these workers, other temporary visa holders such as students, and their families from continuing to

13   reside and work in Santa Clara County, thus impeding the ability of local businesses, including

14   Silicon Valley companies, to hire and retain the staff they need. *Id.* Santa Clara's economic health

15   depends in part on the strength of these companies, and when they struggle, the effects are felt in

16   Santa Clara County's economy overall. Hansen Decl. ¶ 36. These effects injure Santa Clara's own

17   fiscal interests by jeopardizing its taxation revenue streams, as well as Santa Clara's broader interest

18   in promoting a prosperous local economy. *Id.*; *City of Sausalito*, 386 F.3d at 1199.

19        In sum, by rejecting affected residents' full membership in the United States, the Order

20   harms the health and wellness of the community at large and the local economy—and in these ways

21   injures Santa Clara's direct interests as an institution of government. *San Francisco*, 981 F.3d at

22   754, 762; *City of Davis*, 521 F.2d at 671-75; *City of Sausalito*, 386 F.3d at 1199; *County of Santa*

23   *Clara v. Trump*, 250 F. Supp. 3d 497, 525-26 (N.D. Cal. 2017).

24   **III.    The Balance of Equities and the Public Interest Strongly Favor Santa Clara**

25        Ordinarily, when reviewing a motion for preliminary injunction, courts "must balance the

26   competing claims of injury and must consider the effect on each party of the granting or withholding

27   of the requested relief," while allowing "particular regard for the public consequences." *Winter*,

28   555 U.S. at 24. However, when a government entity is a party, the balance of equities and public

interest inquiries merge, placing an even greater weight on the public interest. *E.g.*, *Nken v. Holder*, 556 U.S. 418, 435-36 (2009). As it conducts the public interest assessment, a court is not limited to considering the impact of the Order on the parties; to the contrary, the court "may consider the hardship to all individuals covered by [the Order]," such as current and future residents of Santa Clara County whose families will be affected by the Order. *Golden Gate Restaurant Ass'n v. City & Cnty. of San Francisco*, 512 F.3d 1112, 1126 (9th Cir. 2008).

In this case, the potential harms stemming from granting relief, as to both the Defendants and the public, are slight to the point of approaching nonexistence. First, enjoining the Order preserves, rather than disrupts, the status quo ante. *See Roman*, 977 F.3d at 940-41. Second, Defendants "cannot reasonably assert that [they are] harmed in any legally cognizable sense by being enjoined from constitutional violations." *Zepeda v. INS*, 753 F.2d 719, 727 (9th Cir. 1983). In contrast, four interests of powerful significance weigh in favor of granting relief: (1) the public interests in vindicating constitutional rights and in ensuring presidential power is exercised lawfully; (2) the public interests in promoting community health and avoiding preventable human suffering, particularly for vulnerable populations; (3) the public interest in fostering a prosperous local economy; and (4) the public interest in avoiding the imposition of a self-perpetuating second-class status on a subset of the populace.

### A.    The Public Interests in Vindicating Constitutional Rights and Ensuring Presidential Power is Lawfully Exercised Weigh Strongly in Favor of Granting Relief.

It is settled law that the public interest weighs strongly in favor of preventing unconstitutional acts. *See, e.g.*, *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023) (if a plaintiff shows a likelihood of success of a constitutional claim, the "merged third and fourth factors" of the *Winter* test automatically "tip[] . . . decisively in the plaintiff's favor"); *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014) (same); *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005) ("[A]ll citizens have a stake in upholding the Constitution"). Thus, if the Court finds that Santa Clara has established a likelihood of success on the merits for even one of its constitutional claims, the public interest necessarily weighs in favor of granting relief.

In addition, "[i]t is axiomatic that the President must exercise his powers lawfully. When

1    there are serious concerns that the President has not done so, the public interest is best served by"

2    enjoining the disputed executive action. *Hawaii v. Trump*, 878 F.3d at 700. The public also "has an

3    interest in ensuring that the 'statutes enacted by [their] representatives are not imperiled by executive

4    fiat,'" as would happen if the President were free to ignore the plain text of the INA. *East Bay*

5    *Sanctuary Covenant v. Trump*, 993 F.3d 640, 679 (9th Cir. 2021). For each of these reasons, the

6    public interest weighs strongly in favor of granting relief.

7         **B.**     **The Public Interests in Promoting Community Health and Avoiding Preventable**
**Human Suffering Weigh Strongly in Favor of Granting Relief**

8

9         The public has an interest in promoting community health and wellbeing, particularly

10   through preventative care that lowers overall health care expenses. *E.g.*, *Golden Gate Restaurant*

11   *Ass'n*, 512 F.3d at 1126. In cases involving public benefits, "the public interest supports continuing"

12   uninterrupted services "to those who would predictably disenroll absent an injunction, for numerous

13   reasons," including because disenrollment tends to lead to "decreased vaccination rates," and the

14   public "certainly has an interest in decreasing the risk of preventable contagion." *City & Cnty. of*

15   *San Francisco*, 408 F. Supp. 3d at 1127; *see also Azar*, 911 F.3d at 582 (the balance of equities

16   favors issuance of an injunction if a rule risks "potentially dire public health" consequences).

17        In cases where the potential harms of granting relief are slight, as here—or even in cases

18   where the potential harms are substantial but limited to economic injury—the public interest in

19   avoiding preventable human suffering "far outweighs" the competing interests, particularly in cases

20   involving vulnerable populations. *See, e.g.*, *M.R. v. Dreyfus*, 697 F.3d 706, 737-38 (9th Cir. 2012)

21   (the Ninth Circuit has "several times held that the balance of hardships favors beneficiaries of public

22   assistance who may be forced to do without needed medical services over a state concerned with

23   conserving" money); *Harris v. Bd. of Supervisors, L.A. Cnty.*, 366 F.3d 754, 766 (9th Cir. 2004)

24   (human suffering from reduction in beds at a public hospital "far outweigh[ed]" potential financial

25   losses); *Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983) ("physical and emotional suffering"

26   from loss of benefits "is far more compelling than the possibility of . . . monetary loss"). Moreover,

27   when assessing the weight of "potential human suffering" in a public interest analysis, courts must

28   account for the fact that retroactive relief is deemed "inadequate to remedy" the hardship. *Golden*

1  *Gate Restaurant Ass'n*, 512 F.3d at 1126.

2  These principles provide a strong justification for enjoining the Order. The Order has

3  already begun undermining access to necessary health services in Santa Clara, including programs

4  providing prenatal care, nutritious foods, and postpartum support. *See* Hansen Decl. ¶ 24. If

5  implemented, the Order is likely to further reduce uptake of these services. *Id.* ¶¶ 24-26; Lorenz

6  Decl. ¶¶ 25-26, 34. Even if the Order were permitted to become operative but ruled unconstitutional

7  only a few months later, the harms suffered would be irreversible, further supporting the issuance of

8  an injunction. Hansen Decl. ¶¶ 24-26; Lorenz Decl. ¶ 34; *Golden Gate Restaurant Ass'n*, 512 F.3d

9  at 1126.

10  **C.    The Public Interest in a Prosperous Economy Weighs in Favor of Granting Relief**

11

12  As explained, the Order threatens to destabilize the local economy by making it difficult for

13  technology companies to attract global talent moving forward, and by making existing talent more

14  likely to depart for alternative labor markets. *See supra* Part II.B. The Order has also reduced the

15  appeal of remaining in the Bay Area for residents on student visas who are attending college or

16  university in Santa Clara County. *Id.* Ripple effects will be seen in the near future throughout the

17  community, leading to financial stress and greater reliance on safety-net services. *Id.* In light of the

18  potential havoc the Order could wreak on the local economy—particularly the imminent harms

19  stemming from depleting Silicon Valley's workforce—the public interest weighs in favor of issuing

20  an injunction. *City of Sausalito*, 386 F.3d at 1199.

21  **D.    The Public Interest in Preventing the Creation of an Underclass Weighs in Favor of Granting Relief**

22

23  Denying citizenship to the American-born children affected by the Order would subjugate

24  many children born in Santa Clara County into a permanent underclass. *See* Lorenz Decl. ¶ 17 (in

25  2024, Santa Clara's Health System delivered nearly 1,500 babies born to mothers ineligible for

26  federally funded Medi-Cal due to their immigration status). These children would be denied

27  opportunities, benefits, and resources available to their citizen peers, including enrollment in federal

28  benefits programs such as CalFresh and CalWORKS. Betkolia Decl. ¶¶ 8-9, 11-14; Hansen Decl.

1    ¶¶ 15-16.  The ensuing lack of access to healthy food and other assistance is likely to cause affected

2    children to experience poor health outcomes.  *See* Betkolia Decl. ¶ 9; Hansen Decl. ¶¶ 13-14, 18, 24.

3    The Order would also deny affected children "the privilege of full participation in the affairs of our

4    society," *Knauer v. United States*, 328 U.S. 654, 658 (1946), subject them to "risk of deportation and

5    family separation," and worsen their educational and employment outcomes, *Washington v.*

6    *Trump*, --- F. Supp. 3d ---, 2025 WL 272198, at *1.

7        This treatment does "not comport with fundamental conceptions of justice."  *Plyler*, 457 U.S.

8    at 220 (withholding education from children of undocumented parents unjustly perpetuates

9    underclass status in spite of the child's lack of culpability for the actions of their parents); *Weber v.*

10   *Aetna Cas. & Sur. Co.*, 406 U.S. 164, 175-76 (1972) (there can be "no legitimate state interest" in

11   barring illegitimate children from recovering worker's compensation benefits after the death of a

12   parent, as doing so would be "contrary to the basic concept of our system that legal burdens should

13   bear some relationship to individual responsibility").

14       Particularly when compared to the nonexistence of any harm Defendants would suffer from a

15   grant of relief, the deprivation of affected children's constitutional right to citizenship, and the

16   resulting decrease in their ability to participate meaningfully in society, weighs in favor of granting

17   relief.  *See, e.g.*, *Schneiderman v. United States*, 320 U.S. 118, 122 (1943) (noting that it is "difficult

18   to exaggerate [the] value and importance" of "priceless" American citizenship); *Trop v. Dulles*, 356

19   U.S. 86, 101-03 (1958) (lack of citizenship, particularly for those rendered stateless, "subjects the

20   individual to a fate of ever-increasing fear and distress" so severe that, if meted out as a punishment,

21   it would violate the Eighth Amendment).

22   **IV.    Santa Clara has Standing to Bring this Action**

23       Because Santa Clara has shown irreparable harm, it has established Article III standing as a

24   matter of law.  *See, e.g.*, *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1286-87 (9th Cir.

25   2013) ("The same facts by which Shell has shown (1) a likelihood of success on the merits . . . , and

26   (2) that the resulting harm would be irreparable, necessarily establish that Shell has standing to seek

27   injunctive relief.") (citing *Cole v. Oroville Union High School Dist.*, 228 F.3d 1092, 1100 (9th Cir.

28   2000) (equating the "Article III standing require[ment of] an injury that is actual or imminent, not

1 conjectural or hypothetical," with the "immediate threat of an irreparable injury" that is required for

2 injunctive relief (internal quotation marks omitted))); *see also, e.g.*, *Dep't of Commerce*, 588 U.S.

3 at 767-68 (harms caused by "the predictable effect of Government action on the decisions of third

4 parties" are fairly traceable to the government for purposes of a standing analysis); *Azar*, 911 F.3d

5 at 571-72 (same).

6 **CONCLUSION**

7     For the foregoing reasons, this Court should preliminarily enjoin the Order and its

8 implementation and enforcement.

9

10 Dated:  February 5, 2025                    Respectfully submitted,

11

12                                By:  /s/ Tony LoPresti
                               TONY LOPRESTI

13                                COUNTY COUNSEL

14                                KAVITA NARAYAN
                               MEREDITH A. JOHNSON

15                                RAPHAEL N. RAJENDRA
                               LAURA S. TRICE

16                                HANNAH M. GODBEY
                               TAYRYN A. EDWARDS

17                                Attorneys for Plaintiff
                               COUNTY OF SANTA CLARA

18

19 3201995

20

21

22

23

24

25

26

27

28