OFFICE OF THE COUNTY COUNSEL
COUNTY OF SANTA CLARA
TONY LOPRESTI, State Bar #289269
KAVITA NARAYAN, State Bar #264191
MEREDITH A. JOHNSON, State Bar #291018
RAPHAEL N. RAJENDRA, State Bar #255096
LAURA S. TRICE, State Bar #284837
HANNAH M. GODBEY, State Bar #334475
TAYRYN A. EDWARDS, State Bar #344959
70 West Hedding Street, East Wing, Ninth Floor
San José, California 95110-1770
Telephone: (408) 299-5900
Facsimile: (408) 292-7240
E-Mail: Tony.LoPresti@cco.sccgov.org
Kavita.Narayan@cco.sccgov.org
Meredith.Johnson@cco.sccgov.org
Raphael.Rajendra@cco.sccgov.org
Laura.Trice@cco.sccgov.org
Hannah.Godbey@cco.sccgov.org
Tayryn.Edwards@cco.sccgov.org

Attorneys for Plaintiff
County of Santa Clara

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
San Jose Division

| | |
|---|---|
| **County of Santa Clara**,<br><br>Plaintiff,<br><br>v.<br><br>**Donald J. Trump, et al.,**<br><br>Defendants. | No. 5:25-cv-00981-EKL<br><br>**DECLARATION OF GRETA S. HANSEN IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |

## DECLARATION OF GRETA S. HANSEN

I, GRETA S. HANSEN, declare:

1. I make this declaration in support of the County of Santa Clara's motion for preliminary injunction. I am a resident of the State of California. I know the facts herein stated of my own personal knowledge and if called upon to do so, I could and would competently testify to them under oath.

2. I am the Chief Operating Officer of the County of Santa Clara ("Santa Clara"). In this role, I am responsible for all Santa Clara operations. In particular, my work focuses on increasing access to healthcare, housing, and food assistance for the County's most vulnerable residents; improving the County's child welfare and public benefits systems; leading response operations during local emergencies; expanding access to mental health and substance use treatment services; and other efforts to improve the health and welfare of our community. I have served as Chief Operating Officer since August 2022.

3. Prior to my role as Chief Operating Officer, I served as Chief Assistant County Counsel in the Office of the County Counsel, which provides legal services and advice for Santa Clara. In that role, I oversaw much of the Office's work and advised numerous Santa Clara departments; served as one of the directors of Santa Clara's response to the COVID-19 pandemic; led initiatives to improve and preserve service delivery to county residents experiencing homelessness, mental illness, and substance use; and developed local policies to protect vulnerable county residents. I began my service with the Office of the County Counsel in 2009, became a Lead Deputy County Counsel in 2010, and served as Chief Assistant County Counsel from October 2016 to August 2022.

4. I have served in leadership roles at Santa Clara for 15 years. I am deeply familiar with Santa Clara's policies, structure, operations, and budgeting processes, and I have developed particular expertise in the delivery of health, social, and emergency response services to vulnerable populations by Santa Clara departments.

### <u>The County of Santa Clara</u>

5. Santa Clara is a charter county and a political subdivision of the State of California.

It is home to 1.9 million residents, making it the most populous county in Northern California and more populous than 12 U.S. states.

6. Santa Clara is also one of the most diverse counties in the nation. More than 40 percent of Santa Clara's residents are foreign-born, and more than 60 percent of children in Santa Clara County have at least one foreign-born parent. These percentages are the highest of any county in California and among the highest of any county in the United States.

7. Santa Clara's foreign-born population exceeds 750,000 and includes people holding a wide range of immigration statuses: naturalized citizens; lawful permanent residents; refugees and asylees; people with a wide variety of lawful but temporary statuses, including students, employees, and victims of human trafficking or other crimes who have assisted law enforcement and hold T or U visas; and people without lawful immigration status. Santa Clara has a particularly large population of residents who are experts in computer and other technology industries who hold H-1B and related visas.

8. Santa Clara's mission is to plan for the needs of a dynamic community, provide quality services, and promote a healthy, safe, and prosperous community for all. Under law, Santa Clara is responsible for administering the social safety net and providing services to meet the basic needs of vulnerable residents. Santa Clara is also responsible for public services that promote the safety and welfare of the community overall, including public health, disaster response, and public safety functions.

9. Santa Clara employs around 23,000 employees to carry out its essential safety-net and public service functions. These employees include doctors, nurses, epidemiologists, and other staff providing health services within Santa Clara's comprehensive public safety-net Health System; social workers and eligibility workers who provide protective services and administer benefits within Santa Clara's Social Services Agency; election workers, community outreach specialists, park rangers, law enforcement officers, accountants, housing and community development specialists, and numerous other workers who provide and support necessary public services for the Santa Clara County community.

**Impacts and Financial Harm to Santa Clara as a Safety-Net Service Provider**

10. I am familiar with the Executive Order on Protecting the Meaning and Value of American Citizenship ("Order") issued by the President on January 20, 2025. I understand that, if the Order is implemented, the federal government will no longer recognize the citizenship of children born in the United States if, at the time of the child's birth, (1) the child's mother was unlawfully present and the father was not a United States citizen or lawful permanent resident, or (2) the child's mother had lawful but temporary immigration status and the father was not a United States citizen or lawful permanent resident.

11. If the Order is implemented, it will cause significant harm to Santa Clara in its role as the primary administrator of the social safety net in Santa Clara County.

12. Each year, Santa Clara spends billions of dollars on safety-net services and programs, including specifically to support families and children. For Fiscal Year 2025 (July 1, 2024 to June 30, 2025), Santa Clara budgeted approximately $1.29 billion for services and programs supporting children, youth, and families. This budgeted amount reflects a mix of federal, state, county, and other funding, with an estimated net cost of over $260 million to Santa Clara. As discussed below, some programs are heavily supported by federal and state funding, while others are entirely Santa Clara-funded, often supplementing and filling gaps where state- and federally supported programs are insufficient. But regardless of the funding source for any individual program, federal funding is critical to the sustainability of these programs and services overall and to Santa Clara's ability to meet the basic needs of vulnerable children, support their development, and foster their ability to become thriving participants in our community.

13. If the Order goes into effect, it will undermine the sustainability of Santa Clara's safety-net services because it will necessarily reduce the amount of federal funds available to support the children and families who are affected by the Order. This reduction in federal funds will force Santa Clara to either expend more of its own limited funds to assist affected children and families and fill the gaps where federal benefits and funding are no longer available—or to reduce or eliminate services and supports that are no longer financially sustainable, leaving gaping holes in the social safety net and undermining the health and safety of the community as a whole.

14. As explained in more detail in the declaration of Eilona Betkolia-Gevargiz (which I have reviewed), the Department of Employment and Benefits Services (DEBS), part of Santa Clara's Social Services Agency, administers federally funded benefits, such as CalFresh and CalWORKS, that provide critical food assistance and financial support to low-income children and families, but which are not available to undocumented immigrants and many people with lawful but temporary immigration status. These benefits are a central part of Santa Clara's social safety net. But if the Order takes effect, children impacted by the Order will not be U.S. citizens and will not be eligible for these important public benefits.

15. Other Santa Clara departments also rely on federal funding that will be impacted by the Order. For example, the Department of Family and Children's Services and the Probation Department rely on federal Title IV-E funding, provided under Part E of Title IV of the Social Security Act, to support children and youth in Santa Clara's foster care program. In Fiscal Year 2024 (July 1, 2023 to June 30, 2024), Santa Clara's Department of Family and Children's Services received $36.3 million in federal Title IV-E funding. These funds are used, typically in combination with state and Santa Clara funds, to assist foster families and other out-of-home placements with the costs of supporting the children in their care and to fund Santa Clara's administration of the foster care program.

16. However, Title IV-E funds are available only to support foster care services provided to children who meet federal eligibility requirements. When children are not eligible for federal funds, Santa Clara is required to contribute more of its own funds to support the foster care services provided to those children. As with many federal benefits, the federal eligibility rules for Title IV-E funding exclude undocumented immigrants as well as many children with lawful but temporary immigration status. Therefore, if the Order takes effect, a greater number of children will be ineligible for federal Title IV-E funding because they will lack U.S. citizenship or other qualifying immigration status, and Santa Clara will have to contribute more of its own funds to support critically important foster care services.

17. The loss of CalFresh, CalWORKS, Title IV-E, and other federal public benefit funding will cause harm to Santa Clara that reaches far beyond the departments that administer these

programs. Given Santa Clara's role as the frontline administrator of the social safety net in a county of nearly 2 million residents, the loss of public benefits and assistance funding in one area will necessarily increase pressure on other services and benefits that Santa Clara provides and require Santa Clara to devote additional local resources to support families and children in need.

18. For example, Santa Clara's Office of Supportive Housing operates programs for people experiencing or at risk of homelessness. Many of its programs are funded in part by Santa Clara's General Fund (its main local operating fund that accounts for Santa Clara-wide expenditures and revenues). If the Order is implemented, affected families will lose access to critical public benefits, and many will be forced to divert income that otherwise would have covered rent to buy food and necessities for their children. It is entirely predictable that the Order will place affected families at greater risk of homelessness and push some into shelters, safe-parking programs (for people living in their vehicles), and other Office of Supportive Housing programs for homelessness prevention and temporary housing assistance that are supported by local funds. Santa Clara already devotes over $8 million of its own funds annually to support emergency homeless prevention services and shelters for families, and it will have to spend even more of its own funds to support these programs if the Order is allowed to take effect.

19. Affected families will also predictably need to rely on other forms of Santa Clara-funded public assistance at a higher rate. For example, families whose children are not eligible for CalFresh and CalWORKS benefits to help meet their basic needs will need assistance from programs that provide free diapers and in-kind food assistance, which Santa Clara supports out of its General Fund.

20. In sum, the Order, if implemented, will force Santa Clara to spend more of its own funds to make up for lost federal safety-net funding—by expanding existing programs and/or creating new programs to fill the gap where CalFresh, CalWORKs, and other federally funded benefits programs are no longer available. Santa Clara already spends hundreds of millions of dollars of its own funds on these programs, and the need to devote even more funds to these programs will cause Santa Clara significant financial harm.

//

**Public Health Impacts**

21. Santa Clara also plays a critical role in protecting the public health of Santa Clara County's community as a whole. I am deeply familiar with these functions due to my role in directing Santa Clara's response to the COVID-19 pandemic. The Order, if implemented, will hinder Santa Clara's ability to protect the public health and impose escalating costs on Santa Clara's public health and safety-net healthcare systems.

22. Santa Clara's public health functions are carried out by the Public Health Department, which is responsible for promoting and protecting the health of Santa Clara County's entire population at a community level. The Public Health Department works to prevent disease and injury (for example, through communicable disease prevention and sexual health programs); promote healthy lifestyles (for example, by providing public education about childhood obesity and supporting tobacco and violence prevention initiatives); create healthy environments free from health hazards and pollutants; and collect, curate, and use data to inform decision-making. None of Santa Clara County's 15 cities has its own public health department, and therefore all Santa Clara County residents rely on the Public Health Department to perform essential public health functions.

23. One critical function of the Public Health Department is to support maternal, child, and family health. To that end, the Public Health Department's Maternal Child and Family Health Branch offers services and programs to support children and families in Santa Clara County. This includes administering the Women, Infants and Children nutrition program (WIC), a federal program that provides monthly assistance to buy healthy foods, breastfeeding support, health information, and other services to pregnant and breastfeeding people, infants, and children; California Children's Services, a program for children and youth with certain serious medical conditions; and other programs to improve the health of vulnerable children and families.

24. I am aware that, in the weeks since the Order was issued, Public Health Department staff have reported an increase in fear expressed by participants in the WIC and California Children's Services programs. I am not surprised by these reports. In my years overseeing and advising on Santa Clara's administration of public safety-net services, I have seen how federal policies targeting a group of people can instill fear and deter affected residents from accessing public

services and supports. Based on our experience, I and my colleagues in leadership at the Public Health Department fully expect that the Order will deter pregnant and parenting community members who fear their children are or will be subject to the Order from accessing federally funded programs like WIC. When families avoid these programs because of the fear instilled by the Order, they will lose access to nutritious foods and postpartum support, which are critical to the health of both mothers and children. By reducing uptake of these programs, the Order will harm Santa Clara financially because its safety-net Health System will be forced to absorb the increased costs of caring for a population in poorer health, physically and mentally.

25. The Public Health Department is also responsible for the prevention and control of infectious disease. As part of this work, the Public Health Department seeks to ensure that children in Santa Clara County receive required vaccinations, which are essential not only to health of individual children but to the population overall. For example, the Public Health Department runs a vaccination clinic, funded in part with Santa Clara funds, for children who need to get vaccinated quickly in order to register for school and have no other means of obtaining required vaccinations in time. In addition, after the COVID-19 pandemic, when many children ceased attending regular doctor's visits and therefore fell behind in vaccinations, the Public Health Department undertook an extensive public awareness campaign to educate families on the importance of vaccinations and reduce barriers to vaccine uptake.

26. If the Order takes effect, we fully anticipate that the Public Health Department will need to expend more resources on similar efforts to address low childhood vaccination rates. As explained in the declaration of Paul E. Lorenz, Chief Executive Officer of Santa Clara Valley Healthcare (Santa Clara's system of hospitals and clinics), which I have reviewed, health experts expect that the Order will deter community members who fear their children are or will be subject to the Order from seeking routine prenatal and pediatric care. As Santa Clara experienced during the COVID-19 pandemic, failure to attend routine pediatric visits, in turn, will result in decreased vaccination rates among children, increasing the risk of spread of preventable childhood diseases, such as measles and whooping cough. We have already seen these diseases reemerge due to reduced vaccination rates in the wake of the COVID-19 pandemic, and further spread of these preventable

illnesses, as a result of the Order, would pose serious risks to the community at large. Accordingly, if the Order is implemented, the Public Health Department will be required to expend additional resources to prevent drop-offs in childhood vaccination rates and the associated spread of disease, through means such as expanding the existing vaccination clinic, developing public outreach and education campaigns, and tracking and controlling outbreaks of disease.

27. These public health impacts will harm Santa Clara County residents as a whole and increase costs for Santa Clara's Public Health Department and its public safety-net Health System.

**Harms to Santa Clara as an Employer**

28. Santa Clara will also face burdens as an employer if the Order is implemented. I am aware that Santa Clara employs staff throughout its departments who reside in the United States in lawful but temporary immigration status and work for Santa Clara under a work visa. Many of these employees serve in the County Health System or in direct-service capacities in the Social Services Agency.

29. Up until now, these workers had certainty that any children born to them in the United States during their employment with Santa Clara would be U.S. citizens. Under the Order, that certainty will dissolve. A child born to these employees will not be deemed a U.S. citizen unless the other biological parent of that child is a citizen or lawful permanent resident, and some workers may not know what citizenship, if any, their child will hold.

30. I and others in Santa Clara leadership are concerned about the likelihood that Santa Clara will lose experienced employees as a result of the Order. That loss will create a burden on Santa Clara. Based on my long experience in leadership, bringing on new staff to replace an experienced employee causes disruption and loss of value even under the best of circumstances. It will take time and resources to recruit and train new staff members in the critical roles currently occupied by employees with lawful but temporary immigration status.

31. Even if these employees remain in Santa Clara's employment, as we certainly hope they will, the Order will impose burdens on both Santa Clara as an employer and on affected Santa Clara employees.

//

32. For example, under the Internal Revenue Code, I believe these employees would no longer be able to seek the federal Child Tax Credit for any child born after the Order goes into effect who does not have lawful immigration status with a Social Security number valid for employment in the United States. The loss of this important tax credit creates an immediate economic burden on these employees and their families.

33. The Order will have long-term consequences on our workforce too. When the children of these employees reach employment age, their lack of lawful work authorization would prevent Santa Clara from employing them. For years, Santa Clara has been sought out as an employer by multiple generations of families dedicated to public service. The Order disrupts this valuable employment pipeline.

**Other Economic Harms to Santa Clara**

34. The Order, if implemented, will also have broader adverse economic impacts on Santa Clara.

*35.* Currently, immigrants bring tremendous economic benefits to Santa Clara. Our Office of Immigrant Relations—a Santa Clara office housed, like my own position, within the Office of the County Executive—has partnered with the American Immigration Council to quantify these benefits and better understand the role of immigrants in our Silicon Valley economy. Their research and analysis determined that, in 2021, immigrants collectively contributed $255 billion to Santa Clara's gross domestic product. *See New Americans in Santa Clara County*, American Immigration Council (Sept. 14, 2023), available at https://www.americanimmigrationcouncil.org/research/new-americans-santa-clara-county. The same year, immigrant households in Santa Clara paid approximately $6.7 billion in state and local taxes and $4.2 billion in rent, and international students contributed approximately $476.2 million to the local economy. *Id.*

36. In particular, I am aware that the technological firms of Silicon Valley depend upon highly skilled immigrants, many of whom are temporary H-1B visa-holders, to meet needs in areas such as computer science and engineering. Like Santa Clara employees with temporary work visas, these private employees face uncertainty under the Order. Based on media reports I have reviewed, I believe the Order and the uncertainty it has raised about whether existing workers should remain

here are creating serious anxiety for these workers. *See* Francesca Maglione and Alicia A. Caldwell, *Trump's Birthright Citizenship Order Rattles H-1B Workers Expecting a Baby*, Bloomberg (Jan. 28, 2025), https://economictimes.indiatimes.com/nri/migrate/trumps-birthright-citizenship-order-rattles-h-1b-workers-expecting-a-baby/articleshow/117620598.cms?from=mdr. I am concerned and anticipate that the Order, if implemented, will make Silicon Valley a less attractive place for talented immigrants and will deter H-1B visa-holders and their families from coming and remaining here, thus impeding the recruitment efforts of Silicon Valley companies and hindering their ability to retain the staff they need. Santa Clara's financial health depends in part on the health of the Silicon Valley economy (including to Santa Clara's property and sales tax revenues that account for the overwhelming majority of its discretionary funding), and a slowdown among Silicon Valley tech firms would have negative impacts on the economy of Santa Clara County overall. These impacts would harm Santa Clara, too, and likely increase reliance on safety-net services by those who need more support in less robust economic times.

37. The Order will also harm Santa Clara by creating a permanent underclass made up of U.S.-born children who are neither citizens nor lawfully present immigrants and who cannot participate fully in the community, either socially or economically. Santa Clara has a concrete interest in ensuring, to the greatest extent possible, that its residents are able to fully, openly, and lawfully participate in, work in, and contribute to the community. Such participation brings economic benefit to Santa Clara and all of its residents, makes for safer and healthier communities, and reduces Santa Clara's need to expend resources on safety-net health and welfare services.

38. The Order will harm Santa Clara's interest because instead of allowing U.S.-born children to become full, contributing, and lawfully employed members of the community, it will force them into the shadows. While these residents will still undoubtably contribute to the Santa Clara County economy, culture, and society, their contributions will necessarily be diminished—not through any fault of their own, but because they have been denied the citizenship that was

//

//

//

guaranteed to U.S.-born children who came before them. This is contrary to Santa Clara's values, will undermine the local economy, and will cause Santa Clara immense harm.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on 2/5/25 at San José, California.

GRETA S. HANSEN