BRETT A. SHUMATE
Acting Assistant Attorney General
ALEXANDER K. HAAS
Branch Director
BRAD P. ROSENBERG
Special Counsel
R. CHARLIE MERRITT
YURI S. FUCHS (CA Bar No. 300379)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
(202) 598-3869
yuri.s.fuchs@usdoj.gov

*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

|  |  |
|---|---|
| COUNTY OF SANTA CLARA,<br><br><br>Plaintiff,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>Defendants. | Case No. 5:25-cv-00981-EKL<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION AND MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Hearing Date: February 27, 2025<br>Time: 1:30 pm<br>Judge: Hon. Eumi K. Lee<br>Place: San Jose Courthouse<br>Courtroom 7 |

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................... 1

BACKGROUND ..................................................................................................................... 2

STANDARD OF REVIEW ..................................................................................................... 4

ARGUMENT ........................................................................................................................... 4

I.    Plaintiff Lacks Standing............................................................................................. 4

II.   Plaintiff Lacks a Valid Cause of Action. ................................................................... 7

III.  Plaintiff Is Not Likely to Succeed on the Merits. ..................................................... 8

  A.    Plaintiff Is Not Likely to Succeed on Its Citizenship Clause Claim....................... 8

    a.    The Term "Jurisdiction" in the Citizenship Clause Does Not Refer
      to Regulatory Power. ............................................................................. 8

    b.    Children Born of Unlawfully Present Aliens or Aliens Whose
      Presence Is Lawful but Temporary Fall Outside the Citizenship
      Clause.................................................................................................... 12

    c.    Applicable Interpretive Principles Support the Government's
      Reading of the Citizenship Clause. ...................................................... 17

    d.    Plaintiff's Contrary Arguments Are Unpersuasive................................ 19

  B.    Plaintiff Is Not Likely to Succeed on Its INA Claim.............................................. 22

  C.    Plaintiff Is Not Likely to Succeed on Its Separation of Powers Claim.................. 23

IV.   Plaintiff Will Not Suffer Irreparable Harm During the Pendency of this Lawsuit. .......... 24

V.    The Public Interest Does Not Favor an Injunction. ........................................................ 24

VI.   Any Relief Should Be Limited. ...................................................................................... 24

CONCLUSION........................................................................................................................ 25

# TABLE OF AUTHORITIES

**<u>Cases</u>**

*Afroyim v. Rusk*,
  387 U.S. 253 (1967)..................................................................................... 21

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*,
  458 U.S. 592 (1982)....................................................................................... 6

*Arcam Pharm. Corp. v. Faria*,
  513 F.3d 1 (1st Cir. 2007)........................................................................... 21

*Arizona v. Biden*,
  40 F.4th 375 (6th Cir. 2022) ................................................................. 5, 25

*Arizona v. United States*,
  567 U.S. 387 (2012)..................................................................................... 24

*Benny v. O'Brien*,
  32 A. 696 (N.J. 1895) ................................................................................. 16

*Berenyi v. Dist. Dir., INS*,
  385 U.S. 630 (1967)..................................................................................... 19

*California v. Azar*,
  911 F.3d 558 (9th Cir. 2018) ...................................................................... 25

*Cambranis v. Blinken*,
  994 F.3d 457 (5th Cir. 2021) ........................................................................ 7

*Carlisle v. United States*,
  83 U.S. (16 Wall.) 147 (1872) ................................................................... 12

*Cherokee Nation v. Georgia*,
  30 U.S. (5 Pet.) 1 (1831)............................................................................. 13

*Chin Bak Kan v. United States*,
  186 U.S. 193 (1902)..................................................................................... 20

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013)....................................................................................... 5

*Cochise Consultancy, Inc. v. United States ex rel. Hunt,*
  587 U.S. 262 (2019) .................................................................................. 23

*DeVillier v. Texas,*
  601 U.S. 285 (2024) .................................................................................... 7

*Doe #1 v. Trump,*
  957 F.3d 1050 (9th Cir. 2020) .................................................................. 24

*E. Bay Sanctuary Covenant v. Barr,*
  934 F.3d 1026 (9th Cir. 2019) .................................................................. 25

*E. Bay Sanctuary Covenant v. Biden,*
  102 F.4th 996 (9th Cir. 2024) ..................................................................... 5

*Elk Run Coal Co. v. U.S. Dep't of Labor,*
  804 F. Supp. 2d 8 (D.D.C. 2011) ............................................................... 8

*Elk v. Wilkins,*
  112 U.S. 94 (1884) .............................................................................. *passim*

*Elkins v. Moreno,*
  435 U.S. 647 (1978) .................................................................................. 12

*FDA v. All. for Hippocratic Med.,*
  602 U.S. 367 (2024) .................................................................................... 6

*Franchise Tax Bd. of Cal. v. Hyatt,*
  587 U.S. 230 (2019) .................................................................................. 14

*Franklin v. Massachusetts,*
  505 U.S. 788 (1992) .................................................................................. 25

*Gen. Bldg. Contractors Ass'n v. Pennsylvania,*
  458 U.S. 375 (1982) .................................................................................. 10

*Haaland v. Brackeen,*
  599 U.S. 255 (2023) ......................................................................... 6, 9, 13

*Harisiades v. Shaughnessy,*
  342 U.S. 580 (1952) .................................................................................. 17

*In re Multidistrict Vehicle Air Pollution M.D.L. No. 31,*
    481 F.2d 122 (9th Cir. 1973) ............................................................................ 6

*Inglis v. Trs. of Sailor's Snug Harbor,*
    28 U.S. (3 Pet.) 99 (1830) ...................................................................... 14, 19

*INS v. Chadha,*
    462 U.S. 919 (1983) ............................................................................... 22

*INS v. Legalization Assistance Project of L.A. Cnty. Fed'n of Lab.,*
    510 U.S. 1301 (1993) ............................................................................. 24

*Kaiser v. Blue Cross of Cal.,*
    347 F.3d 1107 (9th Cir. 2003) .................................................................... 24

*Kawakita v. United States,*
    343 U.S. 717 (1952) ............................................................................... 18

*Kellogg Brown & Root Servs., Inc. v. United States ex rel. Carter,*
    575 U.S. 650 (2015) ............................................................................... 22

*Kwock Jan Fat v. White,*
    253 U.S. 454 (1920) ............................................................................... 20

*Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin,*
    599 U.S. 382 (2023) ............................................................................... 13

*Lamar v. Micou,*
    112 U.S. 452 (1884) ............................................................................... 12

*Liu v. SEC,*
    591 U.S. 71 (2020) ................................................................................ 18

*Lone Wolf v. Hitchcock,*
    187 U.S. 553 (1903) ................................................................................ 9

*Madsen v. Women's Health Ctr., Inc.,*
    512 U.S. 753 (1994) ............................................................................... 25

*Marbury v. Madison,*
    5 U.S. (1 Cranch) 137 (1803) ..................................................................... 9

*Martinez v. Bynum,*
  461 U.S. 321 (1983)................................................................................ 12

*Maryland v. King,*
  567 U.S. 1301 (2012).............................................................................. 24

*McDonald v. City of Chicago,*
  561 U.S. 742 (2010)................................................................................ 10

*Miller v. Albright,*
  523 U.S. 420 (1998)................................................................................ 19

*Minor v. Happersett,*
  88 U.S. (21 Wall.) 162 (1874)................................................................ 11

*Mississippi v. Johnson,*
  71 U.S. (4 Wall.) 475 (1866).................................................................. 25

*N.Y. State Rifle & Pistol Ass'n v. Bruen,*
  597 U.S. 1 (2022).................................................................................... 21

*Nebraska v. Biden,*
  143 S. Ct. 2355 (2023)............................................................................. 5

*Newdow v. Roberts,*
  603 F.3d 1002 (D.C. Cir. 2010)............................................................... 25

*Nishimura Ekiu v. United States,*
  142 U.S. 651 (1892)................................................................................ 18

*Nixon v. Fitzgerald,*
  457 U.S. 731 (1982)................................................................................ 23

*Nken v. Holder,*
  556 U.S. 418 (2009)................................................................................ 24

*Oceanic Steam Navigation Co. v. Stranahan,*
  214 U.S. 320 (1909)................................................................................ 18

*Oklahoma v. Castro-Huerta,*
  597 U.S. 629 (2022)................................................................................ 22

*Pennsylvania v. New Jersey*,

   426 U.S. 660 (1976) ........................................................................................... 5

*Robertson v. Cease*,

   97 U.S. 646 (1878) ........................................................................................... 11

*Rogers v. Bellei*,

   401 U.S. 815 (1971) ......................................................................................... 18

*Savorgnan v. United States*,

   338 U.S. 491 (1950) ......................................................................................... 18

*Schooner Exchange v. McFaddon*,

   11 U.S. (7 Cranch) 116 (1812) ..................................................................... 9, 10

*South Carolina v. Katzenbach*,

   383 U.S. 301 (1966) ........................................................................................... 6

*Stormans, Inc. v. Selecky*,

   586 F.3d 1109 (9th Cir. 2009) ........................................................................... 4

*Taggart v. Lorenzen*,

   587 U.S. 554 (2019) ......................................................................................... 22

*The Pizarro*,

   15 U.S. (2 Wheat.) 227 (1817) ........................................................................ 12

*The Slaughterhouse Cases*,

   83 U.S. (16 Wall.) 36 (1873) ........................................................................... 15

*TransUnion LLC v. Ramirez*,

   594 U.S. 413 (2021) ........................................................................................... 4

*Trump v. Hawaii*,

   585 U.S. 667 (2018) ......................................................................................... 17

*United States v. Holliday*,

   70 U.S. (3 Wall.) 407 (1866) ............................................................................. 9

*United States v. Kagama*,

   118 U.S. 375 (1886) ........................................................................................... 9

*United States v. Manzi,*
    276 U.S. 463 (1928) ................................................................................... 19

*United States v. Rahimi,*
    602 U.S. 680 (2024) ............................................................................. 21, 25

*United States v. Texas,*
    599 U.S. 670 (2023) ................................................................................. 1, 4

*United States v. Wong Kim Ark,*
    169 U.S. 649 (1898) ......................................................................... *passim*

*Verlinden BV v. Cent. Bank of Nigeria,*
    461 U.S. 480 (1983) ..................................................................................... 9

*Washington v. FDA,*
    108 F.4th 1163 (9th Cir. 2024) ................................................................... 5

*Wilkins v. United States,*
    598 U.S. 152 (2023) ..................................................................................... 8

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ......................................................................................... 4

*Winton v. Amos,*
    255 U.S. 373 (1921) ..................................................................................... 9

**Constitution**

U.S. Const. amend. XIV, § 1 ............................................................... *passim*

U.S. Const. Art. I, § 8, cl. 4 ...................................................................... 17

U.S. Const. Art. II, § 1 .............................................................................. 23

U.S. Const. Art. II, § 3 .............................................................................. 23

**Statutes**

8 U.S.C. § 1401(a) ..................................................................................... 22

8 U.S.C. § 1401(b) ....................................................................................... 8

8 U.S.C. § 1503(a) ....................................................................................... 7

28 U.S.C. § 2201 .......................................................................................... 7

Opposition to Motion for a Preliminary Injunction
5:25-cv-00981-EKL
              vii

8 U.S.C. § 1401(c) ............................................................................................ 19

Civil Rights Act, 14 Stat. 27 (1866) ............................................................ 10, 15

Nationality Act of 1940, ch. 876, 54 Stat. 1137 ............................................... 10

Naturalization Act of 1790, ch. 3, 1 Stat. 103 .................................................. 18

**Rules**

Fed. R. Civ. P. 65(a)(2) ...................................................................................... 25

**Legislative Materials**

2 Cong. Rec. 3279 (1874) ................................................................................... 16

Cong. Globe, 39th Cong., 1st Sess. 572 (1866) ................................................ 11

Cong. Globe, 39th Cong., 1st Sess. 1117 (1866) .............................................. 14

Cong. Globe, 39th Cong., 1st Sess. 2768 (1866) .............................................. 15

Cong. Globe, 39th Cong., 1st Sess. 2769 (1866) .............................................. 15

Cong. Globe, 39th Cong., 1st Sess. 2893 (1866) .............................................. 11

Cong. Globe, 39th Cong., 1st Sess. 2894 (1866) .............................................. 11

Cong. Globe, 40th Cong., 2nd Sess. 868 (1868) .............................................. 21

Cong. Globe, 40th Cong., 2nd Sess. 967 (1868) .............................................. 21

**Administrative & Executive Materials**

Exec. Order No. 14159, Protecting the American People Against Invasion,

    90 Fed. Reg. 8443 (Jan. 20, 2025) ........................................................... 2, 17

Exec. Order No. 14160, Protecting the Meaning and Value of American Citizenship,

    90 Fed. Reg. 8449 (Jan. 20, 2025) ........................................................ 1, 3, 23

Exec. Order No. 14165, Securing Our Borders,

    90 Fed. Reg. 8467 (Jan. 20, 2025) ................................................................. 2

Proclamation No. 10886, Declaring a National Emergency at the Southern Border of the United

    States, 90 Fed. Reg. 8327 (Jan. 20, 2025) .................................................... 2

**Other Authorities**

2 *A Digest of the International Law of the United States* § 183, at 397 (Francis Wharton ed., 2d.

    ed. 1887) ................................................................................................. 16, 17

Alexander Porter Morse, *A Treatise on Citizenship* (1881)........................................... 16

Amy Swearer, Heritage Found., Legal Memorandum No. 250, *The Political Case for Confining Birthright Citizenship to Its Original Meaning* at 8-11 (2019)................................... 2-3

Emmerich de Vattel, *The Law of Nations* (London, printed for G.G. and J. Robinson, Paternoster-Row, 1797 ed.)................................................................................. 14, 18

John Westlake, *International Law* (1904) ................................................................. 21

Joseph Story, *Commentaries on the Conflict of Laws* (1834)...................................... 14

Justin Lollman, Note, *The Significance of Parental Domicile Under the Citizenship Clause*, 101 Va. L. Rev. 455 (2015) ................................................................................. 16

Mark Shawhan, Comment, *The Significance of Domicile in Lyman Trumbull's Conception of Citizenship*, 119 Yale L. J. 1351 (2010) ............................................................... 15

Spanish Treaty Claims Comm'n, U.S. Dep't of Justice, *Final Report of William Wallace Brown, Assistant Attorney General* (1910)......................................................................... 20

William Edward Hall, *A Treatise on International Law* (4th ed. 1895)................................ 13, 16

**INTRODUCTION**

The Citizenship Clause of the Fourteenth Amendment provides that "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S. Const. amend. XIV, § 1. On January 20, 2025, President Donald J. Trump issued an Executive Order addressing what it means to be "subject to the jurisdiction" of the United States. *See* Exec. Order No. 14160, "Protecting the Meaning and Value of American Citizenship" (Citizenship EO or EO), 90 Fed. Reg. 8449 (Jan. 20, 2025). That Executive Order recognizes that the Constitution does not grant birthright citizenship to the children of aliens who are unlawfully present in the United States as well as children of aliens whose presence is lawful but temporary. Text, history, and precedent support what common sense compels: the Constitution does not harbor a windfall clause granting American citizenship to, *inter alia*, the children of those who have circumvented (or outright defied) federal immigration laws.

Plaintiff's request for a preliminary injunction fails on all levels. To start, its claims fail on threshold grounds. In particular, Santa Clara County lacks standing. As injury, the county relies on the exact sort of incidental expenditure the Supreme Court held insufficient when it previously rejected Texas's argument for standing based on expenditures on public programs in response to a federal policy. *See United States v. Texas*, 599 U.S. 670 (2023). Further, the county lacks a cause of action—its suit cannot be brought under the Citizenship Clause, other constitutional provisions, or under the Immigration and Nationality Act (INA).

Plaintiff is also unlikely to succeed on the merits. As was apparent from the time of its enactment, the Citizenship Clause's use of the phrase "subjection to the jurisdiction" of the United States contemplates something more than being subject to this country's regulatory power. To fall within its scope, persons must be "completely subject to [the] political jurisdiction" of the United States, *i.e.*, that they have a "direct and immediate allegiance" to this country, unqualified by an allegiance to any other foreign power. *Elk v. Wilkins*, 112 U.S. 94, 102 (1884). Just as that does not hold for diplomats or occupying enemies, it similarly does not hold for foreigners admitted temporarily or individuals here illegally.

Although Plaintiff contends that the Citizenship EO upends well-settled law, it is its

maximalist reading which runs headlong into existing law. Not only is it inconsistent with the Supreme Court's holding in *Elk* that the children of Tribal Indians did not fall within the Clause, even though they were subject to the regulatory power of the United States, *id*. at 101-02, but it would render the Civil Rights Act of 1866 (which defined citizenship to cover those born in the United States, not "subject to any foreign power") unconstitutional just two years after it was passed. But the Citizenship Clause was an effort to *constitutionalize* the Civil Rights Act. Plaintiff relies heavily on the Supreme Court's decision in *United States v. Wong Kim Ark*, 169 U.S. 649 (1898). The Court, however, was careful to cabin its actual holding to the children of those with a "permanent domicile and residence in the United States." *Id*. at 652-53.

Reading *Wong Kim Ark* to leave open the question presented here is consistent with contemporary accounts, prior practices of the political branches, *Wong Kim Ark*'s own cautionary note about the use of dicta, and Supreme Court decisions in the years following *Wong Kim Ark*. Finally, the balance of the equities does not favor injunctive relief.

The Court should deny the pending preliminary injunction motion.

## BACKGROUND

The Citizenship EO is an integral part of President Trump's broader effort to repair the United States' immigration system and to address the ongoing crisis at the southern border. *See, e.g.*, Exec. Order No. 14165, "Securing Our Borders," 90 Fed. Reg. 8467 (Jan. 20, 2025); Proclamation No. 10886, "Declaring a National Emergency at the Southern Border of the United States," 90 Fed. Reg. 8327 (Jan. 20, 2025); Exec. Order No. 14159, "Protecting the American People Against Invasion," 90 Fed. Reg. 8443 (Jan. 20, 2025) ("Invasion EO"). As the President has recognized, individuals unlawfully in this country "present significant threats to national security and public safety," Invasion EO, § 1, and the severity of these problems warrants a full panoply of immigration measures. Some of these threats are related to the United States' prior, erroneous policy of recognizing near-universal birthright citizenship. For instance, "the nation's current policy of universally granting birthright citizenship to individuals who lack any meaningful ties to the United States provides substantial opportunities for abuse by motivated enemies." Amy Swearer, Heritage Found., Legal Memorandum No. 250, *The Political Case for Confining*

*Birthright Citizenship to Its Original Meaning* at 8-11 (2019).

The Citizenship EO seeks to correct the Executive Branch's prior misreading of the Citizenship Clause. It recognizes that the Constitution and the INA provide for citizenship for all persons who are born in the United States and subject to the jurisdiction thereof, and identifies two circumstances in which a person born in the United States is not automatically extended the privilege of United States citizenship:

> (1) when that person's mother was unlawfully present in the United States and the father was not a United States citizen or lawful permanent resident at the time of said person's birth, or (2) when that person's mother's presence in the United States at the time of said person's birth was lawful but temporary (such as, but not limited to, visiting the United States under the auspices of the Visa Waiver Program or visiting on a student, work, or tourist visa) and the father was not a United States citizen or lawful permanent resident at the time of said person's birth.

Citizenship EO § 1.

Section 2(a) of the EO directs the Executive Branch (1) not to issue documents recognizing U.S. citizenship to persons born in the United States under the conditions described in section 1, and (2) not to accept documents issued by state, local, or other governments purporting to recognize the U.S. citizenship of such persons. The EO specifies, however, that those directives "apply only to persons who are born within the United States after 30 days from the date of this order," or February 19. Citizenship EO § 2(b). The Citizenship EO makes clear that its provisions do not "affect the entitlement of other individuals, including children of lawful permanent residents, to obtain documentation of their United States citizenship." *Id*. § 2(c).

As for enforcement, the EO directs the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Commissioner of Social Security to take "all appropriate measures to ensure that the regulations and policies of their respective departments and agencies are consistent with this order," and not to "act, or forbear from acting, in any manner inconsistent with this order." Citizenship EO § 3(a). It further directs the heads of all federal agencies to issue public guidance within 30 days (by February 19) "regarding this order's implementation with respect to their operations and activities." *Id*. § 3(b).[1]

---

[1] The Citizenship EO has been challenged and enjoined in several other lawsuits as the Court previously observed in proceedings held on February 7, 2025. Minute Entry, ECF No. 27. Since those proceedings, another court in the District of New Hampshire has enjoined the

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## STANDARD OF REVIEW

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To obtain such extraordinary relief, a plaintiff must demonstrate "that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) (citation omitted).

## ARGUMENT

### I.    Plaintiff Lacks Standing.

Plaintiff's motion should be denied at the outset because Plaintiff has not established that it is likely to meet Article III standing requirements. To establish Article III standing, Plaintiff must show that it has suffered a judicially cognizable injury that is fairly traceable to the Defendants and likely redressable by judicial relief. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Plaintiff attempts to satisfy that requirement primarily by asserting that the EO will indirectly reduce the measure of federal funding the county receives and force it to incur costs to make up for losses in federal funding. Pl.'s Mot. for Prelim. Inj. ("Br.") at 12-15, 23-24, ECF No. 17. This does not satisfy Article III. As an initial matter, the Supreme Court rejected those types of incidental economic harms as a basis for standing in *United States v. Texas*, stating:

> [I]n our system of dual federal and state sovereignty, federal policies frequently generate indirect effects on state revenues or state spending. And when a State asserts, for example, that a federal law has produced only those kinds of indirect effects, the State's claim for standing can become more attenuated. In short, none of the various theories of standing asserted by the States in this case overcomes the fundamental Article III problem with this lawsuit.

599 U.S. at 680 n.3 (citations omitted).

That holding forecloses Plaintiff's standing here. Just as in *Texas*, where it was insufficient for the challenger states to identify monetary costs stemming from the presence of aliens, Santa Clara County cannot rely on its own social services expenditures to challenge the federal

enforcement of the EO as has another court in the District of Massachusetts. *See* Order, *N.H. Indonesian Cmty. Support v. Trump*, 1:25-cv-38 (D.N.H. Feb. 10, 2015) ECF No. 77; Orders on Prelim. Inj., *New Jersey v. Trump* 1:25-cv-10139 (D. Mass. Feb. 13, 2025), ECF Nos. 144-145.

government's regulation of others. The Citizenship EO simply regulates how the federal government will approach certain individuals' citizenship status. Whatever potential downstream effects might arise for county programs in response cannot establish standing. *See Washington v. FDA*, 108 F.4th 1163, 1174-76 (9th Cir. 2024) (reasoning that increased costs to state Medicaid system were the sort of "indirect" fiscal injuries that fell short of Article III); *E. Bay Sanctuary Covenant v. Biden*, 102 F.4th 996, 1002 (9th Cir. 2024) (holding that states lack "a significant protectable interest in minimizing their expenditures" from immigration-related policy changes because "such incidental effects are … attenuated and speculative."). Accepting the county's theory of injury—that a local government suffers Article III injury whenever a federal policy allegedly results in an increase in local expenditures or loss of local revenues—would eliminate any limits on challenges to federal policies by localities. *See Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022) ("Are we really going to say that any federal regulation of individuals through a policy statement that imposes peripheral costs on a State creates a cognizable Article III injury for the State to vindicate in federal court? If so, what limits on state standing remain?"); *cf. Nebraska v. Biden*, 143 S. Ct. 2355 (2023) (finding standing where the challenged federal policy would have directly deprived a state government corporation of ongoing fees that it would have otherwise continued earning under a federal contract).

Moreover, Plaintiff's asserted injuries regarding the increased costs of providing certain benefit programs, "administrative, operational, and compliance costs" in interpreting the EO, and the costs to the county as an employer are not traceable to the Citizenship EO. *See* Br. at 14-17. Because Plaintiff has *voluntarily* chosen to provide certain benefits, services, and employment, the costs it incurs to do so are the result of an independent choice made by the county and not attributable to the Citizenship EO itself. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 417-18 (2013) (holding that "respondents' self-inflicted injuries" were insufficient for Article III standing, because they "are not fairly traceable" to the challenged government action); *Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) ("No State can be heard to complain about damage inflicted by its own hand."). Moreover, Plaintiff's claim of incurring "compliance costs," Br. at 15, in responding to the EO is not attributable to the federal policy itself. To otherwise confer standing

based on the county's self-stated need to adapt its own processes to new federal policies would (improperly) create automatic standing to challenge every new federal policy. *See FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 394-95 (2024). Plaintiff's interest "in the wellbeing of its community," *see* Br. at 17-18, also provides no basis for Article III standing. The EO sets forth a federal government policy with respect to United States citizenship. As discussed above, its impacts on localities are indirect, and it has no effect on their ability to "create and enforce a legal code." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601 (1982).

To the extent Plaintiff attempts to assert standing on behalf of its "community" here and bring a kind of *parens patriae* action, that is also improper. "[P]olitical subdivisions such as cities and counties, whose power is derivative and not sovereign, cannot sue as *parens patriae*." *In re Multidistrict Vehicle Air Pollution M.D.L. No. 31*, 481 F.2d 122, 131 (9th Cir. 1973). Moreover, states and localities lack standing to bring claims under Section 1 of the Fourteenth Amendment against the federal government as Plaintiff attempts to do so here. For example, in *South Carolina v. Katzenbach*, 383 U.S. 301 (1966), the Court held that South Carolina lacked standing to challenge a federal statute under the Due Process Clause. *See id.* at 323-324. The "States of the Union" have no rights of their own under that clause; "[n]or does a State have standing as the parent of its citizens to invoke these constitutional provisions against the Federal Government." *Id.* at 323-24. Similarly, in *Haaland v. Brackeen*, 599 U.S. 255 (2023), the Court held that Texas lacked standing to challenge a federal statute under the Equal Protection Clause as the State "ha[d] no equal protection rights of its own," and Texas could not "assert equal protection claims on behalf of its citizens because 'a State does not have standing as *parens patriae* to bring an action against the Federal Government.'" *Id.* at 294-295 (brackets and citation omitted).

Those precedents control this case. Just as South Carolina and Texas could not sue the federal government under the Fourteenth Amendment's Due Process and Equal Protection Clauses, Plaintiff may not sue the federal government under the Citizenship Clause as it does not "ha[ve] [any] [citizenship] rights of its own," and may not "assert [Citizenship Clause] claims"— or any other claims—"on behalf of [its residents]." *Id.* at 294-95 & n.11.

1    **II.    Plaintiff Lacks a Valid Cause of Action.**

2          The Court should also deny Plaintiff's motion for the threshold reason that it is not likely

3    to show that it has a valid cause of action. Plaintiff first asserts a claim under the Fourteenth

4    Amendment's Citizenship Clause, but it is well established that the Constitution does not generally

5    provide a cause of action to pursue affirmative relief. *See, e.g.*, *DeVillier v. Texas*, 601 U.S. 285,

6    291 (2024) ("[C]onstitutional rights are generally invoked defensively in cases arising under other

7    sources of law, or asserted offensively pursuant to an independent cause of action designed for that

8    purpose."). Plaintiff does not identify any "independent cause of action" that would enable them

9    to enforce the Citizenship Clause. *Id*. at 291. Plaintiff's next claim that the EO violates the

10   constitutional separation of powers fails for a similar reason as Plaintiff does not identify any

11   independent cause of action that would allow it to bring claims for such a violation.

12         As for Plaintiff's INA claim, Congress provided a specific remedy for *individuals* within

13   the United States to seek judicial resolution of disputes concerning their citizenship. Pursuant to

14   the INA's comprehensive statutory framework for judicial review, disputes regarding the

15   citizenship of an individual within the United States are resolved by the individual filing an action

16   for declaratory relief once he is denied a right or privilege as a U.S. national. 8 U.S.C. § 1503(a).

17   Thus, "any person who is within the United States claims a right or privilege as a national of the

18   United States and is denied such right or privilege by any department or independent agency, or

19   official thereof, upon the ground that he is not a national of the United States," may institute an

20   action under 8 U.S.C. § 1503(a), in conjunction with 28 U.S.C. § 2201, for a declaratory judgment

21   that he is a U.S. national. *See id*. § 1503(a).

22         "Congress intended § 1503(a) to be the *exclusive remedy* for a person within the United

23   States to seek a declaration of U.S. nationality following an agency or department's denial of a

24   privilege or right of citizenship upon the ground that the person is not a U.S. national." *Cambranis

25   v. Blinken*, 994 F.3d 457, 466 (5th Cir. 2021) (emphasis added). Plaintiff's attempt—as a locality

26   and not as an individual—to bring an independent challenge outside of Congress's *exclusive*

27   avenue for such claims thus fails.[2]

28         ---
      [2] In its Complaint, Plaintiff brings a claim that the EO "permits and Directs Defendants to
      take actions that violate the [APA]." Compl. ¶ 97, ECF No. 1. However, in its Motion, Plaintiff

III.     **Plaintiff Is Not Likely to Succeed on the Merits.**

    A. **Plaintiff Is Not Likely to Succeed on Its Citizenship Clause Claim.**

       The Citizenship Clause provides that "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S. Const. Amend. XIV, § 1. The Supreme Court has identified multiple categories of persons who, despite birth in the United States, are not constitutionally entitled to citizenship because they are not subject to the jurisdiction of the United States: children of foreign sovereigns or their diplomats, children of alien enemies in hostile occupation, children born on foreign public ships, and certain children of members of Indian tribes.[3] *Wong Kim Ark*, 169 U.S. at 682, 693. The EO notes an additional category of persons not subject to the jurisdiction of the United States: children born in the United States of foreign parents whose presence is either unlawful or lawful but temporary. Plaintiff contends that the EO violates the Citizenship Clause as a result, but it is mistaken.

       a. **The Term "Jurisdiction" in the Citizenship Clause Does Not Refer to Regulatory Power.**

       "Jurisdiction . . . is a word of many, too many, meanings." *Wilkins v. United States*, 598 U.S. 152, 156 (2023) (citation omitted). Plaintiff equates "jurisdiction" with something akin to regulatory power, arguing that it "exempts from birthright citizenship *only* those who are exempt from the reach of American law." Br. at 8. That interpretation is incorrect. It conflicts with both Supreme Court precedent and ample evidence as to the provision's original public meaning.

       1.     Most importantly, Plaintiff's understanding of the term "jurisdiction" conflicts with Supreme Court precedents identifying the categories of persons who are not subject to the United States' jurisdiction within the meaning of the Citizenship Clause. For example, the Supreme Court

---

says that it "does not rely on that claim." Br. at 3 n.2. Thus, Defendants do not address it here. To the extent that the APA is a vehicle for Plaintiff's constitutional claims, no such claim could lie here as Plaintiff does not attempt to "identify the final agency action being challenged." *Elk Run Coal Co. v. U.S. Dep't of Labor*, 804 F. Supp. 2d 8, 30 (D.D.C. 2011).

    [3] Although the Citizenship Clause has always been understood to exclude certain children of members of Indian tribes from a constitutional right to citizenship by birth, Congress has by statute extended U.S. citizenship to any "person born in the United States to a member of an Indian, Eskimo, Aleutian, or other aboriginal tribe." 8 U.S.C. § 1401(b).

has held that children of members of Indian tribes, "owing immediate allegiance" to those tribes, do not acquire citizenship by birth in the United States. *Elk*, 112 U.S. at 102; *see Wong Kim Ark*, 169 U.S. at 680-82. Yet members of Indian tribes and their children are plainly subject to the United States' regulatory power. "It is thoroughly established that Congress has plenary authority over the Indians and all their tribal relations." *Winton v. Amos*, 255 U.S. 373, 391 (1921); *see Brackeen*, 599 U.S. at 272-73. For example, Congress may regulate Indian commercial activities, see *United States v. Holliday*, 70 U.S. (3 Wall.) 407, 416-18 (1866); Indian property, *see Lone Wolf v. Hitchcock*, 187 U.S. 553, 565 (1903); and Indian adoptions, see *Brackeen*, 599 U.S. at 276-280. And the United States may punish Indians for crimes. *See United States v. Kagama*, 118 U.S. 375, 379-385 (1886). If, as Plaintiff argues, "subject to the jurisdiction thereof" means subject to U.S. law, this longstanding exception for Indians would be inexplicable.

In fact, Plaintiff's reading cannot even explain the exception to birthright citizenship for "children of foreign sovereigns or their ministers." *Wong Kim Ark*, 169 U.S. at 693. Although foreign leaders and diplomats have traditionally enjoyed immunity as a matter of common law, the Constitution allows Congress to abrogate that immunity or to make exceptions to it. *See Verlinden BV v. Cent. Bank of Nigeria*, 461 U.S. 480, 486 (1983). And to the extent Plaintiff argues that children of foreign leaders or diplomats are not subject to the United States' jurisdiction because the U.S. *chooses* to extend immunity to them, its theory would allow Congress to turn the Citizenship Clause on and off at will by extending or retracting immunity.

Against the surplusage canon, on Plaintiff's reading, the phrase "subject to the jurisdiction thereof" adds nothing to the phrase "born . . . in the United States." Because the United States is sovereign over its territory, everyone who is born (and so present) in the United States would necessarily be subject, at least to some extent, to the United States' regulatory authority. *See Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116, 136 (1812). But "[i]t cannot be presumed that any clause in the [C]onstitution is intended to be without effect; and, therefore, such a construction is inadmissible." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 174 (1803).

2.      Instead of equating "jurisdiction" with regulatory authority, the Supreme Court has held that a person is "subject to the jurisdiction" of the United States under the Citizenship Clause

if he is born "in the allegiance and under the protection of the country." *Wong Kim Ark*, 169 U.S. at 693. That allegiance to the United States, the Court has further held, must be "direct," "immediate," and "complete[]," unqualified by "allegiance to any alien power." *Elk*, 112 U.S. at 101-02. In other words, a person is subject to the jurisdiction of the United States within the meaning of the Clause only if he is *not* subject to the jurisdiction of a foreign power, and the "nation" has "consent[ed]" to him becoming part of its own "jurisdiction." *Id.* at 102-03; *see also Schooner Exchange*, 11 U.S. at 136 (explaining a nation's "jurisdiction . . . must be traced up to the consent of the nation itself").

That reading of the Citizenship Clause reflects its statutory background. Months before Congress proposed the Fourteenth Amendment, it enacted the Civil Rights Act of 1866. That Act served as "the initial blueprint" for the Amendment, *Gen. Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 389 (1982), and the Amendment in turn "provide[d] a constitutional basis for protecting the rights set out" in the Act, *McDonald v. City of Chicago*, 561 U.S. 742, 775 (2010). The Act stated, as relevant here, that "all persons born in the United States and *not subject to any foreign power*, excluding Indians not taxed, are hereby declared to be citizens of the United States." Civil Rights Act § 1, 14 Stat. 27 (1866) (emphasis added). There is no reason to read the phrase "subject to the jurisdiction thereof" in the Amendment as broader than the phrase "not subject to any foreign power" in the Act—in no small part, because doing so would render the Civil Rights Act unconstitutional. And, as telling, the Act's citizenship language remained on the books until revised by the Nationality Act of 1940, ch. 876, § 201(a), 54 Stat. 1137, 1138—suggesting that Congress regarded the Act's "not subject to any foreign power" requirement as consistent with the Amendment's "subject to the jurisdiction" requirement. The Act thus confirms that, to be subject to the jurisdiction of the United States under the Clause, a person must owe "no allegiance to any alien power." *Elk*, 112 U.S. at 101.

Debates on the Act and the Amendment—which were drafted by the same Congress, *Gen. Bldg. Contractors Ass'n*, 458 U.S. at 390-91—show that members of Congress shared that understanding. During debates, Senator Lyman Trumbull explained that the Act's purpose was "to make citizens of everybody born in the United States who owe[d] allegiance to the United States."

Cong. Globe, 39th Cong., 1st Sess. 572 (1866). Similarly, during debates on the Amendment, Trumbull explained:

> What do we mean by "subject to the jurisdiction of the United States?" Not owing allegiance to anybody else. That is what it means. . . .
> It cannot be said of any Indian who owes allegiance, partial allegiance if you please, to some other Government that he is "subject to the jurisdiction of the United States."

*Id.* at 2893. Trumbull went on to equate "being subject to our jurisdiction" with "owing allegiance solely to the United States." *Id.* at 2894. And Senator Reverdy Johnson agreed that "all that this amendment provides is, that all persons born in the United States and not subject to some foreign Power . . . shall be considered as citizens." *Id.* at 2893.

The full text of the Citizenship Clause reinforces that reading of the Clause's jurisdictional element. The Clause provides that persons born in the United States and subject to its jurisdiction "are citizens of the United States and of the States wherein they reside." U.S. Const. amend. XIV, § 1. The Clause uses the term "reside[nce]" synonymously with "domicile." *See Robertson v. Cease*, 97 U.S. 646, 650 (1878) (explaining that state citizenship requires "a fixed permanent domicile in that State"). The Clause thus makes clear that citizenship flows from lawful domicile.

Finally, as a decisive cross-check, the government's reading is the only one that fully explains the Supreme Court's precedents on citizenship by birth in the United States. It was "never doubted" that "children born of citizen parents" owe allegiance to the United States and are subject to its jurisdiction. *Minor v. Happersett*, 88 U.S. (21 Wall.) 162, 167 (1874). In *Wong Kim Ark*, the Court held that a child born in the United States "of parents of Chinese descent, who at the time of his birth [were] subjects of the emperor of China, but have a permanent domicile and residence in the United States, and are there carrying on business, and are not employed in any diplomatic or official capacity" by China are likewise subject to the jurisdiction of the United States. 169 U.S. at 653. By contrast, children of diplomats, children of certain alien enemies, and children born on foreign public ships are not subject to the jurisdiction of the United States because they all owe allegiance to foreign sovereigns under principles of common law. *See id.* at 655. And the Court has held that certain children of members of Indian tribes are not subject to U.S. jurisdiction in the necessary sense because they "owe[] immediate allegiance to their several tribes." *Elk*, 112 U.S.

1    at 99.

2        **b.  Children Born of Unlawfully Present Aliens or Aliens Whose Presence Is**
3        **Lawful but Temporary Fall Outside the Citizenship Clause.**

4        1.    To determine which sovereign may properly claim a person's allegiance, the

5    Supreme Court has looked to the background principles of the common law and the law of nations,

6    as understood in the United States at the time of the ratification of the Fourteenth Amendment. *See*

7    *Wong Kim Ark*, 169 U.S. at 653-55. Under those principles, a child born of foreign parents other

8    than lawful permanent residents is domiciled in, and owes a measure of allegiance to, his parents'

9    home country. As a result, such a child is not subject to the jurisdiction of the United States within

10   the meaning of the Citizenship Clause.

11       Under the common law, a person owes a form of "allegiance" to the country in which he

12   is "domiciled." *Carlisle v. United States*, 83 U.S. (16 Wall.) 147, 155 (1872); *see The Pizarro*, 15

13   U.S. (2 Wheat.) 227, 246 (1817) (Story, J.) ("[A] person domiciled in a country . . . owes allegiance

14   to the country."). A child's domicile, and thus his allegiance, "follow[s] the independent domicile

15   of [his] parent." *Lamar v. Micou*, 112 U.S. 452, 470 (1884).

16       Temporary visitors and unlawfully present aliens, however, are not domiciled here but in

17   foreign countries. As touched on above, "[i]n general, the domicile of an individual is his true,

18   fixed and permanent home." *Martinez v. Bynum*, 461 U.S. 321, 331 (1983). Temporary visitors to

19   the United States, by definition, retain permanent homes in foreign countries. And illegal aliens,

20   by definition, have no right even to be present in the United States, much less a right to make

21   *lawful* residence here. Instead, as a matter of law, illegal aliens formally retain their foreign

22   domiciles, because they have not yet been accepted to reside anywhere else. *See*, *e.g.*, *Elkins v.*

23   *Moreno*, 435 U.S. 647, 665-66 (1978) (recognizing that federal immigration law restricts the

24   ability of foreigners to establish domiciles in the United States). And if a temporary visitor or

25   illegal alien domiciled in a foreign country has a child with another temporary visitor or illegal

26   alien while in the United States, the child's domicile also lies in a foreign country, and the child

27   owes allegiance to that country. That "allegiance to [an] alien power" precludes the child from

28   being "completely subject" to the United States' jurisdiction, as the Fourteenth Amendment

requires. *Elk*, 112 U.S. at 101-02.

Indeed, the EO follows directly from Supreme Court precedent recognizing that distinction, and the established exception to birthright citizenship for certain "children of members of the Indian tribes." *Wong Kim Ark*, 169 U.S. at 682. Indian tribes form "an intermediate category between foreign and domestic states." *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*, 599 U.S. 382, 396 n.7 (2023) (citation omitted). The Supreme Court long ago determined that Indian tribes are not "foreign nations," instead describing them as "domestic dependent nations." *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 17 (1831) (Marshall, C.J.). Yet the Court has held that "an Indian, born a member of one of the Indian tribes," has no constitutional birthright to U.S. citizenship given his "immediate allegiance" to his tribe. *Elk*, 112 U.S. at 99, 101-02; *see Wong Kim Ark*, 169 U.S. at 680-82.

Illegal aliens and temporary visitors have far weaker connections to the United States than do members of Indian tribes. "Our Constitution reserves for the Tribes a place—an enduring place—in the structure of American life." *Brackeen*, 599 U.S. at 333 (Gorsuch, J., concurring). If the United States' link with Indian tribes does not suffice as a constitutional matter for birthright citizenship, its weaker link with illegal aliens and temporary visitors even more obviously does not do so. *See, e.g.*, William Edward Hall, *A Treatise on International Law* 237 n.1 (4th ed. 1895) ("[A] fortiori the children of foreigners in transient residence are not citizens, their fathers being subject to the jurisdiction less completely than Indians.").

2.     The Fourteenth Amendment's historical background provides additional support for the conclusion that, while children born here of U.S. citizens and lawful permanent residents are entitled to U.S. citizenship by birth, children born of parents whose presence is either unlawful or lawful but temporary are not. Under the common law, "[t]wo things usually concur to create citizenship; [f]irst, birth locally within the dominions of the sovereign; and, secondly, birth . . . within the ligeance, of the sovereign." *Wong Kim Ark*, 169 U.S. at 659 (citation omitted). The phrase "born . . . in the United States," U.S. Const. amend. XIV, § 1, codifies the traditional requirement of "birth within the territory," *Wong Kim Ark* 169 U.S. at 693, and the phrase "subject to the jurisdiction thereof," U.S. Const. Amend. XIV, § 1, codifies the traditional requirement of

birth "in the allegiance" of the country, *Wong Kim Ark*, 169 U.S. at 693.

Drawing from the same tradition, Emmerich de Vattel—"the founding era's foremost expert on the law of nations," *Franchise Tax Bd. of Cal. v. Hyatt*, 587 U.S. 230, 239 (2019)— explained that citizenship under the law of nations depended not only on the child's place of birth, but also on the parents' political status. "[N]atural-born citizens," Vattel wrote, include "those born in a country, of parents who are citizens." Emmerich de Vattel, *The Law of Nations* § 212, at 101 (London, printed for G.G. and J. Robinson, Paternoster-Row, 1797 ed.). Citizenship by virtue of birth in the country also extends to the children of "perpetual inhabitants" of that country, whom Vattel regarded as "a kind of citize[n]." *Id.* § 213, at 102 (emphasis omitted); *see also id.* § 215, at 102. According to Vattel, citizenship does not extend, however, to children of those foreigners who lack "the right of perpetual residence" in the country. *Id.* § 213, at 102.

Justice Story also understood that birthright citizenship required more than mere physical presence. He explained in a judicial opinion later quoted in *Wong Kim Ark* that "children even of aliens born in a country, *while the parents are resident there*," "are subjects by birth." *Inglis v. Trs. of Sailor's Snug Harbor*, 28 U.S. (3 Pet.) 99, 164 (1830) (emphasis added). He also wrote in a treatise:

> Persons, who are born in a country, are generally deemed citizens and subjects of that country. A reasonable qualification of this rule would seem to be, that it should not apply to the children of parents, who were *in itinere* in the country, or abiding there for temporary purposes, as for health, or occasional business.

Joseph Story, *Commentaries on the Conflict of Laws* § 48, at 48 (1834).

3.     Congressional debates over the Civil Rights Act and Fourteenth Amendment also confirm that children born in the United States to non-resident aliens lack a right to U.S. citizenship because they are not subject to U.S. jurisdiction. For instance, Representative James Wilson explained during a debate over the Civil Rights Act that, under "the general law relating to subjects and citizens recognized by all nations," a "person born in the United States" ordinarily "is a natural-born citizen." Cong. Globe, 39th Cong., 1st Sess. 1117 (1866). But he recognized "except[ions]" to that general rule for "children born on our soil to *temporary sojourners* or representatives of foreign Governments." *Id.* (emphasis added).

When Congress was considering the Civil Rights Act, Senator Trumbull, "who wrote [the Act's] citizenship language and managed the Act in the Senate, wrote a letter to President Andrew Johnson summarizing the bill." Mark Shawhan, Comment, *The Significance of Domicile in Lyman Trumbull's Conception of Citizenship*, 119 Yale L. J. 1351, 1352 (2010) (footnotes omitted). The Act, as noted above, provided that "all persons born in the United States and *not subject to any foreign power*, excluding Indians not taxed, are hereby declared to be citizens." Civil Rights Act § 1, 14 Stat. 27 (emphasis added). Senator Trumbull summarized that provision: "The Bill declares 'all persons *born of parents domiciled in the United States*, except untaxed Indians, to be citizens of the United States." Shawhan, *supra*, at 1352-53 (emphasis added) (citations omitted). "Trumbull thus understood the Act's 'not subject to any foreign [p]ower' requirement as equivalent to 'child of parents domiciled in the United States.'" *Id.* at 1353 (footnote omitted).

During a debate over the Fourteenth Amendment, Senator Benjamin Wade proposed a version of the Amendment that would have referred to "persons born in the United States" (without the additional qualification of being "subject to the jurisdiction"). Cong. Globe, 39th Cong., 1st Sess. 2768 (1866). One of his colleagues objected that "persons may be born in the United States and yet not be citizens," giving the example of "a person [who] is born here of parents from abroad temporarily in this country." *Id.* at 2769. Senator Wade acknowledged that the unadorned phrase "born in the United States" would indeed encompass those individuals, but he argued that the situation would arise so infrequently that "it would be best not to alter the law for that case." *Id.* at 2768-69. That exchange concludes that "a person [who] is born here of parents from abroad temporarily in this country" is not subject to the jurisdiction of the United States, *id.* at 2768-69, and is accordingly not constitutionally entitled to citizenship by birth.

4.    Contemporary understanding following ratification accords with that reading of the Fourteenth Amendment. Perhaps most telling, right on the heels of the Citizenship Clause, the Supreme Court described its scope as such: "The phrase, 'subject to its jurisdiction,' was intended to exclude from its operation children of ministers, consuls, *and citizens or subjects of foreign States* born within the United States." *The Slaughterhouse Cases*, 83 U.S. (16 Wall.) 36, 73 (1873) (emphasis added). That is wholly consistent with the Citizenship EO. Contemporary commentators

expressed similar views. *See, e.g.*, *Hall*, *supra*, 236-237 ("In the United States it would seem that the children of foreigners in transient residence are not citizens."); Alexander Porter Morse, *A Treatise on Citizenship* 248 (1881) ("The words 'subject to the jurisdiction thereof' exclude the children of foreigners transiently within the United States.").

The Supreme Court of New Jersey similarly linked birthright citizenship with parental domicile in *Benny v. O'Brien*, 32 A. 696 (N.J. 1895). In a passage that was later quoted in *Wong Kim Ark*, the court interpreted the Citizenship Clause to establish "the general rule that, *when the parents are domiciled here*, birth establishes the right of citizenship." *Id.* at 698 (emphasis added). And it explained that the Citizenship Clause's jurisdictional element excludes "those born in this country of foreign parents who are temporarily traveling here" because "[s]uch children are, in theory, born within the allegiance of [a foreign] sovereign." *Id.*

The political branches operated from the same understanding in the years following the Fourteenth Amendment's enactment. For instance, six years after ratification, Representative Ebenezer Hoar proposed a bill "to carry into execution the provisions of the [F]ourteenth [A]mendment . . . concerning citizenship." 2 Cong. Rec. 3279 (1874). The bill would have provided that, as a general matter, "a child born within the United States of parents who are not citizens, and who do not reside within the United States, . . . shall not be regarded as a citizen thereof." *Id.* Although the bill ultimately failed its "parental domicile requirement" generated little meaningful "debate or controversy." Justin Lollman, Note, *The Significance of Parental Domicile Under the Citizenship Clause*, 101 Va. L. Rev. 455, 475 (2015). The bill thus suggests that, soon after the ratification of the Fourteenth Amendment, members of Congress accepted that children born of non-resident alien parents are not subject to the Citizenship Clause.

The Executive Branch, too, at times took the position that the Citizenship Clause did not confer citizenship upon children born in the United States to non-resident alien parents. In 1885, Secretary of State Frederick T. Frelinghuysen issued an opinion denying a passport to an applicant who was "born of Saxon subjects, temporarily in the United States." 2 *A Digest of the International Law of the United States* § 183, at 397 (Francis Wharton ed., 2d. ed. 1887) (*Wharton's Digest*). Secretary Frelinghuysen explained that the applicant's claim of birthright citizenship was

1    "untenable" because the applicant was "subject to [a] foreign power," and "the fact of birth, under

2    circumstances implying alien subjection, establishes of itself no right of citizenship." *Id.* at 398.

3           5.      Finally, *Wong Kim Ark* recognized an exception to birthright citizenship for

4    "children born of alien enemies in hostile occupation," *Wong Kim Ark*, 169 U.S. at 682. Here, the

5    President has determined that the United States has experienced "an unprecedented flood of illegal

6    immigration" in which "[m]illions of illegal aliens"—many of whom "present significant threats

7    to national security and public safety"—have entered the country in violation of federal law.

8    Invasion EO § 1; *see also id.* (explaining that "[o]thers are engaged in hostile activities, including

9    espionage, economic espionage, and preparations for terror-related activities"). Plaintiff's

10   maximalist reading of the Citizenship Clause would require extending birthright citizenship to the

11   children of individuals who present such threats, including even unlawful enemy combatants who

12   enter this country in an effort to create sleeper cells or other hostile networks.

13          **c.   Applicable Interpretive Principles Support the Government's Reading of the
14                 Citizenship Clause.**

15          1.      "[A]ny policy toward aliens is vitally and intricately interwoven with . . . the

16   conduct of foreign relations." *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952). "Any rule

17   of constitutional law that would inhibit the flexibility" of Congress or the President "to respond to

18   changing world conditions should be adopted only with the greatest caution." *Trump v. Hawaii*,

19   585 U.S. 667, 704 (2018) (citation omitted). The government's reading of the Citizenship Clause

20   respects that principle, while Plaintiff's reading violates it. The Citizenship Clause sets a

21   constitutional floor, not a constitutional ceiling. Although Congress may not deny citizenship to

22   those protected by the Clause, it may, through its power to "establish an uniform Rule of

23   Naturalization," extend citizenship to those who lack a constitutional right to it. U.S. Const. Art.

24   I, § 8, cl. 4; *see Wong Kim Ark*, 169 U.S. at 688. The government's reading would thus leave

25   Congress with the ability to extend citizenship to the children of illegal aliens or of temporary

26   visitors, just as it has extended citizenship to the children of members of Indian tribes.

27          As a "sovereign nation," the United States has the constitutional power "to forbid the

28   entrance of foreigners within its dominions, or to admit them only in such cases and upon such

conditions as it may see fit to prescribe." *Nishimura Ekiu v. United States*, 142 U.S. 651, 659 (1892). "[O]ver no conceivable subject" is federal power "more complete" than it is over the admission of aliens. *Oceanic Steam Navigation Co. v. Stranahan*, 214 U.S. 320, 339 (1909). Interpreting the Constitution to require the extension of birthright citizenship to the children of illegal aliens directly undermines that power by holding out a powerful incentive for illegal entry. Contrary to the principle that no wrongdoer should "profit out of his own wrong," *Liu v. SEC*, 591 U.S. 71, 80 (2020) (citation omitted), it also allows foreigners to secure U.S. citizenship for their children (and, potentially, later immigration benefits for themselves) by entering the U.S. in violation of its laws.

2.      The Supreme Court has resisted reading the Citizenship Clause in a manner that would inhibit the political branches' ability to address "problems attendant on dual nationality." *Rogers v. Bellei*, 401 U.S. 815, 831 (1971). Although the United States tolerates dual citizenship in some circumstances, it has "long recognized the general undesirability of dual allegiances." *Savorgnan v. United States*, 338 U.S. 491, 500 (1950). "One who has a dual nationality will be subject to claims from both nations, claims which at times may be competing or conflicting," and "[c]ircumstances may compel one who has a dual nationality to do acts which otherwise would not be compatible with the obligations of American citizenship." *Kawakita v. United States*, 343 U.S. 717, 733, 736 (1952).

Plaintiff's reading of the Citizenship Clause invites just such problems. For centuries, countries have extended citizenship to the foreign-born children of their citizens because children born abroad "follow the condition of their fathers," so long as "the father has not entirely quitted his [home] country." Vattel, *supra* § 215, at 102. England has extended citizenship to certain foreign-born children of its subjects since at least the 14th century. *See Wong Kim Ark*, 169 U.S. at 668-71. In 1790, Congress extended citizenship to "children of citizens" born "out of the limits of the United States," with the proviso that "the right of citizenship shall not descend to persons whose fathers have never been resident in the United States." Naturalization Act of 1790, ch. 3, 1 Stat. 103, 104. Today, federal law recognizes as a citizen any "person born outside of the United States . . . of parents both of whom are citizens of the United States and one of whom has had a

residence in the United States." 8 U.S.C. § 1401(c). Many other countries have similar laws. *See Miller v. Albright*, 523 U.S. 420, 477 (1998) (Breyer, J., dissenting).

3.      Finally, "[c]itizenship is a high privilege, and when doubts exist concerning a grant of it, generally at least, they should be resolved in favor of the United States and against the claimant." *United States v. Manzi*, 276 U.S. 463, 467 (1928); *see Berenyi v. Dist. Dir., INS*, 385 U.S. 630, 637 (1967). For the reasons discussed above, the Citizenship Clause is best read not to extend citizenship to children born in the U.S. of illegal aliens or of temporary visitors.

### d. Plaintiff's Contrary Arguments Are Unpersuasive.

1.      Plaintiff relies primarily on *Wong Kim Ark*, *see* Br. at 6-8, but it misreads that precedent. *Wong Kim Ark* did not concern the status of children born in the United States to parents who were illegal aliens or temporary visitors. To the contrary, the Court precisely identified the specific question presented

> whether a child born in the United States, of parents of Chinese descent, who at the time of his birth, are subjects of the emperor of China, *but have a permanent domicile and residence in the United States*, and are there carrying on business, and are not employed in any diplomatic or official capacity under the emperor of China, becomes at the time of his birth a citizen of the United States.

*Wong Kim Ark*, 169 U.S. at 653 (emphasis added).

In analyzing that question, the Court repeatedly relied on the fact that the parents were permanent residents. For example, it quoted an opinion in which Justice Story recognized that "the children, even of aliens, born in a country, *while the parents are resident there* under the protection of the government, . . . are subjects by birth." *Wong Kim Ark*, 169 U.S. at 660 (emphasis added) (quoting *Inglis*, 28 U.S. (3 Pet.) at 164 (Story, J., dissenting)). It quoted another court's observation that the Fourteenth Amendment codifies "the general rule that, *when the parents are domiciled here*, birth establishes the right to citizenship." *Id.* at 692 (emphasis added; citation omitted). And it noted that "Chinese persons . . . owe allegiance to the United States, *so long as they are permitted by the United States to reside here*; and are 'subject to the jurisdiction thereof,' in the same sense as all other aliens *residing* in the United States." *Id.* at 694 (emphasis added).

After reviewing the relevant history, the Court reached the following "conclusions": "The Fourteenth Amendment affirms the ancient and fundamental rule of citizenship by birth within the

territory, in the allegiance and under the protection of the country, including all children born of *resident* aliens." *Wong Kim Ark*, 169 U.S. at 693 (emphasis added). Although the Amendment is subject to certain "exceptions" (*e.g.*, for "children of foreign sovereigns or their ministers"), the Amendment extends citizenship to "children born within the territory of the United States, of all other persons, of whatever race or color, *domiciled within the United States*." *Id.* (emphasis added). The Court then summed up its holding as follows:

> [A] child born in the United States, of parents of Chinese descent, who, at the time of his birth, are subjects of the Emperor of China, *but have a permanent domicile and residence in the United States*, . . . and are not employed in any diplomatic or official capacity under the [E]mperor of China, becomes at the time of his birth a citizen of the United States.

*Id.* at 705 (emphasis added).

No doubt some statements in *Wong Kim Ark* could be read to support Plaintiff's position. *Wong Kim Ark* never purported to overrule any part of *Elk*, however, and the Supreme Court has previously recognized *Wong Kim Ark*'s limited scope. In one case, the Court stated that:

> [t]he ruling in [*Wong Kim Ark*] was to this effect: "A child born in the United States, of parents . . . who, at the time of his birth, are subjects of the Emperor of China, *but have a permanent domicile and residence in the United States*, . . . becomes at the time of his birth a citizen."

*Chin Bak Kan v. United States*, 186 U.S. 193, 200 (1902) (emphasis added; citation omitted). In another, the Court cited *Wong Kim Ark* for the proposition that a person is a U.S. citizen by birth if "he was born to [foreign subjects] *when they were permanently domiciled in the United States*." *Kwock Jan Fat v. White*, 253 U.S. 454, 457 (1920) (citation omitted).

About a decade after *Wong Kim Ark* was decided, the Department of Justice likewise explained that the decision "goes no further" than addressing children of foreigners "domiciled in the United States." Spanish Treaty Claims Comm'n, U.S. Dep't of Justice, *Final Report of William Wallace Brown, Assistant Attorney General* 121 (1910). "[I]t has never been held," the Department continued, "and it is very doubtful whether it will ever be held, that the mere act of birth of a child on American soil, to parents who are accidentally or temporarily in the United States, operates to invest such child with all the rights of American citizenship." *Id.* at 124. Commentators, too, continued to acknowledge the traditional rule denying citizenship to children of non-resident

foreigners. *See*, *e.g.*, John Westlake, *International Law* 219-20 (1904) ("[W]hen the father has domiciled himself in the Union . . . his children afterwards born there . . . are citizens; but . . . when the father at the time of the birth is in the Union for a transient purpose his children born within it have his nationality.").

In short, only "those portions of [an] opinion necessary to the result . . . are binding, whereas dicta is not," *Arcam Pharm. Corp. v. Faria*, 513 F.3d 1, 3 (1st Cir. 2007), and the *Wong Kim Ark* Court itself warned that "general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used." 169 U.S. at 679 (citation omitted). The only question that was presented, investigated, and resolved in *Wong Kim Ark* concerned children of parents with "a permanent domicile and residence in the United States." 169 U.S. at 653; *see id.* at 705. The case should not be read as doing anything more than answering yes.

2.    Plaintiff also invokes the "common law rule of *jus soli*—the right of the soil." Br. at 3. But the Supreme Court "has long cautioned that the English common law 'is not to be taken in all respects to be that of America.'" *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 39 (2022) (citation omitted). And that admonition holds particular force here. *Cf. United States v. Rahimi*, 602 U.S. 680, 722 & n.3 (2024) (Kavanaugh, J., concurring). The English *jus soli* tradition was premised on an unalterable allegiance to the King (which was conferred by birth on his soil). But this nation was founded on breaking from that concept of immutable loyalty to a monarch imposed by birth alone, and grounded citizenship instead in the social contract, premised on mutual consent between person and polity. *See*, *e.g.*, Cong. Globe, 40th Cong., 2nd Sess. 868 (1868) (statement of Rep. Woodward) (calling the British tradition an "indefensible feudal doctrine of indefeasible allegiance"); *id.* at 967 (statement of Rep. Bailey) (calling it a "slavish" doctrine).

Indeed, the Supreme Court has already held that the Citizenship Clause departs from English common law in important respects. For example, the Clause's exception for certain children of members of Indian tribes has no parallel in English law, *see Wong Kim Ark*, 169 U.S. at 693; and the Clause permits voluntary renunciation of citizenship, even though English common law did not, *see Afroyim v. Rusk*, 387 U.S. 253, 257-262 (1967). This Court should thus interpret the Citizenship Clause in light of *American* common-law principles, and as shown above, those

principles do not support birthright citizenship for children of illegal aliens or temporary visitors.

Plaintiff also points to precedent that accords with its view. *See* Br. at 6. But it is not unusual for the Supreme Court, after fully exploring a legal issue, to reach a conclusion that conflicts with earlier assumptions. *See*, *e.g.*, *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 644-45 (2022) (holding that states may prosecute non-Indians for crimes against Indians in Indian country despite decades of contrary Supreme Court dicta); *INS v. Chadha*, 462 U.S. 919, 944-45 (1983) (holding the legislative veto unconstitutional even though Congress had enacted, and the President had signed, almost 300 legislative-veto provisions over the preceding 50 years).

**B. Plaintiff Is Not Likely to Succeed on Its INA Claim.**

Separately, Plaintiff is incorrect that 8 U.S.C. § 1401(a) provides it with an independent ground for relief. *See* Br. at 9-10. That statute recognizes citizenship for "a person born in the United States, and subject to the jurisdiction thereof," 8 U.S.C. § 1401(a), which closely tracks the text of the Citizenship Clause. *See* U.S. Const. amend. XIV, § 1 ("All persons born . . . in the United States, and subject to the jurisdiction thereof, are citizens of the United States[.]"). But Plaintiff does not identify any authority suggesting that Congress intended any delta between the statute and the Amendment. Rather, in using the exact text of the Citizenship Clause in the INA, Congress imported its exact scope. *See Taggart v. Lorenzen*, 587 U.S. 554, 560 (2019) ("When a statutory term is obviously transplanted from another legal source, it brings the old soil with it." (cleaned up)); *Kellogg Brown & Root Servs., Inc. v. United States ex rel. Carter*, 575 U.S. 650, 661 (2015) ("Fundamental changes in the scope of a statute are not typically accomplished with so subtle a move. . . . If Congress had meant to make such a change, we would expect it to have used language that made this important modification clear to litigants and courts."). If Congress had intended § 1401(a) to have a different meaning than the Citizenship Clause, it stands to reason that it would not have adopted virtually identical language.

It would also be unworkable to follow Plaintiff's suggestion that essentially identical words in a statute and the Constitution should be given different legal effect based on the allegedly "widely and universally understood" meaning of the Citizenship Clause when Congress enacted the INA, Br. at 9. *See Castro-Huerta*, 597 U.S. at 642-643 (explaining that "the text of a law

controls" over "expectations that the enacting Congress had formed in light of the contemporary legal context") (citation omitted). This suggestion would allow courts to interpret essentially identical language in separate legal instruments to have vastly different legal results, contrary to standard principles of interpretation. *Cf. Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 587 U.S. 262, 268 (2019) ("We . . . avoid interpretations that would 'attribute different meanings to the same phrase.'" (citations omitted)). In any event, as discussed above, Plaintiff overstates the degree of supposed historical consensus there might have been about the meaning of the Citizenship Clause. Accordingly, if the Court properly concludes that the Citizenship Clause does not extend to the children of illegal aliens or temporary visitors, then neither does the near-identical text of the INA.

## C. Plaintiff Is Not Likely to Succeed on Its Separation of Powers Claim.

Lastly, Plaintiff's separation of powers claim is not likely to succeed because the EO falls comfortably within the President's powers under the Take Care Clause and the Vesting Clause. Article II of the Constitution provides that "[t]he executive Power shall be vested in [the] President," and one of the President's duties is to "take Care that the Laws be faithfully executed . . . ." U.S. Const. Art. II, §§ 1, 3. Pursuant to that authority the President retains the authority (and duty) to ensure that federal law is properly followed, which necessarily includes correcting prior errors in the enforcement of federal law. *See Nixon v. Fitzgerald*, 457 U.S. 731, 750 (1982) ("This grant of authority establishes the President as the chief constitutional officer of the Executive Branch, entrusted with supervisory and policy responsibilities of utmost discretion and sensitivity. These include the enforcement of federal law . . . ."). That is merely what the EO has done here: The President has corrected prior misapplication of the Citizenship Clause and INA and ensured that their enforcement going forward aligns with their actual meaning.

Plaintiff's arguments assume that the President is altering the Constitution and/or statute and "assert[ing] a power the President simply does not have." Br. at 11. Those question-begging arguments miss the mark. The EO does not amend or enact law, but rather brings federal law enforcement within the President's understanding of the correct meaning of the Citizenship Clause. *See* EO § 1 ("But the Fourteenth Amendment has never been interpreted to extend citizenship

universally to everyone born within the United States."). Such action readily falls within the President's constitutional powers.

## IV.    Plaintiff Will Not Suffer Irreparable Harm During the Pendency of this Lawsuit.

As discussed above, Plaintiff lacks standing to challenge the Citizenship EO; by definition, it cannot show that the EO will cause it irreparable harm. In any event, Plaintiff fails to establish that its claimed pecuniary harms are irreparable and that any feared loss of federal funding would not be "recoverable," Br. at 12. For instance, Plaintiff does not explain how it would be unable to adjudicate claims in separate proceedings when it seeks reimbursement or whether there are any available administrative processes to recover federal monies after the conclusion of this litigation. *Cf. Kaiser v. Blue Cross of Cal.*, 347 F.3d 1107, 1115-16 (9th Cir. 2003) (finding that a party asserting a claim for Medicare reimbursement would not be irreparably harmed by exhausting claims through an administrative review process).

## V.    The Public Interest Does Not Favor an Injunction.

Plaintiff's asserted harms are outweighed by the harm to the government and public interest that would result from the requested relief. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (noting that the balancing of harms and public interest requirement for emergency injunctive relief merge when "the Government is the opposing party"). Specifically, Executive officials must have "broad discretion" to manage the immigration system. *Arizona v. United States*, 567 U.S. 387, 395-96 (2012). It is the United States that has "broad, undoubted power over the subject of immigration and the status of aliens," *id*. at 394, and providing Plaintiff with its requested relief would mark a severe intrusion into this core executive authority, *see INS v. Legalization Assistance Project of L.A. Cnty. Fed'n of Lab.*, 510 U.S. 1301, 1305-06 (1993) (O'Connor, J., in chambers) (warning against "intrusion by a federal court into the workings of a coordinate branch of the Government"); *see also Doe #1 v. Trump*, 957 F.3d 1050, 1084 (9th Cir. 2020) (Bress, J., dissenting) (an injunction that limits presidential authority is "itself an irreparable injury" (citing *Maryland v. King*, 567 U.S. 1301 (2012)).

## VI.    Any Relief Should Be Limited.

For the reasons above, the Court should deny Plaintiff's motion in its entirety. But even if

the Court determines that a preliminary injunction is appropriate, it should limit its scope in at least three ways. *First*, nationwide relief would be improper because "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted). Relying on that principle, the Ninth Circuit has repeatedly vacated or stayed nationwide injunctions. *See, e.g.*, *E. Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026, 1029 (9th Cir. 2019); *California v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018). To prevent ordering "the government to act or refrain from acting toward nonparties in the case," *Arizona v. Biden*, 40 F.4th 375, 396 (6th Cir. 2022) (Sutton, C.J., concurring), the Court should limit any relief to any party before it—Santa Clara County—that is able to establish its entitlement to preliminary injunctive relief.

*Second*, "courts do not have jurisdiction to enjoin [the President] . . . and have never submitted the President to declaratory relief." *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) (citations omitted); *see Franklin v. Massachusetts*, 505 U.S. 788, 802–03 (1992) ("[I]n general 'this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties.'" (citation omitted)); *id.* at 827 (Scalia, J., concurring in part) ("[W]e cannot issue a declaratory judgment against the President."); *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1866). Accordingly, the Court lacks jurisdiction to enter Plaintiff's requested relief against the President and should dismiss him as a defendant in this action.

*Third*, the Court should reject Plaintiff's facial challenges to the Citizenship EO so that its lawfulness can be determined in individual as-applied challenges, consistent with the process established by the INA. To mount a successful facial challenge, a plaintiff must show that "no set of circumstances exists" under which the challenged provision "would be valid," *Rahimi*, 602 U.S. at 693 (citation omitted), and as explained, Plaintiff has failed to do so here. *See supra* Sec. III.[4]

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiff's motion for a preliminary injunction.

---

[4] Because Plaintiff's claims are purely legal and fully addressed in the parties' briefing on the instant motions, Defendants request that the Court consolidate the February 27 preliminary injunction hearing with a trial on the merits, pursuant to Federal Rule of Civil Procedure 65(a)(2).

Dated: February 14, 2025

Respectfully submitted,

BRETT A. SHUMATE
Acting Assistant Attorney General
Civil Division

ALEXANDER K. HAAS
Branch Director

BRAD P. ROSENBERG
Special Counsel

*/s/ Yuri S. Fuchs*
R. CHARLIE MERRITT
YURI S. FUCHS (CA Bar No. 300379)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
(202) 598-3869
yuri.s.fuchs@usdoj.gov

*Counsel for Defendants*