OFFICE OF THE COUNTY COUNSEL
COUNTY OF SANTA CLARA
TONY LOPRESTI, State Bar #289269
KAVITA NARAYAN, State Bar #264191
MEREDITH A. JOHNSON, State Bar #291018
RAPHAEL N. RAJENDRA, State Bar #255096
LAURA S. TRICE, State Bar #284837
HANNAH M. GODBEY, State Bar #334475
TAYRYN A. EDWARDS, State Bar #344959
70 West Hedding Street, East Wing, Ninth Floor
San José, California  95110-1770
Telephone: (408) 299-5900
Facsimile:  (408) 292-7240
E-Mail:     Tony.LoPresti@cco.sccgov.org
            Kavita.Narayan@cco.sccgov.org
            Meredith.Johnson@cco.sccgov.org
            Raphael.Rajendra@cco.sccgov.org
            Laura.Trice@cco.sccgov.org
            Hannah.Godbey@cco.sccgov.org
            Tayryn.Edwards@cco.sccgov.org

Attorneys for Plaintiff
COUNTY OF SANTA CLARA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
San Jose Division

**County of Santa Clara**,

            Plaintiff,

      v.

**Donald J. Trump**, et al.,

            Defendants.

No. 5:25-cv-00981-EKL

**COUNTY OF SANTA CLARA'S REPLY IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION**

Hearing Date:  Feb. 27, 2025
Time:           1:30 pm
Judge:          Hon. Eumi K. Lee
Place:          San José Courthouse
                Courtroom 7

Trial Date:     Not set

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ...................................................................................................................... 1

    I.    **Santa Clara Satisfies the Requirements for a Preliminary Injunction** ............ 1

        A.    Santa Clara is Likely to Succeed on the Merits ........................................... 1

                1.    Santa Clara Asserts Long-Recognized Equitable Rights of Action ................................................................................................... 1

                2.    Santa Clara Has Standing to Bring This Action ............................. 2

                3.    The Order Violates the Citizenship Clause of the Fourteenth Amendment ..................................................................................... 4

                4.    The Order Violates the INA and the Separation of Powers Doctrine ....................................................................................... 11

        B.    Santa Clara Will Suffer Irreparable Harm Absent an Injunction .............. 12

        C.    The Equities and Public Interest Strongly Favor an Injunction ................ 13

    II.    **Santa Clara's Proposed Remedy is Supported by Settled Law** ...................... 13

CONCLUSION ................................................................................................................ 15

# TABLE OF AUTHORITIES

Page

## CASES

*Afroyim v. Rusk*,
    387 U.S. 253 (1967) ........................................................................................ 1, 5, 13

*Ah How v. United States*,
    193 U.S. 65 (1904) ................................................................................................ 7

*Armstrong v. Exceptional Child Ctr., Inc.*,
    575 U.S. 320 (2015) ......................................................................................... 2, 15

*Biden v. Nebraska*,
    143 S. Ct. 2355 (2023) ......................................................................................... 4

*California v. Azar*,
    911 F.3d 558 (9th Cir. 2018) ......................................................................... 13, 14

*CASA, Inc. v. Trump*,
    2025 WL 408636 (D. Md. Feb. 2, 2025) .................................................... 1, 8, 10

*Chamber of Commerce v. Reich*,
    74 F.3d 1322 (D.C. Cir. 1996) ............................................................................ 15

*Chirac v. Lessee of Chirac*,
    15 U.S. (2 Wheat.) 259 (1817) ........................................................................... 12

*Corfield v. Coryell*,
    6 F. Cas. 546 (C.C.E.D. Pa. 1823) ...................................................................... 8

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
    473 U.S. 788  (1985) ........................................................................................... 15

*Department of Commerce v. New York*,
    588 U.S. 752 (2019) .............................................................................................. 3

*DeVillier v. Texas*,
    601 U.S. 285, 291-92 (2024) ............................................................................... 2

*Doe v. Trump*,
    2025 WL 485070 (D. Mass. Feb. 13, 2025) .......................................... 1, 8, 13, 14

*Dred Scott v. Sanford*,
    60 U.S. 393 (1857) ............................................................................................... 4

*E. Bay Sanctuary Covenant v. Barr*,
    934 F.3d 1026 (9th Cir. 2019) ............................................................................ 14

*E. Bay Sanctuary Covenant v. Biden*
    102 F.4th 996 (9th Cir. 2024) .............................................................................. 4

*Ex parte Chin King*,
    35 F. 354 (C.C.D. Or. 1888); ............................................................................... 7

*FEC v. Cruz,*
    596 U.S. 289 (2022) ........................................................................................3, 4

*Fed. Express Corp. v. United States Dep't of Com.,*
    39 F.4th 756 (D.C. Cir. 2022) ...................................................................2

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992) ...................................................................................15

*Free Enter. Fund v. PCAOB,*
    561 U.S. 477 (2010) .....................................................................................1

*Gee v. United States,*
    49 F. 146 (9th Cir. 1892) .............................................................................7

*Hamdi v. Rumsfeld,*
    542 U.S. 507 (2004) ......................................................................................8

*In re Look Tin Sing,*
    21 F. 905 (C.C.D. Cal. 1884) .......................................................................7

*In re Wy Shing,*
    36 F. 553 (C.C.N.D. Cal. 1888) ...................................................................7

*In re Yung Sing Hee,*
    36 F. 437 (C.C.D. Or. 1888) .........................................................................7

*Inglis v. Trustees of Sailor's Snug Harbor,*
    28 U.S. (3 Pet.) 99 (1830) ........................................................................5, 9

*INS v. Errico,*
    385 U.S. 214 (1966) ......................................................................................8

*INS v. Rios-Pineda,*
    471 U.S. 444 (1985) ......................................................................................8

*Ludlam v. Ludlam,*
    26 N.Y. 356 (1863) .......................................................................................5

*Lynch v. Clarke,*
    1 Sand. Ch. 583 (N.Y. Ch. 1844) .............................................................5, 6

*Madsen v. Women's Health Ctr., Inc.,*
    512 U.S. 753 (1994) ...................................................................................14

*McCreery's Lessee v. Somerville,*
    22 U.S. 354 (1824) .......................................................................................5

*Moody v. NetChoice, LLC,*
    603 U.S. 707 (2024) ...................................................................................15

*Morrison v. California,*
    291 U.S. 82 (1934) ........................................................................................7

*N.H. Indonesian Cmty. Support v. Trump,*
    2025 WL 457609 (D.N.H. Feb. 11, 2025) ................................................1, 8

*Nishikawa v. Dulles*,
    356 U.S. 129, 131 (1958) ........................................................................................8

*Perkins v. Elg*,
    307 U.S. 325 (1943) ..............................................................................................8

*Plessy v. Ferguson*,
    163 U.S. 537 ..........................................................................................................6

*Rogers v. Bellei*,
    401 U.S. 815 (1971) ..............................................................................................8

*Schooner Exchange v. McFaddon*,
    11 U.S. (7 Cranch) 116 (1812) ........................................................................9, 10

*The Divina Pastora*,
    17 U.S. (4 Wheat.) 52 (1819) ..............................................................................10

*Tobin v. Walkinshaw*,
    23 F. Cas. 1346 (C.C.N.D. Cal. 1856) ...................................................................9

*Trump v. Int'l Refugee Assistance Project*,
    582 U.S. 571 (2017) ............................................................................................14

*United States ex rel. Hintopoulous v. Shaughnessy*,
    353 U.S. 72 (1957) ................................................................................................8

*United States v. Bevans*,
    16 U.S. 336 (1818) ..............................................................................................10

*United States v. Texas*,
    599 U.S. 670, (2023) ..........................................................................................2, 3

*United States v. Wong Kim Ark*,
    169 U.S. 649 (1898) .............................................................7, 8, 9, 10, 11, 12, 13

*Vance v. Terrazas*,
    444 U.S. 252 (1980) ..............................................................................................8

*Washington v. FDA*,
    108 F.4th 1163 (9th Cir. 2024) ..............................................................................4

*Washington v. Trump*,
    2025 WL 415165 (W.D. Wash. Feb. 3, 2025) ...........................................1, 4, 8, 14

*Weedin v. Chin Bow*,
    274 U.S. 657 (1927) ..............................................................................................7

*West Virginia v. EPA*,
    597 U.S. 697 (2022) ............................................................................................12

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ............................................................................................15

**OTHER AUTHORITIES**

19 Op. O.L.C. 340, 1995 WL 1767990, *6 (1995)..................................................................12

Chinese Exclusion Act, Pub. L. 47-126, 22 Stat. 58 (May 6, 1882)....................................7

Citizenship Reform Act of 1995 ...........................................................................................12

Civil Rights Act of 1866 .........................................................................................................6

Cong. Globe, 39th Cong., 1st Sess., 1769 (1866).................................................................10

Cong. Globe, 39th Cong., 1st Sess., 1832 (1866)...................................................................6

Cong. Globe, 39th Cong., 1st Sess., 510, 570, 1832 (1866)...................................................9

Cong. Globe, 39th Cong., 1st Sess., 524 (2866)...................................................................15

Cong. Globe, 39th Cong., 1st Sess., 529 (1866).....................................................................6

Cong. Globe, 39th Cong., 1st Sess., 572 ..............................................................................10

H.R. 1363, 104th Cong. (1995)..............................................................................................12

H.R. 46, 110th Cong. (2007)..................................................................................................12

H.R. 6127 at 37-38 (1940).....................................................................................................12

H.R. 6789, 110th Cong. (2008)..............................................................................................12

Hrgs. Before Comm. on H.R. 6127, 76th Cong. (1940).........................................................7

Nationality Act of 1940 ...........................................................................................................7

Vattel, B. 1, ch. 19, § 127 ......................................................................................................10

**INTRODUCTION**

The Executive Order asserts precisely what the Fourteenth Amendment forbids.  The animating purpose of the Fourteenth Amendment was to place the right to full membership in American society for all persons born in the United States and subject to its dominion "beyond the power of any governmental unit to destroy." *Afroyim v. Rusk*, 387 U.S. 253, 263 (1967).  To justify conditioning that unconditional right on the immigration status of a child's parents, Defendants resurrect the odious reasoning of *Dred Scott*—reasoning that, like the strike of a match, ignited the Civil War and led to the Fourteenth Amendment.  Defendants' arguments defy the plain text of the Citizenship Clause, the ancient legal principles that gave rise to its meaning, and an otherwise unbroken chain of binding and well-reasoned precedent.  The County of Santa Clara ("Santa Clara"), which has suffered and will suffer further irreparable injuries because of the Order, asks this Court to defend the Constitution's promise from Defendants' unconstitutional, *ultra vires* attack.

**ARGUMENT**

**I.    Santa Clara Satisfies the Requirements for a Preliminary Injunction**

**A.    Santa Clara is Likely to Succeed on the Merits**

Defendants contest Santa Clara's right of action, standing, and constitutional analysis.  Each attack relies on inapposite authorities that do not stand for the propositions for which Defendants miscast them.  Indeed, even before Defendants offered these arguments here, they were roundly rejected by all four courts to have considered them.  *Doe v. Trump*, 2025 WL 485070 (D. Mass. Feb. 13, 2025) ("*Doe* PI Order"), *appeal filed*, No. 25-1170 (1st Cir. Feb. 19, 2025); *N.H. Indonesian Cmty. Support v. Trump*, 2025 WL 457609 (D.N.H. Feb. 11, 2025) ("*NHICS* PI Order"); *Wash. v. Trump*, 2025 WL 415165 (W.D. Wash. Feb. 3, 2025) ("*Washington* PI Order"), *appeal & emergency mot. to stay filed*, No. 25-807 (9th Cir. Feb. 12, 2025); *CASA, Inc. v. Trump*, 2025 WL 408636 (D. Md. Feb. 2, 2025) ("*CASA* PI Order"), *appeal filed*, No. 25-1153 (4th Cir. Feb. 14, 2025).

**1.    Santa Clara Asserts Long-Recognized Equitable Rights of Action**

Santa Clara's constitutional claims are grounded in the long-recognized "private right of action directly under the Constitution" to seek to enjoin unconstitutional government actions.  *See Free Enter. Fund v. PCAOB*, 561 U.S. 477, 491 n.2 (2010).  This cause of action "is the creation of

1   courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back

2   to England." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015).  The same holds

3   true for Santa Clara's *ultra vires* claim grounded in the Immigration and Nationality Act ("INA").

4   *See Fed. Express Corp. v. United States Dep't of Com.*, 39 F.4th 756, 763 (D.C. Cir. 2022) (tracing

5   origin and continued vitality of equitable actions to enjoin governmental acts that exceed statutory

6   authority); *Sierra Club v. Trump*, 963 F.3d 874, 890-93 (9th Cir. 2020), *vacated and remanded on*

7   *other grounds sub nom Biden v. Sierra Club*, 142 S. Ct. 46 (2021).  Defendants' reliance on

8   *DeVillier v. Texas*, 601 U.S. 285, 291-92 (2024), is inapt; that case stands for the unremarkable

9   proposition that most provisions of the Constitution do not empower a plaintiff to seek money

10   damages, but that is not what Santa Clara seeks in this case.  In fact, *DeVillier* recognizes and leaves

11   undisturbed the longstanding availability of precisely the equitable relief Santa Clara pursues here:

12   injunctive relief against federal officials.  *See id.* [1]

13                    **2.        Santa Clara Has Standing to Bring This Action**

14          Defendants seem to concede that the uncontested record substantiates Santa Clara's

15   cognizable injuries—as they must, because that record illustrates the significant financial,

16   proprietary, administrative, and operational burdens Santa Clara is suffering and will suffer because

17   of the Order.  These injuries hurt Santa Clara in its capacities as a social safety net provider,

18   healthcare provider, employer, and public institution.  Pl.'s Mot. for Prelim. Inj. ("Mot.") [ECF 17]

19   at 12-17; Betkolia Decl. ¶¶ 8-19; Hansen Decl. ¶¶ 15-20, 24, 26, 28-33; Lorenz Decl. ¶¶ 12-34.

20          Defendants' primary standing argument rests on a footnote from *United States v. Texas*,

21   599 U.S. 670, 680 n.3 (2023).  There, Texas and Louisiana challenged the immigration enforcement

22   priorities of President Biden, claiming they would increase—or at least, fail to decrease—the

23   number of immigrants for whom the states would need to expend money on social services.  The

24   Court concluded that the states lacked standing to bring their "extraordinarily unusual" suit, largely

25   for reasons sounding in justiciability concerns.  *Id.* at 676, 678-81 (courts lack "meaningful

26

27   _____

28   [1] Defendants' position is especially vexing because, as *Doe* observed, the Department of Justice
    recently filed equitable claims under the Constitution for injunctive relief against the State of Illinois
    and others, which is "precisely what it says the plaintiff cannot do."  *Doe* PI Order at *6, n.10.

standards" to second-guess the "complicated balancing process" embedded in the exercise of prosecutorial discretion).  In a footnote, the Court observed that incidental harms stemming from a federal policy that does not directly regulate a state "can become more attenuated" and might, in some cases, be insufficient to confer standing.  *Id.* at 680 n.3.  In Defendants' telling, that footnote "forecloses" Santa Clara from establishing standing.  Defs.' Opp. to Mot. for Prelim. Inj. [ECF 29] ("Opp.") at 4.  Not so.  Unlike that case's "novel" theory of standing based on remote harms that might result from the exercise of prosecutorial discretion, 599 U.S. at 681, Santa Clara asserts archetypal pocketbook and institutional injuries easily traceable to the Order along paths that federal courts frequently travel—including in the cases cited by Plaintiff that Defendants do not address.

Each of Santa Clara's injuries is concrete, traceable to the Order, and redressable by the Court.  *First*, the Order will cause Santa Clara to lose federal funding by directly reducing the share of residents and patients eligible for such funds and by rendering some of Santa Clara's core work ineligible for federal reimbursement.  Mot. at 12-14.  *Second*, the Order will drive up the cost of providing safety net services and increase demand for public benefits programs funded by Santa Clara.  *Id.* at 14-15.  *Third*, Santa Clara will incur significant costs analyzing, planning for, and advising residents about the Order and its effects.  *Id.* at 15-16.  And *fourth*, Santa Clara, acting as an employer, will suffer loss of productivity and incur monetary costs to recruit, replace, and train new employees, following the predictable departures of staff with families covered by the Order.  *Id.* at 17.  These injuries are either directly caused by the Order or easily traceable to it because they arise directly from the "predictable ways" residents will react to the Order.  *See Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019).

Nor is there any merit to Defendants' conclusory assertion that Santa Clara's injuries are not cognizable because they are "self-inflicted."  Opp. at 5-6.  As an initial matter, the Supreme Court has cast serious doubt on the proposition that standing is lacking if an injury is "self-inflicted."  *FEC v. Cruz*, 596 U.S. 289, 297 (2022) ("an injury resulting from the application or threatened application of an unlawful enactment remains fairly traceable to such application, even if the injury could be described in some sense as willingly incurred").  But even if that theory remains viable, it is irrelevant here because Santa Clara has not gone out of its way to become injured by the Order.  To

1   the contrary, every one of Santa Clara's injuries arises out of programs and operations that predate

2   the Order and turns on the fact that the Order disrupts the bedrock assumption of birthright

3   citizenship that underpins Santa Clara's funding, budgeting, and operations.  In fact, in many cases

4   Santa Clara is legally obligated to provide the programs and services through which its financial

5   harms will accrue.  Mot. at 11; Cal. Welf. & Inst. Code § 10800; 22 Cal. Code of Regs.

6   § 50101(a)(1), (5), (7).  These legal responsibilities belie Defendants' conclusory assertion that Santa

7   Clara's injuries are self-inflicted.  And Santa Clara's injuries would not be "self-inflicted" *even if*

8   Santa Clara could revise these laws to excuse any non-performance—which it cannot.  *Cruz*, 596

9   U.S. at 297; *Biden v. Nebraska*, 143 S. Ct. 2355, 2365-66 (2023); *Texas v. United States*, 809 F.3d

10  134, 152-53, 156-60 (5th Cir. 2015).

11      Notably, Defendants do not address the caselaw substantiating Santa Clara's standing based

12  on injuries to "its *own* interests, including those, like community health and wellness, that are

13  grounded in the entity's unique status as an institution of government."  Mot. at 17-19.  Defendants'

14  only response is to contend that Santa Clara asserts "a kind of *parens patriae* action."  Opp. at 6.

15  But this is a straw man.  Santa Clara asserts its *own* interests, not those of its residents, and freely

16  acknowledges that it has no *parens patriae* claim against the federal government.  Mot. at 17-18.[2]

17      **3.    The Order Violates the Citizenship Clause of the Fourteenth Amendment**

18      Defendants' interpretation of the phrase "subject to the jurisdiction thereof" is flawed for

19  three reasons: (1) it is at odds with the common law backdrop against which the Fourteenth

20  Amendment was drafted and ratified; (2) it resurrects the rationale of *Dred Scott v. Sanford*, 60 U.S.

21  393 (1857), even though a central purpose of the Fourteenth Amendment was to overrule that

22  decision; and (3) it uses an interpretive framework that retroactively and anachronistically engrafts

23  the INA's statutory categories of "lawful permanent resident," "lawful but temporary" status, and

24  "unlawful presence" onto a provision of the Constitution that predates the INA by almost a century.

25

26  _____

27  [2] Defendants' remaining citations are to cases far afield from this one.  *Washington v. FDA*,
    108 F.4th 1163, 1174-76 (9th Cir. 2024) (Idaho lacked standing where the link between an FDA
28  decision and its fiscal harm was "highly attenuated," "indirect," and speculative); *E. Bay Sanctuary
    Covenant v. Biden*, 102 F.4th 996, 1002 (9th Cir. 2024) (not a standing case; for purposes of
    intervention, states lacked protectable interest "in reducing immigration into the United States").

**i.**  The fundamental presupposition of the Order itself, and thus Defendants' position, is that a child's claim to birthright citizenship under the Fourteenth Amendment rises and falls based on parentage: United States citizenship is, in Defendants' telling, unavailable unless a child's parents fall into certain satisfactory immigration statuses under the INA.  That suggestion fails at the threshold because it would grant modern-day Congresses the power to expand or contract the scope of a constitutional provision ratified in 1868 by amending a statute that did not exist until 1952. Such an outcome is plainly untenable.  *See Afroyim v. Rusk*, 387 U.S. 253, 262-63 (1967) (the Fourteenth Amendment's Framers sought "to provide an insuperable obstacle against every governmental effort" to undermine birthright citizenship).

Even setting that concern aside, Defendants' starting premise is foreclosed by the unambiguous and widely applied common law of citizenship that the Fourteenth Amendment's Framers knew, understood, and embraced.  With the singular and stark exception of *Dred Scott*, American courts consistently recognized, both before the Civil War and during the tenure of the 39th Congress that drafted the Amendment, that constitutional birthright citizenship does not depend on the identity or status of one's parents.  Indeed, it was established beyond doubt that "children born here, are citizens, *without any regard to the political condition or allegiance of their parents*." *Lynch v. Clarke*, 1 Sand. Ch. 583, 583-84 (N.Y. Ch. 1844) (emphasis added); *accord Inglis v. Trustees of Sailor's Snug Harbor*, 28 U.S. (3 Pet.) 99, 164 (1830) (Story, J., dissenting) ("Nothing is better settled at the common law than the doctrine that the children *even of aliens* born in a country, while the parents are resident there under the protection of the government, and owing a temporary allegiance thereto, are subjects by birth"); *see also McCreery's Lessee v. Somerville*, 22 U.S. 354, 356-58 (1824); *Ludlam v. Ludlam*, 26 N.Y. 356, 371 (1863).  There was no need for the child's parents to have established a permanent domicile—birthright citizenship applied even to those children whose parents were passing through for "temporary purposes, as for health, or curiosity, or occasional business." *Lynch*, 1 Sand. Ch. at 674; *Munro v. Merch.*, 28 N.Y. 9, 40 (1863).

Curiously, Defendants do not address or even cite *Dred Scott*, even though the Framers of the Fourteenth Amendment were explicit that a core purpose of the Citizenship Clause was to overrule that decision—not only by reversing its specific instruction that persons of African descent be

1    excluded from birthright citizenship based on their ancestry, but also by rejecting *Dred Scott*'s

2    broader rationale that *any* child's claim to birthright citizenship could be conditioned whether their

3    parents held a status and identity acceptable to the political preferences of the day.  Indeed, during

4    debates in the Senate, the clause of the Civil Rights Act of 1866 that served as the template for the

5    Citizenship Clause, and which is coequal in scope and meaning, was described as "unnecessary, but

6    nevertheless proper, since it is only declaratory of what is the law without it"— "that all 'children

7    born here are citizens without any regard to the political condition or allegiance of their parents.'"

8    Cong. Globe, 39th Cong., 1st Sess., 1832 (1866) (quoting and citing *Lynch*, 1 Sand. Ch. at 584); *see*

9    *also id.* at 1115, 1117, 1262, 2765, 2890.  The catalyst for giving birthright citizenship statutory and

10   constitutional protection was that Confederates had "promulgated the dogma that this is a country of

11   the white man, and that no other man has rights here which the white man is bound to respect."  *Id.*

12   at 1262.  Proponents and opponents alike understood the Fourteenth Amendment to repudiate such

13   dogma.  *Id.* at 527-30, 1262; *Plessy v. Ferguson*, 163 U.S. 537, 560 (Harlan, J., dissenting).[3]

14            It bears emphasis that to the Framers of the Fourteenth Amendment, *Dred Scott* stuck out

15   because it posited for African Americans precisely what Defendants now contend applies to

16   residents of the United States who are not citizens or lack a Green Card: that the supposed

17   incompleteness of their allegiance to the United States passes by blood to their American-born

18   children, perpetuating forevermore their descendants' exclusion from birthright citizenship.  *See*

19   Cong. Globe, 39th Cong., 1st Sess., 529 (1866) (criticizing *Dred Scott* for departing from settled law

20   and for taking the premise that enslaved people were disqualified from citizenship at the Founding to

21   mean that "all their descendants partook of that condition" in perpetuity, "that is to say, they

22   inherited the disqualification from the ancestor").  The Framers saw this approach to be an "error"

23   and lead to the birth of stateless children, which the Framers thought would work an injustice on

24   both the sovereign and the infant.  *Id.* at 1117, 1262.

25

26   _____

27   [3] Defendants claim that Santa Clara's arguments pit the Citizenship Clause against the Civil Rights
     Act.  Opp. at 10.  To the contrary, the phrases "not subject to any foreign power" and "subject to the

28   jurisdiction" of the United States are mirrored encapsulations of the same common law concept that
     all people born under the dominion and sovereignty of the United States owe it an abiding natural
     allegiance.  *See* Part I.A.3.iii below.

1    The text of the Citizenship Clause reflects the Framers' intent to restore the common law rule

2    under which parentage is irrelevant to the question of birthright citizenship.  It speaks only of the

3    "persons born . . . in the United States" to whom it applies and makes no mention of the *parents* of

4    such persons.  Yet on Defendants' telling, the phrase that speaks to the "jurisdiction"—that is, the

5    power—of the United States must be read to have silently embedded a "biological parents of

6    acceptable immigration status" requirement as an additional condition on birthright citizenship.  It

7    would be very strange indeed for a constitutional provision of this magnitude to hide such an

8    important condition in a clause that says nothing about parentage.  *Cf. id.* at 530 (similar).

9        **ii.**  Immediately after ratification, courts recognized that, by repudiating *Dred Scott*, the

10   Citizenship Clause restored the Constitution's agnosticism to the identity or status of the parents of a

11   person born within the country.  Many of the foundational cases on this point arose in the era of the

12   Chinese Exclusion Act.  That Act barred almost all Chinese nationals from immigrating to the

13   United States or obtaining citizenship.  Pub. L. 47-126, §§ 12, 14, 22 Stat. 58, 61 (May 6, 1882).

14   Yet even as the courts recognized the effect of this law on Chinese nationals, they nonetheless held,

15   in a string of unbroken decisions culminating in *Wong Kim Ark*, that the Fourteenth Amendment

16   guaranteed citizenship to the American-born children of Chinese nationals.  *United States v. Wong*

17   *Kim Ark*, 169 U.S. 649, 652-53 (1898); *see also Gee v. United States*, 49 F. 146 (9th Cir. 1892); *In re*

18   *Wy Shing*, 36 F. 553 (C.C.N.D. Cal. 1888); *In re Yung Sing Hee*, 36 F. 437, 438 (C.C.D. Or. 1888);

19   *Ex parte Chin King*, 35 F. 354 (C.C.D. Or. 1888); *In re Look Tin Sing*, 21 F. 905, 909-10 (C.C.D.

20   Cal. 1884) ("[W]hen at an election an inquiry is made whether the person offering to vote is a citizen

21   or an alien, if he answers that he is a native of this country *the answer is received as conclusive that*

22   *he is a citizen*; . . . no one asks whether his parents were citizens or foreigners.  *It is enough that he*

23   *was born here, whatever was the status of his parents.*") (emphasis added).

24       This constitutional rule has remained settled ever since, and was embraced in case law

25   leading up to the passage of the Nationality Act of 1940 and by the Congress that enacted it.  *See*

26   Hrgs. Before Comm. on H.R. 6127, 76th Cong. 37, 38-39 (1940), https://hdl.handle.net/2027/

27   mdp.39015019148942; *see also, e.g.*, *Ah How v. United States*, 193 U.S. 65, 65 (1904); *Weedin v.*

28   *Chin Bow*, 274 U.S. 657, 670 (1927); *Morrison v. California*, 291 U.S. 82, 85 (1934).  And it has

1   been embraced in precedent thereafter.  With the singular exception of *Dred Scott*, constitutional

2   practice demonstrates a deeply rooted and entirely settled understanding extending from the

3   Founding to today that birthright citizenship is available to all people born in the United States and

4   subject to its jurisdiction, *without reference to the immigration status of their parents*.  *E.g.*, *Perkins*

5   *v. Elg*, 307 U.S. 325, 328-29 (1943); *Nishikawa v. Dulles*, 356 U.S. 129, (1958); *United States ex rel.*

6   *Hintopoulous v. Shaughnessy*, 353 U.S. 72, 73-74, 77 (1957); *INS v. Errico*, 385 U.S. 214, 215-16

7   (1966); *Rogers v. Bellei*, 401 U.S. 815, 828 (1971); *Vance v. Terrazas*, 444 U.S. 252, 255 (1980);

8   *INS v. Rios-Pineda*, 471 U.S. 444, 446 (1985); *Hamdi v. Rumsfeld*, 542 U.S. 507, 509-10 (2004).

9   Every court to consider Defendants' position has hewed to the settled constitutional meaning.  *CASA*

10  PI Order at *6-14; *Washington* PI Order at *3-5; *NHICS* PI Order at *3-5; *Doe* PI Order at *7-13.

11          **iii.**  Defendants do not confront or account for this history, text, and precedent.  Instead, they

12  offer arguments that distort the settled relationship between the constitutional term "jurisdiction" and

13  the background common-law principles of "allegiance" on which it relies.  It is common ground

14  between the parties that there are four discrete categories of people who, although born within the

15  physical territory of the United States, are recognized as falling outside the Citizenship Clause's

16  promise of birthright citizenship: (1) children of diplomats, (2) children of enemy soldiers engaging

17  in a hostile occupation, (3) children born on "public ships" operating under the control of a foreign

18  sovereign, and (4) certain children born with membership in a Native American tribe.  *See* Mot. at 7-

19  8; Opp. at 8.  But what Defendants see as an open-ended invitation to the Executive Branch to create

20  "an additional category" of exclusion, Opp. at 8, is in fact a closed universe premised on legal

21  frameworks as ancient as the *jus soli* principle itself, *Wong Kim Ark*, 169 U.S. at 693.

22          **a.**  Birthright citizenship is an application of the common-law concepts of sovereignty and

23  allegiance as they were understood when the Fourteenth Amendment was drafted and ratified.  In

24  that era, sovereignty was defined as the exercise of political power and dominion over a people or

25  place; it gave nations the right to make laws.  *E.g.*, *Corfield v. Coryell*, 6 F. Cas. 546, 551 (C.C.E.D.

26  Pa. 1823).  Citizenship, in turn, was premised on the idea of a reciprocal duty that tied a sovereign to

27  the people who gave it power: a person born in the domain of a sovereign owed a "natural"

28  allegiance to the sovereign and was owed "protection" in return.  *E.g.*, Cong. Globe, 39th Cong., 1st

1    Sess., 510, 570, 1832 (1866).  An intrinsic allegiance arises in a person purely by virtue of their birth

2    in a place that was under the political control—that is, the "jurisdiction"—of a sovereign.  *Schooner*

3    *Exch. v. McFadden*, 11 U.S. (7 Cranch) 116, 136-46 (1812); *Wong Kim Ark*, 169 U.S. at 659.

4         Defendants hold fast to the word "allegiance," but their grip mangles the common law

5    tradition that gave that term a plain and unambiguous public meaning.  Defendants assert that

6    parents in the United States without lawful status or with lawful but temporary status have only

7    *partial* allegiance to the United States, and, despite their residence here, continue to owe their

8    primary allegiance to the countries from which they came.  Opp. at 1, 12.  But this is entirely beside

9    the point.  Defendants' argument veers off the constitutional road because it wrongly imputes a

10   parent's allegiance to their *children* born in the United States.  Opp. at 12-13.  Such a reading is

11   contrary to the longstanding common law rule, absorbed and incorporated into the Fourteenth

12   Amendment and the constitutional rule that preceded it, that assigns a newborn's "natural

13   allegiance" to the sovereign having jurisdiction—or control—over the place they are born.  *Inglis*, 28

14   U.S. at 155-56.  As one court put it in the decade before the 39th Congress drafted the Amendment:

15
16   > *Birth binds man by the tie of natural allegiance to his native soil*, and such allegiance
     > gives, by the principles of universal law, to the country in which he was born rights
     > unknown to mere voluntary or statutory allegiance.

17   *Tobin v. Walkinshaw*, 23 F. Cas. 1346, 1348 (C.C.N.D. Cal. 1856) (emphasis added).

18        **b.**  The four so-called "exceptions" to birthright citizenship are not departures from this

19   rule.  They flow directly from the very same concepts of sovereignty and allegiance captured by the

20   phrase "subject to the jurisdiction thereof."  That is why "the exceptions or qualifications" to

21   birthright citizenship are considered "as old as the rule itself."  *Wong Kim Ark*, 169 U.S. at 693.

22        Beginning with the three exceptions that found sturdy footing in the law of nations as well as

23   English and American common law, it was agreed that the children of ambassadors and enemy

24   soldiers, as well as children born on "public ships" under the immediate control of a foreign

25   sovereign, were not entitled to birthright citizenship.  A longstanding legal principle held that when a

26   foreign sovereign (that is, a queen or head of state) traveled to another country, the very soil under

27   the sovereign's feet was regarded as the soil of her own nation.  The same rule applied whenever she

28   commanded a subject to do her bidding abroad.  When a child was born in the United States to her

subject, present here at her command, the common law and law of nations deemed that child to have been born on the soil of that foreign sovereign. The child numbered among the people from whom the foreign sovereign derived its power; accordingly, that foreign sovereign bore responsibility for the child's protection, and the child's allegiance flowed to that foreign sovereign. *E.g.*, *Schooner Exchange*, 11 U.S. at 138, 144, 146-47; *United States v. Bevans*, 16 U.S. 336, 348-49 (1818); *The Divina Pastora*, 17 U.S. (4 Wheat.) 52, 65 n.9 (1819); *Wong Kim Ark*, 169 U.S. at 655-58, 693; *see also* Vattel, B. 1, ch. 19, § 127 ("children born out of the country in the armies of the state, or in the house of its minister at a foreign court, are reputed born in the country; for a citizen, who is absent with his family on the service of the state, but still dependent on it, and subject to its jurisdiction, cannot be considered as having quitted its territory"), https://perma.cc/ZC3C-7G3Z.[4]

The Framers understood this rule to be captured by the Citizenship Clause's reference to jurisdiction. Cong. Globe, 39th Cong., 1st Sess., 1769 (1866) (Citizenship Clause excludes "the children of foreign ministers" born within the United States because, "[b]y a fiction of law, such persons" did not reside in the United States).

Defendants' assertion that a present-day Congress could abrogate diplomatic immunity is of no moment. Opp. at 9. Immunity was not an essential component of the Framers' conception of citizenship. Indeed, the Framers presumed that all people, even diplomats, owed a partial form of "allegiance" to the country they visited, in that they promised to abide by its laws. Cong. Globe, 39th Cong., 1st Sess., 572. That is why the Senator who drafted the Civil Rights Act rejected the language "all persons born in the United States *and owing allegiance thereto* are hereby declared to be citizens." *Id.* (emphasis added). Instead, to embed the deeper concept of "natural allegiance," the Civil Rights Act refers instead to the country to whom a newborn is "subject," which is the same word theFramers employed in the phrase "subject to the jurisdiction" of the United States, which

---

[4] Defendants mischaracterize Santa Clara as "equat[ing] 'jurisdiction' with something akin to" simple "regulatory power," and proffers a parade of horribles that would result from such a position, including granting birthright citizenship to "children born of alien enemies in hostile occupation." Opp. at 8, 17. Defendants flatten and obscure the relevant law's nuance. Rather, the phrase "subject to the jurisdiction" of the United States means born under the dominion and control of the United States, which is substantively different from being within the regulatory reach of the United States. Contrary to Defendants' suggestion, Santa Clara agrees that children of enemy combatants engaged in a hostile occupation are excepted from birthright citizenship. *See also* CASA PI Order at *13 n.5.

they understood to "exclude, by the fewest and fittest words," the appropriate class of individuals. *Wong Kim Ark*, 169 U.S. at 682, 686.

The fourth and final exception covers children born to members of Native American tribes. The relationship between the United States and tribal nations was (and remains) complex and unique. As a result, children born to tribal members "st[ood] in a peculiar relationship to the national government, unknown to the common law." *Id.* at 682. Using the words of the Fourteenth Amendment's Framers, "[w]hen the United States took possession . . . of the territory that was originally peopled exclusively by the Indians, we found it necessary to recognize some kind of national existence on the part of the aboriginal settlers of the United States." Cong. Globe, 39th Cong., 1st Sess., 2893. They understood "the Indian tribes to be *quasi* foreign nations" that "exist[ed] within our midst" and "with whom we ma[de] treaties," *Id.* at 498, 571. "[W]e [did] not pretend to exercise any civil or criminal jurisdiction" over tribal lands, as we "recognized in an Indian tribe the same sovereignty over the soil which it occupied as we recognize[d] in a foreign nation." *Id.* at 2895. Thus, they concluded, children of Native American tribal members would owe their natural allegiance to the tribe, not the United States, in a manner analogous to foreign diplomats. *Id.* at 2890. Thus these children were not, "in the sense of" the Citizenship Clause, "born subject to the jurisdiction of the United States"—instead, they were born on soil under the dominion of a tribal nation. *Id.*; *see also id.* at 2894.

In sum, the phrase "subject to the jurisdiction" of the United States is far from surplusage. It "affirms the ancient and fundamental rule of citizenship by birth within the territory," and its only four exceptions—children born to diplomats, children born to enemy combatants engaged in a hostile occupation, children born on "public ships," and children born owing immediate allegiance to a tribal nation—arise by applying the very same rules. *Wong Kim Ark*, 669 U.S. at 693.

### 4.    The Order Violates the INA and the Separation of Powers Doctrine

Defendants agree that the meaning ascribed to the Citizenship Clause applies equally to section 301(a) of the INA. Opp. at 22-23. Just as even a cursory review of the historical record belies the Order's so-called "interpretation" of the Citizenship Clause, so too does the historical record evince Congress's intent to codify birthright citizenship for all U.S.-born children without

1    regard to parental status.  *See* Hrgs. on H.R. 6127 at 37-38 (1940) (recognizing that Constitution

2    grants birthright citizenship to "persons who are born in the United States of alien parents," even if

3    taken from the United States "in early infancy" and "brought up in the countries of their parents").

4    Defendants offer nothing to the contrary.[5]

5           As to the separation of powers, it is the Order that invades the province of a coequal branch

6    of government, not the relief sought from this Court.  The President lacks Congress's power over

7    naturalization.  U.S. Const. Art. I, § 8, cl. 4; *Chirac v. Lessee of Chirac*, 15 U.S. (2 Wheat.) 259, 269

8    (1817); *Wong Kim Ark*, 169 U.S. at 701.  Yet the Order claims to exercise that power, trying to

9    reinterpret the INA in a way that belies its plain text and history and would achieve ends that

10   Congress itself has repeatedly rejected.  *See, e.g.,* H.R. 6789, 110th Cong. (2008); H.R. 46, 110th

11   Cong. (2007); H.R. 1363, 104th Cong. (1995) ("Citizenship Reform Act of 1995"); *see Legislation*

12   *Denying Citizenship at Birth to Certain Children Born in the United States*, 19 Op. O.L.C. 340, 1995

13   WL 1767990, *6 (1995) (such legislation is plainly unconstitutional).

14          Defendants argue the Take Care Clause and Vesting Clause authorize the Order.  Opp. at 23.

15   But that position cannot be squared with Section 301(a)'s text or history.  The President cannot be

16   said to be faithfully executing a law by issuing a directive that overtly flouts it.  He is no more

17   authorized to do so under the guise of "correcting prior errors"—which in truth constitute over 125

18   years of consensus among all branches of government that accords with the Framers' manifest

19   intent.  Even absent birthright citizenship's historical grounding and express embrace in the

20   Citizenship Clause and INA, the scope of birthright citizenship would be beyond the Executive's

21   power to limit or alter.  *See West Virginia v. EPA*, 597 U.S. 697, 721 (2022).

22          **B.      Santa Clara Will Suffer Irreparable Harm Absent an Injunction**

23          Defendants largely rely on their standing arguments to contest Santa Clara's showing of

24   irreparable harm, Opp. at 24, but these arguments are meritless for the reasons discussed in

25   Part I.A.2.  Defendants proffer just one additional point: notwithstanding the general rule that

26

27   _____

28   [5] Defendants claim that Santa Clara ascribes a meaning to Section 301(a) of the INA that departs
     from the meaning of the Citizenship Clause.  Opp. at 22-23.  This is incorrect; Plaintiff's position is
     that the Citizenship Clause's meaning "imbues the INA."  Mot. at 9.

1   economic harm is irreparable in suits brought to enjoin an unlawful federal action, *e.g.*, *California v.*

2   *Azar*, 911 F.3d 558, 581 (9th Cir. 2018), Defendants contend that Santa Clara has not suffered

3   irreparable harm because it might be able to pursue "administrative processes to recover federal

4   monies after the conclusion of this litigation." Opp. at 24. This argument is unavailing. First,

5   within this action, Santa Clara's pocketbook injuries are irreparable because Santa Clara seeks only

6   equitable relief. *See supra* Part I.A.1. Second, Defendants have not identified a waiver of the

7   federal government's sovereign immunity, which bars Santa Clara from obtaining money damages.

8   Mot. at 14-15. Third, Defendants fail to identify any particular "administrative processes," much

9   less show that they are available to Santa Clara for each of its financial injuries. Fourth, even if such

10  processes existed and could make Santa Clara financially whole, no future claim for reimbursement

11  could compensate Santa Clara for the operational burdens that it is suffering and will continue to

12  suffer, or recompense for the injuries the Order imposes on public health, community wellbeing, and

13  the stability and strength of its local economy. *Doe* PI Order at 24-25.

14          **C.      The Equities and Public Interest Strongly Favor an Injunction**

15          Defendants do not address the wide variety of interests and equities that favor an injunction

16  in this case. Mot. at 19-23. Instead, Defendants argue only that the final two *Winter* factors disfavor

17  an injunction because it could interfere with the federal government's power over immigration.

18  Opp. at 24. That argument is wrong for three reasons. First, it is well settled that there is significant

19  public harm, and no valid interest, in permitting unlawful or unconstitutional executive actions.

20  Mot. at 20-21. Second, by definition, birthright citizenship under the Fourteenth Amendment sits

21  *apart from* the Executive Branch's interests in managing or enforcing immigration laws. *E.g.*, *Wong*

22  *Kim Ark*, 169 U.S. at 694, 702 (immigration laws cannot "constrain or permit the judiciary to refuse

23  to give full effect to the peremptory and explicit language of the fourteenth amendment"); *Afroyim*,

24  387 U.S. at 263 (same). And third, *even if* the Citizenship Clause could be construed to leave any

25  questions related to birthright citizenship open, such questions could only be answered by Congress

26  using its *legislative* power, not by the Executive Branch. Mot. at 10-11.

27  **II.    Santa Clara's Proposed Remedy is Supported by Settled Law**

28          Santa Clara seeks a nationwide preliminary injunction prohibiting implementation or

                                                13

1   enforcement of the Order with respect to any person born in the United States. The record and

2   circumstances of this case justify that scope and underscore the insufficiency of anything less.

3       To be sure, the general rule is that injunctive relief should extend only as far as necessary to

4   provide complete relief to the plaintiff. *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765

5   (1994). Case-specific circumstances must, however, drive that assessment. *Azar*, 911 F.3d at 584

6   (narrowing nationwide injunction because "[*t*]*he circumstances of this case* dictate a narrower

7   scope" and "[*o*]*n the present record*, an injunction that applies only to the plaintiff states would

8   provide complete relief to them" (emphases added)); *E. Bay Sanctuary Covenant v. Barr*, 934 F.3d

9   1026, 1028 (9th Cir. 2019) (same). The Supreme Court has made it clear that the appropriate scope

10  of relief "often depend[s] . . . on the equities of a given case" because "[t]he purpose of . . . interim

11  equitable relief is not to conclusively determine the rights of the parties but to balance the equities as

12  the litigation moves forward." *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 580 (2017).

13      There is a stark contrast between the record and circumstances here and those in the cases in

14  which nationwide injunctions were narrowed. Three features are especially relevant. First and

15  foremost, an injunction limited to Santa Clara County will not provide Santa Clara with complete

16  relief. People move from place to place, and they may well relocate into Santa Clara County after

17  giving birth elsewhere. Moreover, people sometimes need to seek healthcare—especially

18  unexpected, emergency healthcare like the kind provided by Santa Clara's health system—in places

19  where they do not live. Santa Clara must plan for and administer its programs *now* in a manner that

20  anticipates and accounts for these probabilities, including the possibility of needing to verify the

21  public benefits eligibility of young children born both within and outside of Santa Clara County. *See*

22  Betkolia Decl. ¶¶ 17-19. Similarly, an injunction limited to Santa Clara County (or even California)

23  would not alleviate Santa Clara's harms arising from providing healthcare to those who are no

24  longer Medicaid-eligible because of the Order—particularly given Santa Clara's legal obligation to

25  provide services to patients regardless of their birth location. *See* Lorenz Decl. ¶ 23; *see also*

26  *Washington* PI Order at *6-7; *Doe* PI Order at *14-16.

27      The nature of this case also justifies nationwide relief. An essential component of the law of

28  citizenship in the United States is its uniformity. This is no accident. The Fourteenth Amendment's

1   Framers were keenly aware of the problems that could arise from nonuniform rules of citizenship.

2   Cong. Globe, 39th Cong., 1st Sess., 524 (1866) (each state having its own naturalization process

3   "introduced confusion and disorder and inconvenience"; to prevent such disarray, the power to

4   establish "an uniform Rule of Naturalization" was vested in Congress).  This explains why the

5   Framers raised to constitutional status a single, unified, national definition of citizenship.  *Id.* at

6   2890.  Anything short of nationwide relief undermine the Constitution's insistence on uniformity.

7          Defendants' other arguments against nationwide relief also fail.  The INA does not bar this

8   challenge; its remedies are not exclusive and it does not mandate individualized, as-applied

9   challenges.  Defendants are also wrong that the President cannot be sued.  "[T]he President's actions

10  may . . . be reviewed for constitutionality," *Franklin v. Massachusetts,* 505 U.S. 788, 801 (1992),

11  and constitutional challenges to executive orders are common.  *See, e.g.*, *Youngstown Sheet & Tube*

12  *Co. v. Sawyer*, 343 U.S. 579, 582 (1952); *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473

13  U.S. 788, 795-96 (1985); *see also Chamber of Commerce v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir.

14  1996); *Armstrong*, 575 U.S. at 327.

15         Finally, Defendants are wrong that Santa Clara cannot mount a facial challenge to the Order.

16  Opp. at 25.  Santa Clara has demonstrated that there is no set of circumstances under which the

17  Order could be valid.  The Order does *precisely* what the Citizenship Clause prohibits: it conditions

18  birthright citizenship on the status of a child's parents.  This case therefore does not "rest on

19  speculation about the law's coverage and its future enforcement."  *Moody v. NetChoice, LLC*, 603

20  U.S. 707, 723 (2024) (citation omitted).  Nor does granting Santa Clara relief "threaten to short

21  circuit the democratic process by preventing duly enacted laws from being implemented in

22  constitutional ways."  *Id*. at 723 (same).  To the contrary, it is the Order that demeans constitutional

23  democracy by adopting a rule rejected by the Framers and each branch of government.  The Order

24  can never be constitutionally implemented.

25                                          **CONCLUSION**

26         This Court should preliminarily enjoin the Order and its implementation and enforcement.

27

28

Dated:  February 19, 2025

Respectfully submitted,

By:  /s/ Tony LoPresti
TONY LOPRESTI
COUNTY COUNSEL

KAVITA NARAYAN
MEREDITH A. JOHNSON
RAPHAEL N. RAJENDRA
LAURA S. TRICE
HANNAH M. GODBEY
TAYRYN A. EDWARDS

Attorneys for Plaintiff
COUNTY OF SANTA CLARA

3211090